FILED

**Kristen Lai**

Email: kristenjlai@gmail.com
44-70 21st St. #3181
Long Island City, NY 11101
(917)594-3230
Plaintiff in Pro Per

2026 JUL -2 PM 3: 37

CENTRAL DIST. OF
LOS ANGELES

BY: _____

UNITED STATES DISTRICT COURT FOR THE

CENTRAL DISTRICT OF CALIFORNIA

Fee Due

KRISTEN LAI, individual heir of Tai M. Lai and as power of attorney for Ming Mei Lai

Plaintiff,

vs.

Huntington Hospital
General Group Care Inc.
University of Southern California
Sunrise Hospital
Garfield Hospital
San Gabriel Hospital
Med West Realty, Bryan McKenney
Office of Dr. Andrew Liao
Office of Dr. Arthur An
Office of June Chih Jesse Liu
Office of Felix Yip
Office of Dr. Andrew Hung
CT Corp
CSC Lawyers Incorporating Service
Getem Process Servers
Fed Ex. Corp
Transwestern Property Co. West LLC
St. Vincent Hospice Services
Jim Lai M.D., beneficiary, brother
Ming Mei Lai, trustee, mother
Arcadia Police Department
Aging and Disabilities Department Adult Protective Services
Citibank: Attorney John Preston Turner, Johanes Hermanto, manager, Lea Calara
Fidelity Brokerage Services LLC:

CASE NO. 2:26-CV-07252-SPG-PD

COMPLAINT FOR DAMAGES:

1.  PREMEDITATED WRONGFUL DEATH CCP § 337.60
2.  18 U.S.C. §§1961-1968 RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)
3.  FEDERAL CONSPIRACY 18 U.S.C. §371 & 18 U.S.C §1349
4.  DENIAL OF PATIENT RIGHTS CODE OF FEDERAL REGULATIONS TITLE 42 CHAPTER IV §482.13 FAILURE TO COMPLY WITH LEGITAMATE DISCOVERY REQUESTS § 164.510 (5)
5.  18 U.S.C. §1030 COMPUTER FRAUD AND ABUSE ACT (CFAA)
6.  18 U.S.C. § 371 GENERAL CONSPIRACY TO DEFRAUD THE GOVERNMENT (MEDICARE)18 U.S.C. § 286 & 287 (CONSPIRACY FOR CLAIMS AND FALSE CLAIMS)
7.  ELDER ABUSE Cal Code WIC § 15657(b) (Tai Min Lai & Ming Mei Lai) PHYSICAL, EMOTIONAL & FINANCIAL
8.  MEDICAL BATTERY CCP § 340.5
9.  LIBEL, SLANDER, & DEFAMATION OF CHARACTER
10. GROSS NEGLIGENCE
11. PERSONAL INJURY

Jury Trial Demanded: No

COMPLAINT

Michael Mitchell, Emily Desimone, Sam Ruddick, Alexis Fasano, Walter Conley, manager, Andy Reidmatter, Blaine Heath
First Bank
JP Morgan Chase Bank: Benjamin Ashkinos, Claire Durand
The Cheesecake Factory
Courtyard Marriott Monrovia
Double Tree Hilton Monrovia
Yi Fang Taiwan Fruit Tea
Kyuramen x Tbaar- Arcadia
Girasol Cocina Mexicana
Mahan Indian Restaurant
Marie Callender's
In-N-Out Burger
Soonheene & Twozone Chicken
Molly Tea
Paris Baguette
Ike's Sandwiches
Sharetea
Delta Air lines
American Airlines
Jet Blue
Remax, Maggie Chan & Gary Zuo
Cloudflare
Harmon Wong Im, Norman Wong CPA
Sun Clinical Labs
Verizon Wireless
State Farm Lynn Wen Agency, attorney Jeffrey Carson
Havens Malcynski Grigolla LLP
Ruttenberg Culter Broomer LLP
And Doe Defendants 1-25,
                 Defendants.

## I. **JURISDICTION**

1. This court has jurisdiction under Diversity Jurisdiction according to Statue 28 USC § 1332

   because the civil actions where the matter in controversy exceed the sum or value of $75,000 and

COMPLAINT

the plaintiff and defendants are citizens from different states. I am a citizen of the state of New York and all the defendants are citizens of different states which include California, Nevada, New York, Pennsylvania, Texas and Tennessee.

2. There is a federal question involved FEDERAL CONSPIRACY 18 U.S.C. §371 & 18 U.S.C §1349.

3. There is another federal question arises pursuant to 18 U.S.C. §§1961-1968 RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO).

4. There is a federal question involved VIOLATION 42 CFR § 482.13 PATIENT RIGHTS, CONFIDENTIALITY, DUE PROCESS, INFORMED CONSENT, FAILURE TO COMPLY WITH LEGITAMATE DISCOVERY REQUESTS § 164.510 (5)

5. There is a federal question involved 18 U.S.C. §1030 COMPUTER FRAUD AND ABUSE ACT (CFAA)

6. There is a federal question involved 18 U.S.C. § 371 GENERAL CONSPIRACY TO DEFRAUD THE GOVERNMENT (MEDICARE)

## II. VENUE

7. Venue is proper pursuant to 28 U.S.C. § 1390(a) because at all relevant times this is the county where the majority of the wrongful acts and/or omissions complained of herein occurred in this judicial district. The majority of defendants reside in this district and the decedent was a resident of this district. Proper venue is based on the most "convenient" or "fair" forum as established by various statutory criteria (such as defendant's residence or where the cause of action arose) Securities Investor Protection Corp. v. Vigman (9th Cir. 1985) 764 F2d 1309, 1313-1314; 28 USC § 1309(a).

8. **PARTIES**

3

COMPLAINT

9. Plaintiff's name is Kristen Lai. Plaintiff is the daughter/heir of decedent, Tai M Lai. Ming Mei Lai is mother of plaintiff and plaintiff is listed as power of attorney. The plaintiff resides in Queens, New York.

10. The Defendant Huntington Hospital is located in Pasadena, California.

11. The Defendant General Care Group Inc. is located in Los Angeles, California

12. The Defendant St. Vincent Hospice is located in Pasadena, California

13. The Defendant CT Corp is located in Glendale, California

14. Garfield Hospital is located in Monterey Park, California

15. The Defendant CSC Lawyers Incorporation Service is located in Sacramento, California

16. The Defendant Sunrise Hospital is located in Las Vegas, Nevada

17. The Defendant Transwestern Property Co. West LLC is located in Glendale, California.

18. The Defendant Getem Process Servers is located in Arcadia, California.

19. The Defendants Fidelity Brokerage , Michael Mitchell, Emily Desimone, Alexis Fasano, Walter Conley, Andy Reidmatter, Blane Heath are located in various states.

20. The Defendant JP Morgan Chase, Benjamin Ashkinos is located in Arcadia, CA

21. The Defendants Citibank, Johanes Hermanto, Lea Calara, Lynette Menjivar (unknown), Anna Li are located in Arcadia, California

22. The Defendant Remax, Maggie Chan and Gary Zuo are located in Arcadia, California.

23. Cloudflare is located in San Francisco, California.

24. University of Southern California is located in Arcadia and Pasadena, California

25. Garfield Hospital is located in Monterey Park, California

26. New York Presbyterian Hospital is located in New York City, New York.

27. Care Specialist is located in Granada Hills, California

4

COMPLAINT

28. FirstLight Careservices is located in Arcadia, California

29. LA CareNet is located in Los Angeles, California

30. 1Heart Caregiver Services is located in Pasadena, California

31. Sun Clinical Labs is located in El Monte, California

32. Office of James Lin M.D. is located in Arcadia, California

33. Office of Jessie Liu M.D. is located in Arcadia, California

34. Office of Felix Yip M.D. is located in Monterey Park, California

35. FedEx Corporation is located in Memphis, Tennessee

36. Harmon Wong Im, Norman Wong C.P.A. is located in South Pasadena, California

37. Office of Dr. Andrew Hung is located in Los Angeles, California

38. Office of Dr. Andrew Liao is located in Arcadia, California

39. Office of Dr. Arthur An is located in Arcadia, California

40. Office of Monty Polonsky is located in Arcadia, California

41. Verizon Wireless is located in

42. Havens Malczynski Grigolla LLP is located in Glendora, California

43. Jim Lai M.D. is located in Simi Valley, California

44. The Cheesecake Factory Restaurant is located in Arcadia, California

45. Dots Café is located in Pasadena California

46. Paris Baguette is located in Arcadia California

47. Yumiyaki Rowland Heights is located in Rowland Heights California

48. Sharetea is located in Arcadia, California

49. Marie Callenders is located in Monterey Park, California.

50. JB Burgers is located in Monrovia, California

COMPLAINT

51. Molly Tea is located in Arcadia, California

52. Courtyard Marriott Los Angeles Monrovia/Arcadia is located in Monrovia, California

53. State Farm Lynn Wen, Joseph Tseng, Rose Situ, Benjamin Rodriguez, Justin Turley, Janny Huang, Jennie Wu is located in Arcadia California and Phoenix Arizona

54. Citibank, John Preston Turner (Wilmington DE), Anna Li, Johanes Hermanto, Lynette Menjivar, Lea Calara is located in Arcadia, California

55. JP Morgan Chase Bank, Benjammin Ashkinos is located in Arcadia California

56. Ruttenberg Culter Broomer LLP is located in Los Angeles California

57. Havens Malczynski Grigolla LLP is located in Glendora, California

58. And Doe Defendants 1-25 whom are believed to be individuals and/or various corporations from financial institutions, healthcare institutions, private persons/individuals, and other businesses that are part of the RICO enterprise.

## STATEMENT OF RELEVANT FACTS

**DECEDENT (TAI MIN LAI) WAS AN ADULT DEPEDNENT OF KRISTEN LAI AND MING MEI LAI IS AN ADULT DEPENDENT OF DAUGHTER, KRISTEN LAI**

1. From August 2018 to the time of decedent's premature and premeditated death on July 5, 2024, plaintiff, Kristen Lai was involved in the direct care of decedent and the payment of Tai M. Lai's medical care. Kristen Lai was the primary caretaker of Tai M. Lai and Ming Mei Lai for the past several years. Prior to the decedent's health issues, Tai Min Lai was the primary financial manager for himself and his wife. He took care of his own brokerage/retirement accounts, he never had a financial advisor who took commission for his investments at Fidelity Investments, filed the couple's taxes with accountant Norman Wong, and handled most of the household maintenance. Although Ming Lai was taking care of her own daily activities, she

COMPLAINT

was never capable of handling financial affairs for the family. She could only do simple bill payments involving check writing for credit card bills, utilities and other miscellaneous charges. She also never had a career in the United States and was a homemaker. The decedent also had to tell his wife many times not to talk to strangers on the phone who are asking her personal financial information but she wouldn't heed the warning and would provide information to scammers on the phone. In 2018, Tai Lai was receiving medical treatment for "prostate cancer" and was experiencing severe side effects from the medication he received which included extreme dizziness and difficulty walking. Tai Lai was prone to falls and fell a few times. Decedent asked plaintiff to help with his care due to his difficulty driving. Initially his disability dealt with gait and dexterity, in later months and years the decedent had transient personality changes, delirium, anxiety and hallucinations. These symptoms slowly disappeared after 2021-2022 (after the cessation of "Lupron" injections) but the decedent had residual physical damage regarding his mobility. The medications he was receiving, specifically Lupron" injections, that were allegedly given were not actually administered according to Medicare billing records. The plaintiff discovered recently that only one shot was ordered through the decedent's Medicare insurance however, more than 7 shots are believed to have been given over a few years. The side effects that the decedent exhibited did not align with the side effects of the Lupron shots allegedly administered. The decedent did not receive any other medications during this period of time. The medical battery of Tai Lai was part of a plan to claim the decedent was "incapacitated" to extort him and his wife money with the collaboration of physicians and financial advisors. The diagnosis of "prostate cancer" was a premeditated plan to state a fraudulent "cause of death", reason to enroll Tai Lai into hospice services, bilk Tai Lai's retirement accounts, defraud the U.S. Government of

7

COMPLAINT

Medicare funds and prematurely deprive Tai Lai of his life (murder). The plaintiff also took care of Ming Mei Lai from 2020 regarding helping with bill payments, helping with household affairs when she bought her house at her current resident, dealt with daily activities of living such as purchasing food, clothing, transportation, house maintenance, healthcare because she was exhibiting mild dementia in 2020. Through the years from 2020 to present her mental state has deteriorated and currently exhibits severe cognitive dysfunction and short term memory loss. Currently, Ming Lai is only capable of dressing and bathing herself and handling her own laundry. She is not capable of preparing safe food, paying bills, house hold maintenance, driving (gets lots, poor driving and vision), giving informed consent, taking medication independently and is in need of supervision on a daily basis for her safety (falls). Due to Ming's mental state, she is unable to resist undue influence and fraud, therefore making her an easy target for groups of individuals to defraud her regarding healthcare, finances, insurance and other contract or monetary issues.

2. TAI M. LAI AND MING MEI LAI REVOCABLE TRUST 4/2/2008 HAVENS MALCZNSKI GRIGOLLA LLP, ATTORNEY FOR TRUST CLOYD HAVENS

*STANDING TO FILE CLAIMS*

On April 2, 2008, the parents (mother and father) of the plaintiff and defendant (Jim Lai, M.D.), created a trust under the Tai M. Lai and Ming Mei Lai Revocable Trust 4/2/2008. Tai and Ming Lai signed a Uniform Statutory Form Power of Attorney, a will and an Advance Healthcare Directive with power of attorney. The Uniform Statutory Form Power of Attorney (California Probate Code Section 4401) document authorized all of the following powers to the plaintiff: Real property transactions, tangible personal property transactions, stock and bond transactions, commodity and options transactions, banking and other financial institution

COMPLAINT

transactions, business operating transactions, insurance and annuity transactions, estate, trust, and other beneficiary transactions, claims and litigation, personal and family maintenance, benefit from social security, Medicare, Medicaid, or other governmental programs or civil or military service, retirement plan transactions, and tax matters. Ming Mei Lai's Uniform Statutory Form Power of Attorney states if Tai M. Lai (deceased 7/5/2024, unable to act) ceases or fails to act as my agent, for any reason, I appoint Jim Lai to act as my agent, If Jim Lai ceases or fails to act, for any reason, I appoint Kristen Joy Lai to act as my agent. The power of attorney document authorizes agent Kristen Joy Lai to have the power to litigate claims regarding all of the following that have been mentioned since Jim Lai has ceased or has failed to act.

Currently, there is a petition for Removal of Trustee Tai M. Lai and Ming Mei Lai Revocable Trust in a probate matter at Stanley Mosk Courthouse under the case number 24STPB11789. The plaintiff is in the process of filing a motion to reconsider for a conservatorship of Ming Mei Lai due to the abuse of power by Jim Lai. In fact, Jim Lai condones the elder abuse of Ming Mei Lai. The attorney who wrote the trust was Cloyd Havens of Havens Malczynski Grigolla LLP has continued to provide legal advice (current attorney) for Ming Mei Lai on multiple occasions throughout 2021-2024 through drafting and finalizing amendments with Ming Lai at his office. It is believed that Cloyd Havens still advises Ming Lai and has referred her to other "legal advisors" in their law offices to try to "relinquish their relationship" with the trustee. Ming Mei Lai would go with her son, defendant Jim Lai to Havens Malcynski Grigolla LLP law office in Glendora, California. This power of attorney gives the plaintiff standing in litigation in regards to any of the above matters for this case.

COMPLAINT

Currently, a trust case is being litigated in Stanley Mosk Courthouse for the removal of trustee, Ming Mei Lai. Along with the removal of trustee petition, there is a request to disinherit heirs Ming Mei Lai, Jim Lai and daughter of plaintiff, Winnie Lai due to neglect an abandonment of decedent Tai M. Lai pursuant to probate code § 259. There is a potential conservatorship that will be requested in a motion for reconsideration for Ming Mei Lai due to her diagnosis of dementia by two physicians, however employees at the two physicians office who have already diagnosed her with a cognitive disorder are obstructing justice and tampering with witnesses by refusing to allow the plaintiff to communicate with the physicians. The plaintiff has observed multiple individuals at physician's offices, hospitals, financial institutions and other businesses that have been financially abusing the plaintiff's mother for financial gain in addition to the decedent through direct and indirect ways.

According to California Code of Civil Procedure CCP § 377.60 a cause of action for the death of a person caused by wrongful act or negligence of another may be asserted by any of the following persons or by the decedent's personal representative on their behalf:

(a) The decedent's surviving spouse, domestic partner, *children*, and issue of deceased children, or, if there is no surviving issue of the decedent, the persons, including the surviving spouse or domestic partner, who would be entitled to the property of the decedent by intestate succession. Plaintiff is the adult child of decedent and heir of the Tai M. Lai and Ming Mei Lai Revocable Trust 4/2/2008.

3. 18 U.S.C. §§1961-1968 RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)

A RICO cause of action must show four components which includes conduct, enterprise, pattern and racketeering activity. An enterprise is defined as "includes any individual,

COMPLAINT

partnership, corporation, association, or other legal entity, and any union or **group of individuals associated in fact although not a legal entity**." Odom v. Microsoft Corp., 486 F 3d 541 (9th Cir. 2007). The decedent, Tai M. Lai and his wife, Ming Mei Lai and the plaintiff are victims of a large nationwide (potentially international) scheme of by various healthcare professionals, court staff, law enforcement personnel, financial institution employees or related agents, attorneys, accountants, caregivers and agencies employing them, real estate agents, insurance agents and claims adjustors, other individuals at various businesses which includes food service employees (these entities comprise the enterprise) to deprive the elder dependents' and plaintiff of their health (through poisoning) for financial gain, the decedent's life, their finances, their property and general-wellbeing because of intentional, reckless, malicious and oppressive conduct that these individuals executed with the above common aim (Civil Code § 3294). The second element, conduct, is clearly shown by the behavior or acts of the various individuals at different businesses. They have "a common purpose of engaging in a course of conduct" as Odom argued. That conduct is displayed in a pattern, meaning that there are multiple acts of the same nature committed to achieve continuous organized objectives (fraudulent misrepresentation to defraud Medicare-fraudulent diagnosis of metastatic prostate cancer to be placed on hospice, extortion of financial assets of the trustees, swindling of real property of trustees and utilization of other sources of income such as insurance fraud, social security fraud, tax fraud). To find liability, the "racketeering acts" element must be present. The racketeering acts or "predicate acts" for RICO have to show least two predicate acts of racketeering activity within the past 10 years; in this specific case, these predicate acts consist of: extortion (of various sorts, financial, medical purposes for theft of Medicare funds), kidnapping (movement of decedent from one location to another in hospital, restricting him

11

COMPLAINT

from leaving), premeditated wrongful death (intentionally falsifying diagnosis for profit decedent to die prematurely), tampering with a witness, informant (preventing physicians for Tai M. Lai and Ming Mei Lai testifying) and obstruction of justice (preventing testimony, concealing records, retaliating against witnesses (plaintiff) to prevent witness testimony through acts of poisoning to prevent further disclosure of facts in her litigation case), dealing in a controlled substance or listed chemical in section 102 (plaintiff believes that Tai Lai was injected with various controlled substances and also the plaintiff and her mother were poisoned (with unknown potentially controlled substances for purposes of financial gain), mail fraud (to further the profits of financial fraud, banks/financial institutions, insurance companies), wire fraud (to further the profits of financial fraud, banks/financial institutions, insurance companies), interstate commerce (predicate acts cross state lines in acts of fraud), attempts to claim "unlawful debt" (Fraudulent scam letters to decedent and plaintiff from "Government entitites" writing letters to plaintiff in attempts to collect unlawful debt , relating to dealing in obscene matter (believes that individuals involved in the enterprise also have common goal to extort the plaintiff into "working" in an obscene manner), relating to obstruction of justice & relating to obstruction of criminal investigations (law enforcement agencies concealing records of elder abuse and actively engaged in conspiring with other in fraudulent acts), relating to obstruction of State and law enforcement, acts which is indictable under the Immigration and Nationality Act (caregiver agencies lack of vetting of employees and hiring unqualified workers relating to bringing and harboring certain aliens if the act is indictable under such section of such Act was committed for the purpose of financial gain). These individuals engaged in the enterprise have with a common goals which was to profit financially by any means possible through fraudulent tactics against the plaintiff and her parents. The individuals

12

COMPLAINT

in this enterprise also targeted the plaintiff and her family in various schemes posing as government agencies, such as the social security department and other government agencies like the state franchise tax board through mail fraud in efforts to defraud the plaintiff and her family of money.

DEFENDANT JIM LAI M.D., MING MEI LAI AND ATTORNEYS FOR JIM LAI: HAVENS MALCYNSKI GRIGOLLA LLP, RUTTENBERG CULTER BROOMER

4. Recently, on June 9, 2026, Jim Lai filed a restraining order in the Superior Court of Los Angeles at 111 North Hill Street case number 26STRO03688 on behalf of Ming Mei Lai under counsel, Sarah Broomer of Ruttenberg Cutler Broomer LLP against the plaintiff. There is clear and convincing evidence that this restraining order was filed by Jim Lai and his attorneys because they understood that a second physician already diagnosed trustee, (trust states two physicians must diagnose the trustee to incapacitate) Ming Mei Lai with dementia. This was a desperate attempt on Jim Lai's part to control the assets of the trust because he knew that this would be confirmation that his mother would be removed and he could no longer manipulate her. With the advice of his attorneys whom the plaintiff believes are also conspiring with attorney Cloyd Havens, a temporary restraining order was requested and granted by Judge Holly Hancock-Goode (another individual involved in the RICO conspiracy).This was also a coordinated objective with attorneys regarding motives to financially defraud the plaintiff by refusing to reimburse her for claims she made regarding expenses for the decedent that were promised to be paid back by the decedent and his wife and prevent the plaintiff from becoming trustee due to two physicians incapacitating her. These objectives also are in line with the RICO enterprise.

13

COMPLAINT

FRAUDULENT MISREPRESENTATION, FRAUDULENT CONCEALMENT, BREACH OF DUTY, VIOLATION OF CALIFORNIA CODE, CCP § 1161, DEFAMATION, LIBEL, SLANDER, NEGLIGENCE (JIM LAI, MING MEI LAI, RUTTERBERG CULTER BROOMER LLP & HAVENS MALCZYNSKI GRIGOLLA LLP)

5. On May 13, 2026, Jim Lai was on the phone with Ming Mei Lai during an appointment that the plaintiff and her mother were attending at Dr. Arthur An's office (a board-certified neurologist). Ming Mei Lai was already diagnosed with a cognitive disorder by her primary care physician Dr. Andrew Liao. Jim Lai called his mother multiple times to tell her not to go to the appointment and that the plaintiff should not be there during her May 13th appointment in front of the doctor. Since Ming Mei Lai stated that Jim Lai didn't want to the plaintiff to be in the appointment with her to Dr. An, the neurologist suggested that her son can schedule the next appointment for her and attend with her. The plaintiff emailed and texted her brother to tell him to make an appointment within 2 weeks to see the doctor regarding his mother's health. Rather than setting an appointment to see Dr. An to deal with his mother's inability to care for herself, Jim Lai made an appointment to see attorney(s) on May 22, 2026 with Ming Mei Lai and Winnie Lai to find a route to circumvent the plaintiff's plans regarding the removal of trustee and appointment of Kristen Lai as successor trustee along with a potential conservatorship for proposed conservatee Ming Mei Lai. The attorneys for Jim Lai, Ruttenberg Culter Broomer LLP, drafted a petition for a temporary restraining order which prevented the plaintiff from aiding her mother to get the medical care she needed and protection from elder abuse by many individuals. In fact, the temporary restraining order Jim Lai requested was issued on the date Jim Lai's appointment on June 9, 2026 to see Dr. An. Jim Lai asked Ming Mei Lai sign a paper that stated she wanted a temporary restraining order on

14

COMPLAINT

June 9, 2026. Ming Mei Lai was with Jim Lai in an appointment at 1:45 p.m. and the temporary restraining order was already granted in less than 2 hours of receiving the petition the same day.

6.  The temporary restraining order case #26STRO03688 petition included a statement by Sarah Broomoer stating the plaintiff had previously used violence on Ming Mei Lai. In Sarah S. Broomer's Declaration Re: Ex-Parte Request (No Notice Given) she states, "I did not give notice to the other party in this action because: I was afraid that the **violence would reoccur** when I gave notice that I was asking for these orders." When she states reoccur, that means that she states for a **fact** that violence had occurred previously. Sarah Broomer is stating that the plaintiff was violent towards her mother when there is no documented evidence of that (Libel and Defamation of Character). Counsel, Ms. Broomer accused the plaintiff of violence against an elder dependent as a statement of fact without any proof. Sarah Broomer did not have any evidence that the plaintiff was violent towards Ming Mei Lai nor did she have any credible evidence that the plaintiff was threatening violence (Battery PC 242 A battery is any willful and unlawful use of force or violence upon the person of another) against Ming Mei Lai. Temporary restraining orders are meant for immediate danger for the victim, not solely financial abuse but it was approved by Judge Holly Hancock-Goode within 2 hours of receiving it because she was part of the RICO enterprise (obstruction of justice & tampering with a witness: predicate act). The petition was 127 pages and Judge Goode was able to determine or pre-determined that it should be approved even though there was lack of credible evidence of immediate danger (Judge Goode and all of the attorneys at Ruttenberg Broomer Culter are part of the RICO conspiracy, it is believed that Judge Goode was the one in orchestrating the order). Sarah Broomer acted with reckless disregard to the statement she

COMPLAINT

made and she did it intentionally to pursue a protective order to manipulate Ming Mei Lai and further the financial and emotional elder abuse of Ming Mei Lai by other people other than the plaintiff. Attorney Sarah Broomer also makes many unsubstantiated accusations that the plaintiff is an elder abuse with so-called evidence in Exhibits which actually show the opposite, that is the plaintiff is trying to protect her mother against individuals addressed in emails. In fact, many of these alleged Exhibits such as phone calls from the protected person, Ming Lai are not available to view or be reviewed (there's no evidence backing up Jim Lai and attorney Ms. Broomer's claims). The lack of critical thinking ability and common sense that attorney Sarah Broomer is concerning. These types of baseless accusations should prompt an investigation into her fitness as an attorney when she is incapable of substantiating her legal arguments with valid facts.

7. Jim Lai has many facts that are also false and states I have abused and mistreated my mother and financially abused my father without any proof (Libel and defamation of character) in his petition. In fact, he knows that I have paid for almost all of my father's expenses and provided proof to all of Ming Mei Lai's lawyers, Eric Yamamoto, Ellen Finkelberg, Frank Piro and Cloyd Havens. Ming Mei Lai states that Jim Lai is the one who communicates with all of the attorneys and she does not even know what their names are. Jim Lai's petition for restraining order also does not contain any evidence of a resignation for Ming Mei Lai in his Exhibit D as he stated was included in his petition nor does it have any proof or indication for the removal of trustee Tai M. Lai of unfitness for his accounts in Exhibit D. Exhibit D has a letter from Andy Reidmatter removing him because allegedly Ming Lai requested Tai Lai to be removed, however, Ming Mei Lai told me she did not do that. Jim Lai states that this letter indicates that the diminished capacity of Tai Lai was noted but it does not state that at all. All of the

COMPLAINT

evidence does not support an elder abuse claim by the petitioner, Jim Lai or his attorneys. Ming Mei Lai also admitted to me she signed a paper on June 9, 2026 without reading it because she "trusts" her son. Ming Mei Lai is liable for gross negligence (signing the paper).

8. On June 10, 2026, during a probate hearing at 8:30 a.m. in Stanley Mosk Courthouse department 67, Stefanie Culter, counsel for Jim Lai stated that Ming Mei Lai signed a resignation letter as trustee which allowed Jim Lai to become trustee. Ming Mei Lai told the plaintiff on May 22, 2026 that she went to the attorney's office in Glendora, the trust attorney who wrote the trust for the decedent and his wife in 2008. The next day, May 23, 2026, Ming Mei Lai stated to the plaintiff that she spoke to some attorneys but she did not sign anything (Fraudulent Misrepresentation & RICO enterprise financial elder abuse goal, to deprive Ming Lai access to her trust for attorneys financial gain).

ILLEGAL LOCK OUT: LACK OF UNLAWFUL DETAINER

The evening of June 9, 2026, the plaintiff became very frightened because an unidentified male who did not have a badge/identification or body camera appeared with a gun at the door. The unidentified male stated that he was serving the plaintiff with a restraining order. The plaintiff asked, "Are you a police officer?" since she noticed that he was carrying a gun and wore a black military like uniform. He stated "no." The plaintiff became very frightened because he was not an officer, had no clear identification badge on him or a body camera and he had a gun. The unidentified male appeared to be a Hispanic male approximately 6'4"-6'5" and 240 lbs in his 50's. He did not identify himself or provide his name. He just handed the restraining order papers to the plaintiff and stated "You've been served." And stated the plaintiff had to leave and to gather her belongings. He asked how long it would take to get her belongings together and the plaintiff said "Probably two hours." The unidentified male with the gun said

COMPLAINT

"I will have to call my boss." He said after making a phone call to his "boss" he said, "You have to be finished in 15 minutes or I will physically get you out of here." Then he said, "I'll call the police too if you refuse to get out." The plaintiff said "Go ahead and call the police." The plaintiff was very scared and severely emotionally distressed because he was in the house, showed that he was given a key to the house and had a gun. He also said he would use physical force against the plaintiff if she didn't leave within a certain time and he was not a peace officer. The plaintiff also stated she wanted to come back to get the rest of her things but the unidentified man stated that she can't come back at all. The Arcadia Police arrived and told the plaintiff to gather her things and leave by 10 p.m. The plaintiff left around 10 p.m. and saw Jim Lai standing outside with the unidentified male. The same evening around 11:30 p.m., Ming Mei Lai called the plaintiff and asked where she was, the plaintiff explained that her son requested a restraining order and the police came to escort the plaintiff out. The plaintiff's mother said "Just come back." The plaintiff said "No". The next day when the plaintiff saw that Ming Mei Lai was not at the location of the house, (the car of Ming Mei Lai was elsewhere which meant that Ming Mei Lai was probably not at the home), the plaintiff attempted to get her belongings and tried to use her key. The key did not work because the locks were changed. There was no unlawful detainer issued which meant that Jim Lai did an "illegal lock out". Jim Lai admitted in court his legal counsel told him to do so. Also Judge Goode said on the record, "You don't need an unlawful detainer if you have a valid restraining order. You can be locked out immediately." After the plaintiff was served the restraining order, she discovered the defendant, Jim Lai had Ming Mei Lai removed out of the home that evening, June 9, 2026, so she could not observe the "illegal lockout" and the serving of the restraining order. The unidentified individual with a firearm who served the plaintiff according

18

COMPLAINT

to his proof of service which was emailed to the plaintiff by attorney, Matthew Kanin was Arotin Arakelian and he was employed by "Drucker Investigative Services at 3804 Burbank Blvd Unit B, Burbank, CA 91505. The plaintiff researched this location and it is not a business for an Investigative Services, it is a gun store called Gun Brothers Inc. It is uncertain that the unidentified male had a conceal and carry permit which also is concerning for the safety of the plaintiff. The plaintiff discovered that Ming Mei Lai stated that she didn't know what the paper was that Jim Lai asked her to sign on June 9, 2026 and she did not even read it. The plaintiff's mother said that she wanted to tell the police and say that it was a mistake. The plaintiff said well you have to tell them that you didn't read it. Ming Mei Lai stated, "I'm not going to say that, that makes me sound stupid. I'll just tell them I changed my mind." The plaintiff stated, "Well I guess that means what you said, 'stupid'. If you say you changed your mind, then you are lying. It will make it seem as if you knew what you were doing." The plaintiff's mother called her on Saturday June 27, 2026 and told her that she would go with her to court to tell them the restraining order was a mistake but when the court date came, it was known that Matthew Kanin prevented the appearance of Ming Lai (tampering with a witness & obstruction of justice) to ensure that the restraining order would be granted without her testimony in the matter. It was also clear that Judge Holly Hancock-Goode was also aligned with the same goal (predicate acts-conspiracy: witness tampering and obstruction of justice). Despite the claims of the respondent, she continued without regard to the witness testimony of Ming Lai even though Kristen Lai objected many times stating that Ming Lai did not request the restraining order and is not there to testify. Judge Goode (obstruction of justice & tampering with a witness, in conspiracy with Rutterberg Culter Broomer LLP) said it didn't matter, "Jim Lai is here to speak for her and it's the same thing". This is not the only time

19

COMPLAINT

Ming Mei Lai admitted she didn't read papers that she signed. She admitted to not reading papers she signed at USC Arcadia hospital regarding the discharge papers for Tai M. Lai. The plaintiff stated that the actions of her mother were very serious and that she will be held liable for everything she signs whether she reads it or not. The plaintiff was illegally kicked out and was severely distressed by the event which occurred and feared for her life due to the unidentified male who stated he was going to physically take her out of the residence and had a weapon (gun). Jim Lai had all of the locks changed on the house doors and the unidentified male took the garage opener from the plaintiff on June 9, 2026. A week later, on June 15, 2026, the plaintiff went to the location 11150 Olympic Boulevard Los Angeles, CA 90007 to find the law office of Ruttenberg Culter Broomer LLP and there was no office listed in the building. She also called the law office and someone answered stating they would pass the message onto a paralegal, Brenda.

9. The attorneys at Ruttenberg LLP were granted a Temporary Restraining Order in Metro Dept 65 by Judge Holly Hancock-Goode in the Family-Metro Department 65 at 1945 South Hill Street, Los Angeles, California 90007 without any legal justification or basis. There was no evidence of an immediate threat of violence or urgent need for a restraining order. Jim Lai and the lawyers of Ruttenberg Cutler Broomer LLP were strategically using the temporary restraining order to prevent the plaintiff from providing medical care for her mother's deteriorating mental state and helping her mother who needed significant help with her daily activities of living and preventing the plaintiff to recover a claim mailed in July 2024 to Cloyd Havens (trust attorney) which was ignored. Jim Lai was aware that the plaintiff was in the process of having her mother evaluated by Dr. An. The defendant, Jim Lai is a medical doctor and has over 20 years of experience in emergency medicine but is not a board-certified

20

COMPLAINT

neurologist like Dr. Arthur An. Medical doctors of any background and experience are capable of diagnosing dementia and are well aware of the signs and symptoms. After Jim Lai went to Dr. An's appointment, the plaintiff discovered that he made an appointment in December 2026 instead of continuing care (following up closely with a 1-2 week appointment) under Dr. An because he did not want Ming Mei Lai to be further evaluated.

RESTRAINING ORDER HEARING JUNE 30, 2026 (TAMPERING WITH WITNESSES & OBSTRUCTION OF JUSTICE PREDICATE ACTS)

10. In the restraining order hearing on June 30, 2026, the attorneys, Matthew Kanin and Marie Mondia were present with Jim and Winnie Lai. Judge Holly Hancock-Goode did not have attorneys Matthew Kanin and Marie Mondia swear in during the trial. She stated that because they are attorneys they don't need to. She already showed bias towards these "attorneys". The plaintiff also stated in the hearing that Sarah Broomer wrote in her ex-parte that the plaintiff was violent to Judge Goode but Judge Goode said she couldn't "see it". The plaintiff said, "well it was served to me, I saw the copy from the records room and you should be able to see it in the computer." But Judge Goode continued to deny the existence of the documents. In every court hearing, all of the attorneys are sworn but Judge Goode did not allow them to (because she is conspiring with them as part of the RICO enterprise and is aware they are committing perjury). In an email, Matthew Kanin attempted to extort the plaintiff by using the temporary restraining order as a means to have a "mediation" and it appeared as if he wanted to have the plaintiff "settle" in which she felt that meant that they wanted her to do some "work" for them as a settlement. The plaintiff was in disbelief to think that people would be so blatantly corrupt to approve such ridiculous orders without any facts and just heresay. The permanent order was recorded and the justification that Judge Holly Hancock Goode gave was

COMPLAINT

"emotional abuse and financial abuse" because of a statement that Jim Lai claimed that a manager said to him (heresay) but no documented evidence and Jim Lai didn't even say that it was the plaintiff who did the exorbitant charges.

11. Matthew Kanin also stated that he didn't want the protected person at the hearing, Ming Mei Lai. Attorney Mr. Kanin also focused on the fact that the plaintiff didn't have a job and he appeared to be focused on her unemployment status. This was his focus and also as the plaintiff stated, these individuals in the RICO enterprise have a goal to force the plaintiff to work for them in an "obscene matter". The reason why the plaintiff believes that Mr. Kanin's focus on the plaintiff's employability rather than the focus on alleged elder abuse made it clear and convincing that he was interested in the plaintiff's employment (part of RICO enterprise goal, get plaintiff to work in "obscene matter" because now she has a restraining order granted and can't get a job because of defamation of character and bad record and/or give a job with strings conditions to work in "obscene matter") status rather than her mother's well-being. He even included an Exhibit of the plaintiff's expired California nursing license but he obviously doesn't know that the plaintiff passed the Adult Gerontology Nurse Practitioner Board Examination. Even in the petition, they do not allege financial elder abuse and all the exhibits or evidence appeared to not be included. As far as alleged violence, there was only one allegation by Jim Lai claiming that his mother told him that she "threw a vase at her". The plaintiff stated, "If she told you that why didn't you call the police?" He said that it was a week later when she told him. In conclusion, there was no factual evidence of financial elder abuse, Judge Goode approved the permanent restraining order on the basis of heresay allegations from Jim Lai in a statement that the manager at Citibank said that Ming Mei Lai was spending money in her Norstrom account around $40-50,000 in February 2026. The

22

COMPLAINT

manager himself was not there and there was no documentation that even showed that Kristen Lai was the person making the purchases. Even when the plaintiff mentioned that the protected person isn't here to even state her wishes. Judge Goode said it "Doesn't matter, Jim Lai is speaking for her. If you wanted to bring her as a witness you should have brought her but it's too late, you didn't want a continuance." The plaintiff stated that she spoke to the "witness", Ming Mei Lai and she agreed to go to court and speak on the plaintiff's behalf but they attorneys for Jim Lai and Jim Lai refused to allow her to come. The logic to Judge Goode's argument was flawed because how is a respondent to a restraining order supposed to bring the "victim" to the hearing if Judge Goode implemented a "no contact order" in which Jim Lai and his attorneys are using to manipulate and further the abuse of the victim? They were required to bring Ming Lai to court to testify as to her agreement with the restraining order but Judge Goode and the attorneys were conspiring together (in this case it is 4-5 attorneys and one judge) to tamper with the witness and obstruct justice (predicate act: RICO). The plaintiff was in shock with how Judge Goode and Jim Lai's attorneys were committing abuse of process. The plaintiff said that Jim Lai can't speak for her mother and that her mother has to speak for herself. Judge Goode said "Well you could have called her as a witness." The plaintiff said "She wanted to come but they are preventing her to come to court and tampering with witnesses." The attorney Mr. Kanin also admitted that he didn't want her to be there. At the conclusion, Mr. Kanin wanted a company of his to touch the belongings of the plaintiff and also the judge stated that there was no need for an unlawful detainer when you have a restraining order, you can legally lock out someone with the restraining order which is what the attorneys from Rutterberg Culter Broomer LLP told Jim Lai.

23

COMPLAINT

12. In the restraining order that was filed on June 9, 2026, there were various trust documents used in Exhibits from the office of Havens Malczynski Grigolla LLP.  There were several amendments that were signed on July 22, 2022 which were included.  Some of these documents were sent to the court by attorney Cloyd Havens because he refused to provide the amendments to the plaintiff in January 2025 she spoke to attorney, Mr. Havens at his office at 333 W. Foothill Blvd. Glendora, CA.  A beneficiary has a right to see the terms of the trust. Beneficiary, Kristen Lai also spoke to attorney, Cloyd Havens around 2020-2021 regarding Ming Mei Lai because she went with Jim Lai to speak to him regarding Tai M. Lai.  Plaintiff made attorney Cloyd Havens aware that Ming Mei Lai was neglecting and abandoning Tai M. Lai because she refused to care for him by providing basic necessities and supervision when he was feeling ill due to medical battery from doctors.  She also told attorney Mr. Havens that her mother, Ming Lai was leaving the decedent home alone when he was ill (Plaintiff went to his office around 2021 to speak to him in person).  The plaintiff only recently discovered that Jim Lai was the individual responsible for taking his father to these appointments to get medically battered with injections of an unknown and undocumented substance for "prostate cancer treatment" which caused his issues with gait and then later some temporary confusion.  Some of these symptoms cleared up after the cessation of "Lupron" injections, however there was lingering damage to Tai Lai's health and physical mobility.

13. Attorney Cloyd Havens allowed Ming Mei Lai to forge the signature of Tai M. Lai for the amendments to the trust which is observed and seen in the July 22, 2022 signing.  Tai Lai was not there and he did not sign any documents.  In fact, many other employees at various business have allowed Ming Mei Lai to forge her husband's signature in banks, real estate transactions and obviously trust documents (common of the enterprise goal, condone the

COMPLAINT

forgery of Tai M. Lai in order to deprive him of his property). This was an objective that the enterprise used which was allow Ming Mei Lai to forge various documents for Tai Lai to make it appear as if he is consenting to the sale of property or allowing to execute handling of his finances. It is believed that other individuals forged Tai Lai's signature and not Ming Mei Lai because it is not consistent with the signature of Ming Mei Lai's forgery of Tai M. Lai. It is also believed that Ming Mei Lai is also signing documents out of order (back dating or forward dating) concerning dates and possibly not even physically going to the attorney's office to sign documents (it is believed that Winnie Lai is possibly the gopher to send documents to Ming Lai to sign). Attorney, Cloyd Havens also did not produce the amended power of attorney documents from the trust which include the alleged power of attorneys which were changed allegedly to Jim Lai and Winnie Lai (fraudulent concealment/obstruction of justice) when he received the subpoena to provide these documents to the court. The plaintiff also has doubts whether the documents are authentic. When Ming Mei Lai was informed by the plaintiff regarding the "updated" power of attorney she said, "Why is Winnie Lai a power of attorney? She's just a kid. It should be you." (referring to the plaintiff). Havens fraudulently concealed these records because he was attempting to prevent the plaintiff from receiving any inheritance to further the financial goals of the enterprise. The plaintiff believes that the law office of Havens Malzynski Grigolla were hoping that the plaintiff would have to "work" in an extortion type scheme (obscene manner) for the RICO enterprise. The plaintiff believes he was collaborating with many other individuals in an extortion plot against the plaintiff from the enterprise (RICO) which include physicians, employees at hospitals and doctors offices, accountants, financial advisors, bank employees, other court personnel and even law enforcement. Cloyd Havens told the plaintiff when she was at his office in January 2025 that

25

COMPLAINT

she was a "potential" beneficiary, meaning that he had a premeditated plan to change the trust for his own benefit to exclude her. He had this premeditated plan to fraudulently change the terms of the trust by asserting Jim Lai as the trustee and Winnie Lai as a back up. Ming Mei Lai, Jim Lai and Winnie Lai met at the office of Havens Malcynski Grigolla LLP on May 22, 2026 but "hired" attorneys Ruttenberg Culter Broomer who are located in Los Angeles. There is circumstantial evidence linking Cloyd Havens as a conspirator with the Ruttenberg law office. Ming Mei Lai also told the plaintiff that she did not sign and allow Jim Lai to act as trustee when she is alive. She stated "it's ok if Jim Lai is trustee if I'm not alive but I'm still living." Cloyd Havens as the trust attorney failed to inform the trustee of her duties as trustee regarding notice to beneficiaries since the decedent passed (provide notice to beneficiaries pursuant to probate code , failed to communicate with the trustee the claim against the trust by the plaintiff regarding debts owed, failed to consult the decedent regarding his rights while the co-trustee, Ming Mei Lai was signing amendments. Cloyd Havens was sent a letter in July 2024 regarding a claim the plaintiff made against the trust and he ignored it and did not notify the trustee. Instead he just continued to sign amendments to the trust for the Tai M. Lai and Ming Mei Lai Revocable Trust on August 19, 2024. Cloyd Haven's actions were reckless, oppressive and malicious towards decedent, Tai M. Lai and Ming Mei Lai for failing to properly advise and inform the trustees their duties to the beneficiaries. It became very clear that Mr. Havens was only advising trustee Ming Mei Lai for his own personal financial gain and not advising her regarding her duties as trustee and purposely misinforming her regarding probate code and rights of beneficiaries. He did not advise her to send notice to the beneficiaries after the decedent died or provide an accounting as requested by beneficiary. He told Ming Mei Lai that she doesn't have to tell beneficiaries anything (from advice from

26

COMPLAINT

attorney, Mr. Havens). Mr. Havens also told beneficiary, Kristen Lai the exact same thing in January 2025 when she came to his office to see the amendments. He stated that the plaintiff can't see the trust until her parents die (fraudulent misrepresentation & willful misconduct). He also said that in order to see the amendments, the plaintiff (beneficiary of Tai M. Lai and Ming Mei Lai Revocable Trust 4/2/2008) had to subpoena the documents despite showing her state ID (to show she is a beneficiary) to him and his front office worker. There is clear and convincing evidence that Cloyd Havens was involved in fraudulent concealment (obstruction of justice: predicate act) with a premeditated purpose of changing the Tai M. Lai and Ming Mei Lai Revocable Trust 4/2/2008 for the common goal of the enterprise: (profit financially indirectly or directly) elder abuse of trustee, Tai M. Lai and Ming Mei Lai and (predicate act) extortion of Kristen Lai (It is believed the enterprise wanted to force plaintiff to "work" for them by depriving her of any inheritance and refuse to pay out claims to the plaintiff). Attorney Mr. Havens and attorneys at Ruttenberg Culter Broomer LLP have breached their duty as attorneys because it is fundamentally their duty to ensure their client understands the contracts or legal papers they're signing as a legal and ethical obligation of competent representation and informed consent. They are to translate complex "legalese" or get a translator to speak in Mandarin to ensure the client fully understands what they are signing. They are supposed to make sure the client understands the consequences of their agreement. They are also supposed to make sure that Tai Lai was involved in the changes in his own trust, but Cloyd Havens purposely did not do that. Cloyd Havens is liable for the fraudulent misrepresentation and elder abuse of Tai M. Lai and Ming Mei Lai. Ming Mei Lai stated she did not understand nor read the documents she signed.

27

COMPLAINT

14. In addition to attorney, Cloyd Havens, another attorney at Havens Malzynski and Grigolla named Lauren Guccione told the plaintiff that Cloyd Havens wasn't Ming Lai's attorney and never represented her in any way around January 2026. The plaintiff stated that Cloyd Havens wrote the trust for the trustees. She stated, "That doesn't mean that he's the attorney for them." The plaintiff has grave concerns for attorney Lauren Guccione because in the trust it states that he is indeed the attorney for both trustees and wrote the trust. The fact that he is continuing to draft and make amendments to the trust is proof of his role duty as attorney to the trustees. He also received payment for the amendments. He may not have acted in litigation concerning the trust but he acted as an attorney who added amendments, changed power of attorney documents and condoned the forgery of Tai M. Lai's signature by Ming Mei Lai. An office worker told the plaintiff that Cloyd Havens was retired around January 2025 when she stopped at his office in January 2026, yet his license is still active. According to the trust that was signed on April 2, 2008, a document was included stating that Cloyd Havens is "representing both of you, there is a potential for a conflict of interest…I reserve the right to withdraw from representation, subject to ethical restrictions placed on me by the applicable Rules of Professional Responsibility. If I decide to terminate representation, notice will be sent to your last known address."-Cloyd Havens. No letter was sent to either trustee indicating that Cloyd Havens ceased to represent Ming Mei Lai or Tai M. Lai. He signed the document with both trustees, Ming Mei Lai and Tai M. Lai on April 2, 2008. Cloyd Havens continued to make changes to the trust by coercing Ming Mei Lai to sign amendments to the trust for the common goal of the enterprise, financial abuse of Tai M. Lai and Ming Mei Lai. Attorneys, Ms. Broomer, Ms. Culter, and beneficiary Jim Lai allege that Ming Mei Lai signed a resignation

COMPLAINT

letter as trustee on May 22, 2026, however Ming Lai told the plaintiff on May 23, 2026 she did not sign anything that day.

15. In addition to attorneys who are part of this enterprise committing predicate acts (Lauren Guccione mailed a letter (mail fraud) stating Cloyd Havens wasn't Ming Lai's attorney, extortion of Kristen Lai, more than two times and fraudulent misrepresentation, obstruction of justice: concealing amendments to trust documents) the pattern of racketeering slowly started in 2017-2018 regarding racketeering activity regarding extortion and financial abuse of the trustees. However, the plaintiff believes it actually goes as far back as close to 2 decades which will be addressed when the plaintiff is able to obtain more in discovery.

COLLABORATIVE EFFORT OF ENTERPRISE TO FINANCIALLY ABUSE AND DEFRAUD DECEDENT TAI M. LAI (AND MING MEI LAI) THROUGH MEDICAL BATTERY, FRAUDULENT "INCAPACITATION" SIMULTANEOUSLY WITH ULTIMATE GOAL TO FRAUDULENTLY DIAGNOSE TAI M. LAI WITH METASTATIC CANCER PROSTATE CANCER (DEFRAUD MEDICARE WITH UTILIZATION OF HOSPICE SERVICES) AND PREMEDIATED WRONGFUL DEATH.

16. In the summer of 2017 and spring of 2018, the decedent was slowly being assessed for prostate cancer at his primary care physician at the time, Dr. James Lin. There were a few blood tests to measure PSA. It is believed that Dr. James Lin referred Tai Lai to either urologist Dr. Felix Yip or Dr. Albert Mak. A biopsy was performed on May 4, 2018 and a specimen was sent to Sun Clinical Labs where Dr. Muh Yau Tang performed a microscopic diagnosis. In his diagnosis out of 6 areas, 5 out of 6 tissue areas allegedly contained at least 70% adenocarcinoma. The plaintiff believes the biopsy that was used as a premise and justification for the administration of medical "cancer treatments" which were Lupron shots (conspiracy-at

29

COMPLAINT

least two people make an agreement to commit an illegal act for the purpose to defraud the U.S. government Medicare). Felix Yip was the main physician who administered these "Lupron" injections. It was believed that the Lupron shots were administered due to "high PSA levels". The plaintiff noticed that her father was not feeling well and asked her to drive him around due to feeling ill. The plaintiff didn't know that her father was receiving so multiple "Lupron" injections until May 2026 (predicate act: use of controlled substances to further the agenda of the enterprise, fraudulently incapacitate Tai Lai for financial gain through financial elder abuse and Medicare Fraud). The plaintiff only learned that medication was being administered during a visit she had with Dr. Ana Grace (oncologist) in an appointment around August 2018. The plaintiff told Dr. Grace that her father should not receive any medications because he was prone to falls and she believed the medication was causing the falls. Jim Lai was also at the appointment and heard the plaintiff state that she did not want her father to receive any shots for prostate cancer. The plaintiff was under the impression that the decedent wasn't receiving any more shots until recently when she discovered that her brother, Jim Lai and Winnie Lai continued to take the decedent to get more injections by Dr. Felix Yip for several years until approximately 2020 from subpoenaed medical records of Tai Lai. The plaintiff noticed much later after her father's death that Medicare did not charge but one injection for Lupron, yet Tai Lai received numerous shots for Lupron according to Felix Yip's medical records. The plaintiff believes the decedent was medically battered because the symptoms that Tai Lai exhibited did not match the side effects of the Lupron medications. The lack of Medicare billing for Lupron wasn't ordered (medical battery) which lead the plaintiff to believe that another toxic substance was injected into Tai Lai to cause impaired mobility and transient delirium. The plaintiff saw in 2025 Tai Lai's Medicare charges and observed only

30

COMPLAINT

one dose of Lupron being ordered. At first, Dr. Tai Lai's symptoms were mostly issues with gait and balance. The issues with cognition started later in 2019. The plaintiff believes that Dr. Felix Yip conspired with various financial advisors and physicians to gain control of his assets by fraudulently claiming he was permanently mentally incapacitated by injecting debilitating drugs into Tai Lai's body to make it appear as if he was "crazy". The plaintiff recalls her mother telling her that employees at Fidelity Investments around the end of 2018 and beginning of 2019 alleged that the decedent, Tai had called into service center at Fidelity "sounding incoherent". The plaintiff thought this was suspicious because her father never called into Fidelity. He knews how to use the computer to do his trading and never wanted to pay any financial advisors to handle his accounts since he was capable of doing his own trading. He also knew that if there were issues with the internet, he would call into the internet provider, Spectrum, not Fidelity. He would tell the plaintiff, "Why would I pay someone to handle my brokerage accounts when I can do it myself? Look at how much money I made you." The plaintiff allowed her father to handle her financial accounts and together owned a joint account and a separate retirement account in which she allowed her father to have access to. The plaintiff recalls calling into Fidelity Investments around 2015 or so and to give permission to add her father, Tai Lai to the accounts and authorized trading authority on her accounts. After Ming Lai received a call from Fidelity Investments about adding a power of attorney, Tai Lai had started to exhibit changes in his personality which were not usual like willingness to spend more money when he was always very frugal. He didn't care about how much money was spent on food and didn't pay attention to costs of material items. The plaintiff believes that it had to do with the injections of an unknown toxic substance and potentially other drugs mixed in with the anesthesia that was given during his surgeries. The

31

COMPLAINT

plaintiff believes the type of toxic substances Tai Lai was being injected with was changing because the symptoms he exhibited were also changing. The plaintiff believes it was a deleterious controlled substance that not only caused issues with cognition but with his gait. These were the first symptoms for a few months. It was believed that these injections were meant to intentionally and fraudulently "incapacitate" the decedent for the profit of financial advisors at various businesses like Fidelity Investments, Citibank, and JP Morgan and eventually Medicare (inability to consent to medical care due to "incapacity"). There was a doctors note that was also produced to declare the decedent was incapacitated permanently that was submitted to Fidelity. These individuals participating in the enterprise knew that Tai Lai was a strong-willed person capable of handling his own finances but Ming Lai was an adult dependent her whole life, never had a job and was unable to withstand undue influence and fraud. The enterprise of individuals of RICO, knew she was gullible and vulnerable. This was not just two people agreeing to act to defraud the decedent but a large network of people which spanned over multiple states. It is believed that many of the financial advisors stole funds from Tai Lai through interstate commerce because his accounts were located in California and these advisors were residents of multiple states such as Colorado, Massachusetts and Texas. These advisors would extort Ming Mei Lai making her feel as if they needed her to manage her husband's finances because he had "diminished cognitive abilities".

GARFIELD MEDICAL CENTER SURGEON ANDREW HUNG M.D. UNIVERSITY OF SOUTHERN CALIFORNIA

17. Before the decedent had the prostatectomy, the plaintiff strongly advised her father **_against_** **_having_** the prostate surgery because she understood that evidenced based practices show that prostate cancer is statistically not an evasive or deadly cancer. She explained that one is more

32

COMPLAINT

likely to die of another cause other than prostate cancer. The plaintiff tried to convince him not to get the surgery because she knew that it would make his lifestyle worse because of the side effect of incontinence. But due to coercion and fear tactics from various health providers, Tai M. Lai proceeded to schedule a prostatectomy in October 2018 at Garfield Hospital. At this time, the plaintiff was a registered nurse but because of the fraudulent tactics that she observed being used on her father, she decided to enroll in a graduate program to be a nurse practitioner in 2019 on the east coast so she could better care for her parents (she also saw the same type of activity occurring with her mother's healthcare as well). She flew back and forth to take care of her father and also at times brought him to New York. The decedent also told the plaintiff after his surgery around 2020 that he was physically abused during his surgery at Garfield Hospital. Tai Lai also made it seem as if it was Dr. James Lin who coerced him into having the surgery because around 2020 when the plaintiff took him to an appointment, he stated "I know what you did, you're very bad!" At that point, the plaintiff decided to switch providers to Dr. Glenn Ho. Dr. Glenn Ho became Tai Lai's primary care physician.

18. The decedent was adamant about getting the surgery and scheduled it on October 26, 2018. When Tai Lai went to surgery, it is believed Jim Lai took him to the hospital to be admitted. The decedent was in surgery longer than expected. The plaintiff believed he was in surgery for 6+ hours. The plaintiff went to the hospital after he was admitted and waited for him to come out. Tai was in surgery for a minimally invasive surgery, did not appear to have any discomfort, any complications, was awake, alert and ambulatory. The surgery was minimally-invasive but the admitting doctors refused to discharge him that day or the next day. The plaintiff wanted her father to be discharged that evening because having worked as a medical surgical nurse, she has observed minimally invasive surgeries where the patient is able to leave

33

COMPLAINT

the same day. She was already suspicious about the surgery and didn't want to have him stay there longer. The admitting doctor said he needed to stay overnight. The next day the plaintiff continued to ask to allow her father to be discharged and the physicians refused to allow him to leave. They stated he needed to stay for 5 days (unnecessary services, False Claims Act). The plaintiff did not see Dr. Andrew Hung nor did he tell the plaintiff or patient to follow up in person. The plaintiff had to schedule an appointment herself to see him with her father. Plaintiff went with her father in March 2019 for a follow up appointment with Dr. Andrew Hung and she attempted to get medical records at USC Medical Center in Pasadena but the female office worker refused to allow the plaintiff to request a written request and stated that she had to do it online. She attempted to get medical records online but was unable to. Approximately a month after the surgery, the decedent told the plaintiff the reason why he proceeded with the surgery was because he was told the cancer would spread all over his body and it would metastasize to his bones if he didn't. The plaintiff also requested Tai Lai's medical records from Garfield hospital in 2024 and noticed that an unauthorized person was present at his surgery and Tai Lai did not have a patient physician relationship with Dr. Pierre Alain Huber (violation of patient consent/HIPAA, medical battery).

UNIVERSITY OF SOUTHERN CALIFORNIA PASADENA

19. In 2025, plaintiff attempted to get medical records again at the same location and made a written request and encountered obstacles with the employees again (obstruction of justice). Since the written request wasn't being honored, (they were not following Code of Federal Rules regarding medical records, an individual may obtain the medical records of a family member whom they were directly involved in the care or payment of the healthcare). The plaintiff was told by Rosa Michaels and Maryam Rastgoo that she was not allowed to get the

34

COMPLAINT

medical records because she had to be a personal representative. The plaintiff explained to various health information specialists that she was the daughter and individual involved in the medical care of the patient. They still refused to provide the records. In fact, the employees were directing the plaintiff to people who were not the director or custodian of records (obstruction of justice, fraudulent concealment). It is believed that the individuals were purposely doing this so the plaintiff couldn't get the information needed for a complaint and knowledge of the plan of premeditated murder. Bessie Rivera finally provided the medical records of one visit but did not provide the full record (obstruction of justice, fraudulent concealment) and also acknowledged that the plaintiff was involved in the care of the decedent. She refused to provide further records and also failed to meet and confer afterwards.

OFFICE OF DR. ANDREW HUNG

The plaintiff initially attempted to request medical records from Dr. Andrew Hung because she forgot that he was previously working at University of Southern California but currently is working at Cedar Sinai Medical Center. The plaintiff have a request for medical records served at Dr. Andrew Hung's office in Los Angeles 8635 W. 3rd St. Suite 1070W Los Angeles, California. A sheriff Taylore Boagni served the subpoena stating that medical records are to be requested at a location in Torrance, California. The plaintiff looked at the address and saw it was a hospital the decedent never went to and knew it was fraudulent misrepresentation. The plaintiff went to the office and spoke to an Asian female who stated her name was "Annie Lee" in May 2025. After the plaintiff stated that's not right, the decedent never went to that hospital, then she changed the location to Cedar Sinai. There were other instances in which the plaintiff also had other documents served which included a witness subpoena from the same sheriff Taylore Boagni and another process server Kuntak Fok, both documented that witness

35

COMPLAINT

subpoenas are to be sent to CT Corp. Later the plaintiff received a notice that CT Corp is not a registered agent for Dr. Andrew Hung. It is clear that there are employees at the office of Dr. Andrew Hung who are committing predicate acts of obstruction of justice and witness tampering involving evidence of the RICO goal, to deprive Tai Lai of his life and conceal the records of his medical care.

20. After the decedent had surgery, the plaintiff discovered much later that decedent's biopsy report from two physicians who are pathologists showing **no evidence of metastatic cancer and very minimal amounts which contradict the biopsy report of Dr. Muh-Yau Tang's report.** Another physician's report stating that decedent had **a life expectancy of more than 10 years** when he was "diagnosed" with prostate cancer at age 77. The decedent passed away at only 83 years old which is **at least 4 years short of his life expectancy.** It is also believed that multiple CT images of the decedent's body (head, chest, spine, pelvis) show that the decedent had no evidence of metastatic cancer within days of passing away, yet some radiologists wrote reports claiming specifically that the decedent had specifically "metastatic prostate cancer" in their documentation of the decedent's CT images without any evidence backing up the claim (no biopsy or lab results).

CONSPIRACY WITH FIDELITY INVESTMENT EMPLOYEES AND MEDICAL PROVIDERS

21. The plaintiff believes that the physicians were using a high PSA marker to indicate the decedent is in need for medical prostate treatment using Lupron injections to purposely fraudulently medically "incapacitate" the decedent. It is beyond a reasonable doubt that this medical battery was done with intent, malice, was fraudulent, oppressive and reckless. The reasoning to use PSA markers as an indicator of the progression of prostate cancer is not

conclusive, there are many reasons other than prostate cancer for a high PSA level. This method of medicine is not based on evidence-based practices. There can be many reasons for a high PSA which have nothing to do with prostate cancer, these include recent activity such as cycling, old age, UTI, **laboratory errors (false positives)**, and prostatitis. The plaintiff has observed individuals change numbers in the laboratory of various hospitals. The plaintiff is a board-certified adult gerontology nurse practitioner and understands the basics of cancer treatment for prostate cancer. It is believed that Dr. Felix Yip used a debilitating substance that would cause physical and cognitive issues in the decedent because there is only one documentation for the purchase of one Lupron shot given to Tai Lai, however he was injected over 7 times with an unknown substance over a few years with Tai Lai's Medicare charges. This was a plan conspired by the enterprise of individuals to fraudulently make it appear as if Tai Lai was developing "dementia" when he was just being chemically assaulted and experiencing delirium from the side effects of the medication. There is clear and convincing evidence that physicians and financial advisors were both aware that this was the common goal. The physicians also ultimately wanted to make it appear as if Tai Lai eventually developed "dementia" and "metastatic prostate cancer" to be able to fraudulently claim Medicare charges violating the false claims act, defrauding Medicare (enrollment in hospice and all the medical procedures, hospital stays) while bilking the decedent of his financial accounts, charging the decedent excessive "advisory fees" through extortion. A part of the plan and common goal was to send Tai M. Lai to a nursing home which was **against his wishes in his advance healthcare directive**. This message was not only conveyed by Fidelity employees to Ming Mei Lai (Fidelity employees refused access to Tai Lai's Fidelity accounts or Trust accounts until Ming Lai put him in nursing home through a conservatorship) but by

37

COMPLAINT

Arcadia Police officers in fraudulent police reports stating that the plaintiff wanted her father to be sent to a nursing home also (predicate act extortion to pursue a common goal of receiving funds directly or indirectly from decedent). A doctor's note was submitted to Fidelity Investments, according to Jim Lai that stated that Tai Lai was seen a few times and was totally and permanently "incapacitated" which was signed allegedly by neurologist Dr. June Chih Jesse Liu (this information was filed in the Stanley Mosk Courthouse for the removal of trustee case #24STPB11789 in an objection made from Jim Lai). It was believed that it was sent to Fidelity around 2020 by Jim Lai. A Fidelity employee named Claire Durand stated in an email that she, along with another employee Blaine Heath demanded that Tai Lai be placed in a conservatorship because of "undue influence" of the plaintiff. There was no reason to reject the power of attorney document that was submitted by the plaintiff as power of attorney for her father. Claire Durand's only excuse was because of "undue influence", not elder financial abuse. There is clear and convincing evidence that Claire Durand, Blaine Health and Andy Reidmatter conspired to purposely rejected the power of attorney submitted by the plaintiff to further the goal of extortion and financial elder abuse of Tai Min Lai for their own profit and the profit of other financial advisors who were charging his accounts with exorbitant advisory fees. As previously stated by the plaintiff, this was the common goal of the enterprise to extort money from the decedent and his wife. These Fidelity employees were in receipt of the multiple power of attorney documents which were signed by the decedent and placed Kristen Lai as a power of attorney for his financial accounts from 2019-2023. The Fidelity advisors knew if the plaintiff had access to his accounts, they knew that she would fire them since Tai Lai never had financial advisors prior to 2019, he always handled his own brokerage accounts himself, and they would not be able to charge advisory fees. Fidelity only had one physician

38

COMPLAINT

note that stated Tai Lai was "permanently incapacitated" but even with a physician note, it does not legally prohibit a power of attorney to manage his assets. The trust also states that two physicians need to declare the trustee incapacitated. Tai Lai could not withdraw any funds since 2018 (no withdraw or internet access). Fidelity employees placed an unlawful restriction on the decedent where he was unable to access his accounts online because Fidelity employee, Andy Reidmatter claimed that Ming Lai restricted the access "as power of attorney". When questioned, Ming Lai denies that she restricted her husband's accounts when the plaintiff discovered this restriction. The plaintiff attempted numerous times to help her father access his accounts with calls into Fidelity in 2019-2023 and submitted multiple powers of attorney documents for Tai Lai since Jim Lai and Ming Mei Lai failed and ceased to help Tai with his daily activities for living and the costs associated. Also when subpoenaed, a Fidelity "Legal Analyst" Alexis Fasano, stated that there were no written records regarding Ming Mei Lai prohibiting Tai from online access. She also sent an email with a malicious link to the plaintiff's email account to hack into and delete messages regarding litigation matters of the probate cases at Stanley Mosk Courthouse and to gain unauthorized access to view private information of Kristen Lai (violation of Computer fraud and abuse act).

22. Emily Desimone was the first financial advisor who started to "manage" the decedent's accounts and also gained access to the plaintiff's joint accounts in early 2019. The plaintiff noticed she was receiving emails from Emily Desimone regarding her Fidelity Account and also on her joint account with her father, Emily Desimone was listed as the advisor. She noticed that someone, (plaintiff believes it was Emily Desimone) changed the checking account for direct deposit regarding the joint account belonging to Tai M. Lai and plaintiff when originally it was set at the plaintiff's checking account. When the plaintiff tried to

39

COMPLAINT

withdraw money from her joint account, the money went to Tai M. Lai's and Ming Mei Lai's account instead of the original account which was logged for Kristen Lai's Citibank checking account. The plaintiff recalls meeting with Emily Desimone and also she had signed power of attorney first for her father at Fidelity since she didn't trust any of the advisors there. After she did this, Jim Lai and Ming Mei Lai changed it a month later around May 2019 to be the power of attorneys for Tai Lai's accounts.

23. JP MORGAN AND FIRST BANK

Around 2021, Ming Lai told her that she had taken the money she received from the sale of 22 W. Magna Vista and placed some of the funds at JP Morgan because someone at Citibank referred her to another financial advisor (common goal of enterprise to defraud Ming and Tai Lai). The plaintiff knew that Ming Lai had trust funds and other types of investments at Citibank with various financial advisors. She noticed that the financial documents stated Tai M. Lai and Ming Mei Lai Revocable Trust from J.P. Morgan. She also was told that the advisors "lost" $35,000 in some type of investment from the account. Ming Lai withdrew the funds around 2024 from J.P. Morgan. She told the plaintiff that she "lost a lot of money". The plaintiff also recalls that the trustee, Ming Mei did not ask Tai Lai to sign any documents so it is also believed that advisors were taking funds out of this account. In a motion to compel for records from J.P. Morgan/Chase Bank in July 2025, one of the managers, Alyssa Monarrez, was served a subpoena for business records. She worked at the location where the financial advisor managing the trust funds (Benjamin Ashkinos) was employed. Rather than meeting and conferring with the plaintiff regarding the subpoena, it appeared as if she was attempting to conceal the records. She also contacted multiple employees from various Chase Banks around the country to call the plaintiff stating they were the custodian of records allegedly and the

40

COMPLAINT

subpoena was not properly addressed to the correct entity. The plaintiff discovered that the employees were not custodian of records and just employees at other Chase Banks. Other employees at the Chase Bank that Alyssa Monarrez used to work at (60 E. Huntington Drive Arcadia, CA, even told the plaintiff that the managers have access to the accounts and can pull up the information. Alyssa Monarrez even asked a "lawyer from Argentina" who allegedly works at Chase Bank/JP Morgan to email the plaintiff to address the matter. The plaintiff thought this was very strange that someone who doesn't have legal authority to practice in the U.S. was emailing her. The plaintiff also believed that it could have been a scam email as well. A few months later the plaintiff discovered that she was "terminated". This was only due to an online search that indicated that the manager currently has a lawsuit for wrongful termination in the Central District of California Courts according to websites online. The plaintiff does not know whether the motion to compel had any connection with her termination. The facts showed clear and convincing evidence that Alyssa Monarrez she was obstructing justice (part of the enterprise; predicate acts) by intentionally concealing records at Chase Bank that most likely indicate financial elder abuse of Tai M. Lai and Ming Mei Lai.

CITIBANK: MANAGER, JOHANES HERMANTO, TELLER, LEA CALARA & FIRST BANK (More conspirators involved in financial elder abuse)

The plaintiff also tried to help decedent get access to his financial accounts on other banks using his check account at Citibank to help pay for his expenses. The plaintiff took her father to Citibank to issue a certified check for a car for his transportation. The plaintiff helped the decedent purchase a new car because the car that was being used at the time had problems with the frame. The plaintiff helped pick out a new car because of the frame was breaking down and she didn't feel it was worth repairing. After she picked out a car with her father, she took

41

COMPLAINT

her father to issue a certified check to pay for the downpayment of the car at Citibank. The check was issued around in December 2022. The check was issued by teller Lea Calara at 100 S. 1st Avenue Arcadia, CA 91007. However, the plaintiff needed additional funds to pay for the remainder. When the plaintiff returned to Citibank, she approached Lea Calara again regarding the next check to pay for the remainder of the car and she went to tell manager, Johanes Hermanto. Johanes Hermanto said, "Your father can't get any money out of the bank." The plaintiff said "Why?" Mr. Hermanto, stated, "Because your mom said so." The manager had no legal reason to deny the plaintiff's father to access his accounts and this caused the plaintiff hardship because she had to sell her own car to pay for the remainder of the balance. It is with clear and convincing evidence that there was no legal reason to deny the decedent access to his funds. Johanes Hermanto and Lea Calara were conspiring with the others in the enterprise to defraud and financially abuse the decedent. It was also confirmed again in a conversation that the plaintiff had on June 5 & June 6, 2026 in which they both admitted to not allowing the decedent to access his accounts and could not state a legal reason why.

FIRST BANK

 Due to of the issues plaintiff had with Citibank employees, she had to open a new account at another bank, First Bank. The plaintiff opened a joint account with her father so she could deposit the money she received from the payment of selling her own car into First Bank. Ming Lai also had trust funds at First Bank as well. An employee at First Bank violated privacy laws and told Ming Lai of the existence of the joint account owned by Tai Lai and the plaintiff. The employee lied to Ming Lai stating that the plaintiff stole funds from her and were hiding them in the joint account at First Bank. Ming Lai had Tai Lai sign a deposit slip at his home and

42

COMPLAINT

went to the bank to deposit it without him physically being there. This is another instance of Ming Lai denying and taking funds that belong to the plaintiff without permission because she was told from the First Bank employee that the plaintiff was "taking" money from the decedent. This employee is also believed to be a part of the enterprise at First Bank. The money was not the decedent's but it was the plaintiff's money from selling her car. The plaintiff believes that various employees at different banks were referring Ming Lai to others in the enterprise who were defrauding her and the decedent. It is believed that some of the employees were changing from one bank to another to make it more difficult in being detected regarding their financial elder abuse tactics. It is believed that Ming Lai was possibly referred to these individuals at the banks from the real estate agents or other financial advisors. The start of the trust funds being spread amongst various institutions is believed to be note after the purchase and sale of 2531 Louise Avenue and 22 West Magna Vista Ave. Arcadia, CA 91007.

REMAX (FORGERY AND FINANCIAL ELDER ABUSE OF TAI M. LAI AND MING MEI LAI) BY REAL ESTATE AGETNS: MAGGIE CHAN AND GARY ZUO

Approximately in March 2020, Ming Mei Lai purchased a home at 2531 Louise Avenue Arcadia, CA 91006 and was intending to sell the home at 22 W. Magna Vista Avenue Arcadia, CA 91007. During the sale of 2531 Louise Avenue, Ming Mei Lai was the only person who signed the papers for the purchase of the home. It is seen in the subpoenaed documents provided by Remax that someone forged the signature of Tai M. Lai. It is not Tai M. Lai's signature because the plaintiff was with Tai M. Lai at the time of the signing and Ming Lai admitted that she is the only one who signed the documents for the purchase of the house. It is also clear from subpoenaed documents that were provided by Rory Lee, custodian of records that the most of the forgeries were done in Ming Mei Lai's signature of Tai M. Lai. Gary Zuo

43

COMPLAINT

allowed Ming Mei Lai to forget the signature of Ming Mei Lai. Maggie Chan also fraudulently lowered the listing price (predicate act: mail fraud; listed lowered price in a published mailed advertisement) without the permission of Ming Lai (financial elder abuse). Maggie Chan didn't even ask Tai M. Lai to sign the purchase of the property on 2531 Louise Avenue but there is one signature which was also forged regarding the purchase of the current property. When Ming Lai was notified by the plaintiff since she saw the listing was lowered $100,000.00 less than the original listing price, her mother was initially angry at first but due to being an elder dependent who is unable to withstand undue influence and fraud, she did not take any action. The plaintiff stated to her mother to go to the Remax agency and to cancel the contract with Maggie Chan for breach of fiduciary duty. The plaintiff's mother refused and just stated she would just wait until the contract expires and change the real estate agent. It is believed that Maggie Chan referred Ming Lai to Gary Zuo to conceal the fraudulent tactics of financial elder abuse (lowering the price of the home without the consent of Ming Lai). It is believed they were working together to financially defraud Ming and Tai Lai. Later Gary Zuo took the place of Maggie Chan and Ming Lai signed another contract with him. In the real estate records, it is also seen that there are multiple forgeries of Tai M. Lai's signature and it is believed that Ming Lai is the person who forged most of them. Tai Lai did not agree to sell 22 W. Magna Vista and he did not sign the documents which were filed with the LA County Registrar. Ming Lai also admitted that she is the only one who signed the contract for the sale of the house at 22 W. Magna Vista Avenue and not the plaintiff's father. The plaintiff knows this to be true because Tai Lai was with the her when Ming Lai went to sign the contracts without her husband. In a motion to compel real estate business records (Removal of Trustee case #24STPB11789 Stanley Mosk Courthouse) for Remax, Maggie Chan refused to provide

44

COMPLAINT

the contract as the original seller of 22 W. Magna Vista Avenue which detail the elder abuse of Ming Mei Lai and the fraudulent lowering of the price of the property. Maggie Chan advertised a price for the property 22 W. Magna Vista Avenue that was $100,000.00 lower then the agreed listing in a printed flyer and it is believed it was also changed on the MLS. Maggie Chan refused to produce the contract regarding the sale of 22 W. Magna Vista Avenue when a motion to compel was filed (fraudulent concealment of financial elder abuse). She continued to state that the only records were produced were the sales contract between herself and Ming Mei Lai for 2531 Louise Avenue and the contracts between Gary Zuo who was the second realtor for 22 W. Magna Vista Ave. Gary Zuo was able to close the sale of 22 W. Magna Vista Avenue due to the financial elder abuse that Maggie Chan committed since she lowered the price without the consent of Ming Lai. It is believed the two agents agreed on this plan and that Maggie Chan referred Ming Lai to Gary Zuo.

CLOUDFLARE

Wire Fraud (18 U.S.C. § 1343), PREPARING FALSE EVIDENCE IN A COURT PROCEEDING, OBSTRUCTION OF JUSTICE (FRAUDULENT CONCEALMENT), PERJURY: MEL TORTORELLA AND CLOUDFLARE ATTORNEY, NATALIE RITCHIE

In a related matter, it was discovered around April 2025 that a website (predicate act: wire fraud, falsely advertising trust property of Tai M. Lai and Ming Mei Lai Trust) was publishing a listing regarding trust property of Tai M. Lai and Ming Mei Lai. This is real estate fraud. It was uncertain how long this website was listing the property for sale but it was taken down in September 2025. A subpoena that was served on Cloudflare around July 1, 2025 regarding the administrators and content stored on the website's server. The website which contained photos of property Tai M. Lai and Ming Mei Lai property 2531 Louise Avenue Arcadia, CA 91006

COMPLAINT

and was using photos of the property that were used when real estate agent Maggie Chan was selling the property in 2017-2020. It is speculated that Maggie Chan is involved in this since the photos (real estate fraud, fraudulent misrepresentation, predicate act to further the objective to financial gain indirectly or directly from trust property belonging to the Lai trust) used to advertise the trust property 2531 Louise Avenue Arcadia, CA are believed to belong to Maggie Chan the original real estate agent who sold the property to Ming Lai. The plaintiff tried to meet and confer with Cloudflare but only received evasive emails and phone calls from unidentified numbers, unidentified individuals and phone messages that did not contain the identities of the caller, phone numbers (called from blocked numbers) to call back, any means to communicate with a live person and appeared clear that the individuals intentionally wanted to remain "anonymous" (obstruction of justice, fraudulent concealment). It was discovered through a motion to compel at Stanley Mosk Courthouse in which the plaintiff obtained documents submitted by Cloudflare that the individuals that left anonymous phone messages and anonymous emails were Mel Tortorella and in-house-counsel, Natalie Ritchie. In all of the communication that these two employees left with the plaintiff, neither provided their first or last name, they did not provide a direct phone number or any phone number at all, they did not sign any "declaration" as custodian of records through an email (the declaration was blank) and they also called from blocked numbers. This is clear and convincing evidence that they were trying to prevent the plaintiff from obtaining the requested discovery and also prevent the plaintiff from identifying them as employees responsible for their actions. It is also clear that they are trying to conceal evidence regarding a legal proceeding. Ms. Tortorella and Ms. Ritchie provided a declaration under oath that the website was not hosted by Cloudflare. There is clear and convincing evidence that Cloudflare does indeed host the website and it is on the

46

COMPLAINT

Cloudflare platform. As Natalie Ritchie is in-house counsel for Cloudflare according to her declaration, she should have known to send the subpoenaed response to the court with an affidavit of the custodian of records or other qualified witness pursuant to Evidence Code section 1563(b), but instead she just had Mel Tortorella email false evidence to the plaintiff without any signature and affidavit as custodian of records. In an anonymous email (the email that Natalie Ritchie claims Mel Tortorella sent), Mel Tortorella also provided more false evidence that stated the ip address was from internet service provider Sonic along with other fraudulent information. This is clear and convincing evidence that she is intentionally attempting to conceal evidence and present false evidence in a court proceeding. Natalie Ritchie (counsel in "Washington D.C.") continues to purport that Cloudflare is not a hosting website when in fact it states it on Cloudflare's website that it is a hosting website and also hosts video content and other services. It is beyond a reasonable doubt that Mel Tortorella and Natalie Ritchie are part of the enterprise to extort and attempt to further the goal of financial elder abuse regarding selling trust property of Tai M. Lai and Ming Mei Lai by concealing the identities of those hosting the website that is falsely advertising trust property through wire fraud (predicate act: RICO) on Cloudflare's hosting platform. Natalie Ritchie also states in her declaration that she produced the individual who was the alleged owner of the website or host. This is false information because that is not even included in the documents with the affidavit that were provided from Mel Tortorella.

CAREGIVER AGENCIES, PHYSICIANS AND HOSPITAL CONSPIRACY (ELDER ABUSE, NEGLECT & INTENTIONAL ABUSE)

During the period of the sale of the house at 22 West Magna Vista Avenue and purchase of 2531 Louise Avenue Arcadia, CA, the plaintiff was attempting to finish a graduate program as

COMPLAINT

a nurse practitioner on the east coast but had to quit several times and restart her program several times due to the problems that Ming Lai caused regarding neglect and abandonment of Tai Lai. Jim Lai also refused to care for his father, Tai Lai from 2018 until the decedent's death on July 4, 2024. In January 2023, the plaintiff reinstated in graduate school in Los Angeles and stayed with Ming Mei Lai and Tai M. Lai temporarily until she finished graduate school. She anticipated that it would take 1 ½ years to finish. The plaintiff had to hire caregivers to help with the care of Tai M. Lai because Winnie Lai refused to help care for the decedent as well.

Ming Lai refused to pay for a caregiver since 2021 (a call was made to Adult Protective Services because Ming refused to pay for and care for her husband, Tai Lai. The plaintiff had to take it upon herself to find and pay for caregivers due to the neglect of Ming Mei Lai to care for her husband. The plaintiff had to use her own money to pay for the caregivers and the decedent had an agreement with her regarding reimbursement. The plaintiff's wife also agreed to pay for the caregiver services but due to her dementia, she wasn't able to remember who was paying for the services. The plaintiff found FirstLight Caregiver Services through an advertisement in a magazine and hired the agency.

FIRST LIGHT CAREGIVER SERVICES WORKING WITH CORNELL WEILL NEW YORK PRESBYTERIAN HOSPITAL EMPLOYEES IN COMMON GOAL TO MEDICALLY ASSAULT (ALSO DENIAL OF PATIENT RIGHTS TO FURTHER MEDICAL ASSAULT) DECEDENT TO CAUSE HIM TO GO TO HOSPICE SERVICES (PHYSICAL ELDER ABUSE: MEDICAL BATTERY TO PROMOTE THE COMMON GOAL OF THE ENTERPRISE; SEND TAI LAI TO THE HOSPITAL FOR ENROLLMENT IN FRAUDULENT HOSPICE CARE SERVICES)

48

COMPLAINT

The plaintiff signed a contract to have Tai Lai cared for by a caregiver. The first caregiver First Light Caregiver services matched for the decedent was a 62 year old man named Mamhoud Azhar. The plaintiff wasn't very pleased at first because of the worker was a frail old man and appeared to weigh less than the decedent. At the time, the decedent weighed approximately 145 pounds and was very strong. The tasks the caregivers were given were typical daily activities such as help with feeding, assistance with bathing, toileting, dressing, ambulating, pushing the decedent in a wheel chair when needed and cleaning up after the decedent. Mr. Azhar helped for about 3 days at the end of January 2023 and his behavior was peculiar because on the first day, he insisted on asking to help when the plaintiff stated she would need someone the next day. She also was going to leave to New York in a week or so, she said to Mamhoud that she would probably need someone the next day. She believes that either she was on the phone with the agency and Mr. Azhar heard her and that's when he started insisting that he work. The agency actually said he was not available but rather than let the agency decide, he kept on calling them to demand that he be hired to care for the decedent. He continued to press on to insist that he would come to work, however, the plaintiff stated that it wasn't up to her to decide who is supposed to come and work, it is his agency who makes the decision. She stated she doesn't pay him directly, his agency pays him. Despite them telling the plaintiff he is not available, he kept on saying, hold on. He called the agency and begged them to hire him. The calls went back and forth with him and the person from the agency on the phone. The plaintiff thought it was very odd. She said if he comes without them knowing, she can't pay him out of her pocket (First Light also made the plaintiff sign a contract stating that if she uses the caregivers outside of the agency that the plaintiff has to pay a $15,000 if she hires them within 1 year of working for the family). At this time, the plaintiff stated that it is

49

COMPLAINT

up to the agency to allow him to work or not. The calls back and forth with the agency continued for a bit and then finally he said he was able to come and the agency agreed. He literally called the agency several times while he was on the clock working for the decedent to make sure he would work for the plaintiff the next day or the day after. While he was working, he was given tasks such as mopping the floor where the decedent ate and cleaning up areas that the Tai Lai occupied. He was offered a breaks during his shifts but he refused. He worked each shift approximately 6 hours at a time. He acted as if he was in a hurry. The next time Mamhoud came, he helped feed Tai Lai. The plaintiff would recalled giving Mamhoud food for her father to eat and provided him utensils to supervise Tai outside to eat. The plaintiff tried allowing Tai to eat outside because the food would fall on the floor outside and it would not need to be cleaned up. It was also because he could enjoy the scenery in the backyard. The plaintiff left Mamhoud with Tai for just a few minutes when he was feeding Tai to get other food and drinks. This is when the plaintiff believes that Mr. Azhar poisoned Tai with excessive amounts of Lasix (furosemide), sodium pills and injected him with large amounts of glucose. A little later, Mamhoud also was scheduled to work the next day, the plaintiff believes it was a Sunday. On this day, Mamhoud said something suspicious, he said he had to quit because his client "died" two weeks ago from another job and he was going to go back to school to be a teacher. Soon after Mamhoud left, the plaintiff noticed a few days after that the decedent was behaving differently. On February 1, 2023 when the plaintiff was on his way with the decedent to get on a plane to New York, he appeared as if he almost fainted. He did not hit his head but the plaintiff was able to help him from falling. The plaintiff at this time attempted to take him to the ER because he seemed unsteady. The plaintiff arrived at the ER in San Gabriel but the decedent got up again and wanted to leave. The plaintiff was worried but

50

COMPLAINT

he appeared to be better and said he didn't want to stay so the plaintiff left the ER with the decedent. The plaintiff and the decedent went to New York and took a night flight with the decedent. Winnie Lai also went with the plaintiff and decedent. The decedent had some food served to him on the plane but the plaintiff noticed he was behaving strangely and throwing bits of the food on the floor. The decedent continued to exhibit strange behavior including confusion, lethargy and tremors. She also noticed small red dots like petechiae on his thighs and stomach as if something was injected in his skin. The plaintiff tried to feed the decedent but he didn't seem to want to eat and didn't respond well. The plaintiff was so depressed and worried but couldn't figure out what was wrong with him. She felt so confused and overwhelmed and thought he was going to die but couldn't figure out what was wrong. But after a couple days, she started to think the tremors were an electrolyte imbalance and she took her father to the ER at Weill Cornell New York Presbyterian Hospital. When Tai Lai entered the hospital, Winnie Lai and the plaintiff were present. The plaintiff stayed with the decedent in the ER overnight and slept in a chair and Winnie took over the next morning so the plaintiff could go to sleep the next morning. The plaintiff found out that her father's sodium and glucose levels were elevated at critical levels. Sodium and glucose levels do not reach these levels by themselves and Tai did not have any medical conditions that would cause this. The plaintiff believes that Mamoud Azhar purposely came to "care" for Tai to make him sick so he would go to the hospital to start the diagnosis of "metastatic cancer" to be placed on hospice (part of the goal of the enterprise). The plaintiff asked one of the physicians, Dr. Richard Polo (one of the attending physicians to decedent) to see the lab results for her father and he told her that she can log onto New York Presbyterian's website to see all of the results and medical record. The plaintiff tried to do this but it didn't work (obstruction of justice, fraudulent

51

COMPLAINT

concealment of medical records to further the demise of Tai M. Lai). This is not the only time that she attempted to get medical information from a hospital, she attempted to do the same in 2019 at USC Pasadena and was unable to access the records (obstruction of justice, fraudulent concealment). While in the hospital, the physicians stated they believed that the decedent had an upper respiratory virus so he was treated with antibiotics. At first the plaintiff didn't want him to get any antibiotics around the second day of the administration of antibiotics because she knew that viruses do not "cure" viruses. One of the nurses, Maureen, attempted to give the antibiotic and the plaintiff stated she did not want to have the decedent given the antibiotics. Nurse Maureen refused and said "He has to get it and he has no choice. If we feel he should get the medication it is our decision." The nurse violated patient rights by not respecting the wishes of the patient and proceeded to medically batter the decedent. There were also other issues of physical abuse to the decedent which was apparent when she observed the inside of the decedent's mouth. It was injured during the suctioning due to fluid overload and excessive secretions. The plaintiff told a medical student who was attending to the decedent ("Andy") that she was not satisfied with the care of the nurses at the hospital and that she wanted him to go somewhere else where the plaintiff could stay with the decedent and sleep overnight with him in the same room because of the abuse she observed. The plaintiff told the medical student and asked him if there was another place the plaintiff could take her father where she can stay with him and he said he would ask. The plaintiff also went to the nurse manager (Kristen) to complain and the nurse manager referred the plaintiff to the Director of Nursing for the 5 West (the unit the decedent was located). The plaintiff spoke to the Director of Nursing (Margaret) and told her that she was not satisfied that nurse Maureen violated patient rights, the Director (Margaret) stated that the nurses have the right to force the patient to

52

COMPLAINT

receive whatever medical treatment they find necessary. The patient stated that it was not a "life or death" situation and that healthcare providers can't do that and this was decision was the patient's choice. The director, Margaret disagreed. The plaintiff also told the Dr. Polo the same thing regarding the discontinuation of the medication and he said, "Well, today is the last day so it's no longer going to be administered." The plaintiff also believes she spoke to another Dr. Devora Isseroff, Dr. Richard Polo and the medical student (Andy) regarding the nurses who were caring for her father. She recalls telling at least one of them about the injuries to his mouth due to the forced suctioning. The plaintiff was told by the physicians on the medical team that the only way for the plaintiff to stay with her father was to stay in a room which cost $850 per night where the plaintiff could stay with her father and sleep overnight in the same room. The plaintiff stated that's fine and she attempted to get on the "list" for the room because she felt that it would be safer for the patient than to leave him alone at night. Another thing the plaintiff noticed was even after the cessation of antibiotics, she still noticed that the decedent was still receiving intravenous fluids and he had a strong odor of "antibiotics". The plaintiff knows this because when she took certain antibiotics, you can smell it in the skin and urine of the one ingesting it. The smell was very strong and she noticed that at least one of the nurses (she recalls that the nurse Meeyah) was still administering the fluids (continuous 24/7) when the decedent was not supposed to be on any fluids at all. The plaintiff believes that the decedent was also medically battered surreptitiously by various nurses who were putting antibiotics in his IV fluids and purposefully giving them when it was discontinued. She only learned this the second to last day of his stay around February 11, 2023. This was because one of the physicians came in to check on the patient and said, "Why is he on fluids still?" The plaintiff stated "I don't know." Since the plaintiff was unable to get

53

COMPLAINT

access to the decedent's medical record, she was unable to see what was being order and the nurses were able to batter the decedent without the plaintiff knowing (obstruction of justice, fraudulent concealment). When the decedent was discharged, she noticed that he was able to speak in coherent sentences. Also during the stay, the decedent spoke to several adult gerontology physicians and he was able to speak with clarity, alert and oriented, not in a state of delirium and capable of giving medical consent, but he didn't like being in the hospital. The plaintiff knew that the decedent had to stay in the hospital to obviously get better but she was very anxious at the same time due to the issues she had with primarily the nurses. She also found needle caps in the decedent's bed and other types of harmful devices that could hurt the decedent (unsafe environment). Years later, after receiving the medical records of the decedent, she saw that there were several physicians stating he had "metastatic cancer" in his bones and believes these individuals were also part of the enterprise of furthering the fraudulent diagnosis of "cancer" to place decedent in hospice care. The decedent also suffered long term residual effects of the medical battery by the antibiotics which damaged his kidneys. He was adverse to eating foods for a few months and unable to swallow easily.

USC ARCADIA HOSPITAL, SUNRISE HOSPITAL (LAS VEGAS), HUNTINGTON HOSPITAL, ST. VINCENT HOSPICE, GENERAL CARE GROUP INC., FIRST LIGHT CAREGIVERS, 1HEART CAREGIVERS, LA CARENET & CARE SPECIALIST CONSPIRACY: SAME AGENDA TO PHYSICALLY HURT DECEDENT AND SEND HIM TO THE HOSPITAL FOR THE PURPOSES OF MEDICARE FRAUD (HOSPICE SERVICES) AND PREMEDITATED WRONGFUL DEATH GOAL.

The second time that First Light Caregivers sent someone that furthered the agenda of the enterprise was Christy Pelupessy. When Christy Pelupessy started, she didn't appear to know

54

COMPLAINT

what she was supposed to do. She seemed lost and didn't understand the concept of "caregiver". For the first few days of her working, the plaintiff thought she should have been replaced because she didn't know what to do and how to handle the decedent but soon after the plaintiff trained her, she started to understand what she was supposed to do. She did all of the same type of activities that Mr. Azhar did, cleaning, food preparation, toileting, bathing, help with ambulation, dressing and daily activities for the decedent. Christy Pelupessy started to improve with her care towards decedent. The plaintiff noticed that the decedent soon after Christy Pelupessy cared for him got very ill. The next day when the plaintiff was caring for him by herself, she went to the dog park with her dog and her father. The decedent appeared to have difficulty walking at the dog park in the afternoon. She decided to take her father home as soon as possible. When she arrived at the house she told her mother that her father wasn't feeling well and she felt that he needed to take him to the hospital. Tai almost collapsed when walking back from the dog park and a fellow citizen helped her get her father back into the car. The plaintiff told her mother to watch her father while she went to get something. Her mother did not watch her father and left him alone. He got up and fell down and hit his head on the hard floor and it started to bleed profusely. The plaintiff yelled at her mother stating, "Why didn't you watch him?!?!" Then she tried to hold his head and stop the bleeding. It is believed later, Jim Lai arrived and helped the plaintiff take the decedent to USC Arcadia Hospital. The doctors were told that he fell and the plaintiff stated he was not steady, losing his balance and that's why she knew he had to go to the hospital. It appeared as if he had a fever from the ER when the nurse took his temperature. They believed he had possibly a UTI. Jim Lai stayed in the hospital overnight with the decedent while the plaintiff went home to sleep. When she woke up she went to the hospital to check on her father. When she arrived, she met Dr.

COMPLAINT

Marianne Shaknovits and she spoke to Dr. Jennifer Li on the phone. Dr. Li stated to the plaintiff she contacted her brother, Jim Lai and he agreed to place her father on hospice. Allegedly, Jim Lai denies this and phone records to Verizon were subpoenaed in January 2026 regarding calls to and from Jim Lai and the physicians for those dates to show conspiracy between Jim Lai, Dr. Li and Dr. Shakhnovits but employees at Verizon mailed fraudulent information regarding phone records stating that Jim Lai's is not a Verizon customer but evidence shows the contrary and they also claimed that they only keep records for 1 year which is also false. The plaintiff requested phone records previously and was able to get at least 6 years of records from Verizon. Verizon employees also refused to disclose the records. Dr. Shaknovits told the plaintiff that "there's nothing they can do for him." The plaintiff was confused and didn't understand what she was talking about. The plaintiff said "Can't he stay in the hospital?" Dr. Shakhnovits said, "No." Dr. Shakhnovits said that the decedent had to be discharged on hospice. The plaintiff thought to herself, that's odd that she wants to discharge him on hospice when he doesn't qualify (Medicare Fraud-no evidence of metastatic cancer, Illegal kickbacks, premeditated wrongful death). The plaintiff didn't know what documentation she wrote regarding the reason for hospice but she was not concerned about that at the time since she was just worried that her father would get worse if he stayed in the hospital and she didn't trust the nurses after her experience in New York Presbyterian Hospital. Dr. Shakhnovits stated she can discharge him on St. Vincents Hospice and she didn't even tell the plaintiff why he was being discharged on hospice (for prostate cancer). Dr. Shakhnovits didn't give any other options besides St. Vincents Hospice when talking to the plaintiff. The plaintiff agreed as long as the decedent would get antibiotics for his infection. The doctor agreed he would get antibiotics. The plaintiff believed that her father could get better at home

56

COMPLAINT

if he received the antibiotics for the infection. The plaintiff weighted the pros and the cons of staying in the hospital and also recalled the bad experience she had at Cornell Weill New York Presbyterian Hospital so she agreed to the discharge on hospice. The plaintiff was under the impression that he had a urinary tract infection due to an elevated temperature that was measured in the ER. When the decedent was discharged, the individual who took his temperature used a temporal thermometer which isn't accurate and the plaintiff felt his body and the decedent was very hot to touch. When the decedent was discharged, she went home with her father and had him rest in his bed. Decedent's daughter noticed that he was very warm and appeared to still have a fever despite taking the antibiotics for more than a week. Later the plaintiff believes that he could have been poisoned with various drugs to cause elevated body temperature. The plaintiff returned home and met with St. Vincent Hospice the next morning and signed a POLST form. St. Vincent Hospice stated they would provide a home health aide to help shower the decedent once or twice a week, provide supplies for the decedent like diapers, pads, toiletries, other types of medical supplies. It is believed that another caregiver took the place for Christy until the decedent got better and then Christy Pelupessy returned about a few days later. Christy worked as a caregiver about 2 months and she stated she had to "leave back to Indonesia" and was working on her "visa" to return. Christy Pelupessy told the plaintiff that she was trying to get a green card and that her "boss" David, the owner of the caregiving agency was offering to sponsor her for her visa as a student but later she said she said he was lying about it. She also told the plaintiff that the agency uses fake social security numbers to get paid and she also was paid only $11 per hour (below minimum wage). She also told the plaintiff a story that sounded fictitious as if her "boss" David tried to sexually assault her because she did not appear as if she was being held

57

COMPLAINT

"captive" and she would also laugh when telling the story. She also said she was looking for other jobs at other agencies and some of them were live in caregiver where the worker takes care of several patients that live in a facility. She also mentioned something strange about doing something with her "boss" David. It sounded like some type of "job of an obscene matter". She said she didn't want to do it for "free" but wanted to get paid. She inferred that there was some kind of industry to do these "obscene matters" for money (pornography). While Christy took care of the decedent, the plaintiff didn't notice anything regarding her behavior until a month after when there were times she acted lazy and then there were a couple of times she had to leave the decedent with her to care for him by herself because she had some things she had to finish for her graduate program. The decedent didn't appear to like her and at one point said "Fuck you!" to her. Tai said this approximately a month after he went to the hospital and was placed on hospice. The plaintiff was shocked at first but later realized that Christy probably did something bad to him and said things to him when she wasn't around or had her back turned. Christy told the plaintiff that she really wanted to work for the decedent and that she had to "return" to Indonesia due to her visa expiring. The plaintiff believed that she didn't leave the U.S. but found a job at another agency as a live in caregiver from what other caregivers told her. Christy Pelupessy also emailed the plaintiff a week or so later after she "left" and said that she was in Indonesia. She also showed the plaintiff her "instagram" account. The plaintiff didn't really use instagram but after Christy showed her, the plaintiff became interested in watching the videos and pictures that she posted. Christy also met another neighbor that lived near her parent's house named Steve. The plaintiff did not get along with the neighbor Steve. In fact, it is believed that he is part of the enterprise in extortion to try to also get the plaintiff to do something of an "obscene nature" for pay (this is

58

COMPLAINT

documented in a restraining order request with text messages from him in the Pasadena Court House at 300 E. Walnut St. Pasadena, CA). The plaintiff actually believes that Christy and Steve were working together in an extortion plan with the RICO enterprise because he said in text messages something about making a person dependent on him so they have to go to him for money. The plaintiff believes that Steve had a premeditated plan regarding the plaintiff hoping that she would hire an illegal immigrant to work for her family knowing that the person could sue the plaintiff, establish residency in the home of the decedent and get the plaintiff in legal trouble for harboring an "alien". She believes that he had two potential individuals (Christy and the male Pilipino friend from his church) that he was collaborating with regarding this plan because he was trying to introduce the idea to the plaintiff since he knew that she needed a caregiver. The plaintiff already knew there were so many people trying to scam her family and poison them so she knew this was just another scam. Christy was stating in emails to the plaintiff she was "crying" for days because she had to find an "American boy" to bring her "back" to America. He also said something about marrying a woman 10 years younger than him (he know plaintiff was about 10 years younger). He would harass, annoy and say threatening things in various text messages to the plaintiff stating that she would go back to being a "monkey", which the plaintiff understood meant like being a "slave" because the plaintiff wouldn't have any money. Christy also posted some photos on Instagram and emailing the plaintiff saying that she was in Indonesia and in October 2023, she started to emailing that there was a problem with her "visa" and that she had to go find an "American boy" to "fix it". The plaintiff started to figure out that there was something suspicious with what she stated in her email and figured out that she was being probably being blackmailed about her legal status. It sounded like she was being black mailed into doing something of an

59

COMPLAINT

"obscene matter" for her visa. She also told the plaintiff that she was going to be able to come to America for "free" (meaning able to get a green card without any type of payment) in an email. This lead the plaintiff to believe that she was doing something fraudulent because there is no such thing as a "free" visa. The plaintiff believes that because she was probably in a fraudulent marriage while posting public photos claiming she was Indonesia was most likely the cause of her problems. Christy emailed the plaintiff that the "embassy" said that there was a discrepancy in her "paperwork". Also the same day that Christy left to the "airport", Steve also told the plaintiff that he had to take "a friend" to the airport. Christy also inferred something strange as if she thought the plaintiff would have to do something to "help" her. The plaintiff didn't really know what she was referring to and didn't understand why the plaintiff would have to "help" her regarding her visa affairs. The plaintiff believes that the RICO enterprise was convincing immigrant female caregivers from First Light caregivers, 1Heart Caregivers, LA CareNet and Care Specialists (who came to the U.S. on a fraudulent visa-pay for green card) at all of the caregiver agencies convinced these female caregivers on fraudulent marriage visas (conspiracy to defraud the U.S. Government through marriage fraud) that the plaintiff was going to be forced into "work" in an obscene matter (pornography) and they can profit from that as a "third party" if they could kill the decedent (while trust attorney Cloyd Havens and financial advisors defraud the trustees and also change the trust so the plaintiff doesn't receive any money). The RICO enterprise goal was to prevent the plaintiff from getting any reimbursement for her father's living expenses and also write her out of the trust (Cloyd Havens attempts to change trust since he called plaintiff "potential beneficiary" despite being listed as a beneficiary of the trust which he wrote in April 2008). They also wanted others to believe that she had to "work in an obscene manner" to get a job in healthcare

60

COMPLAINT

as a nurse practitioner but the plaintiff wasn't planning on doing that since she is capable of working for herself as an independent contractor and would be able to go to states where nurse practitioners can work with full authority (New York, Nevada, Hawaii and other states) once she graduated. This is why she went to Las Vegas and New York with her father during the fall of 2023 and also because she didn't feel safe at 2531 Louise Ave Arcadia, CA because she people were trespassing onto her parents property, breaking things, poisoning the food and drinks. She wouldn't have to deal with any of the incompetent selfish caregivers. She doesn't mind living on welfare if she wasn't able to make a living as a nurse practitioner. When the plaintiff was around 22 years old, she lived in a low-income neighborhood in Queens, New York, wore donated clothing, had only one pair of shoes and didn't own anything of great value. The plaintiff would rather live on welfare than work in an "obscene matter". The RICO enterprise wasn't counting on that and tried to convince many individuals to join and commit illegal acts to further profit from financial abuse and extortion of Tai, Ming and Kristen Lai. Soon after August 2023, after Christy Pelupessy left to "Indonesia", the agency didn't provide many caregivers who were capable of handling the decedent. First Light caregiving agency only provided possibly 2 caregivers that were competent but they weren't reassigned to the decedent and they continued to provide poorly trained or elderly individuals. It was very clear that First Light Caregivers didn't do background checks (no identification tags when caregivers came to work) on the caregivers because they obviously hired individuals who were not even legal to work in the U.S. to begin with (Christy Pelupessy) nor did they provide the proper training for the individuals they sent. Also within this month of August 2023, Ming Lai received a ticket from a LA county sheriff around August 23, 2023 and the

61

COMPLAINT

plaintiff recalls her mother telling her that sometimes she feels that she has dementia because she is forgetting things.

Due to the lack of help from Ming Lai, Jim Lai and Winnie Lai, the plaintiff had no other agencies to work with and told Ming Lai to care for her husband and get another agency. The plaintiff tried to force her mother to take responsibility for her father and do something regarding his care since she refused to pay for the caregiving services at First Light Caregivers and the plaintiff had to pay for all of it. Despite telling Ming Lai that she had to reimburse her and her mother agreed, she would always make an excuse not to and to ask for the bills. When the plaintiff would show her the bills, Ming Lai would forget. The cycle would continue over and over in this manner of Ming Lai's forgetfulness. This is why the plaintiff tried again to submit the power of attorney at Fidelity in September 2023 since the employees at Citibank (Johanes Hermanto and Lea Calara refused to allow the decedent to withdraw funds from his own account without justification in 2022). During the few days that Kristen Lai was gone (around August 30, 2023-September 4, 2023), Ming Lai was unable to handle caring for the decedent since she never took care of her own parents and the plaintiff was the one who took care of the decedent for the past several years. Ming called the plaintiff frantically because Jim and Winnie Lai refused to help take care of the decedent. The plaintiff left for a few days and returned and Jim and Winnie Lai hired another agency called 1Heart Caregivers. This agency was even worse than First Light Caregiver Services. The agency did not provide consistent care for the decedent and also physically abused the decedent as well in addition to forcing incompetent workers upon the plaintiff to work refusing to change them to another individual. The plaintiff believes they refused to provide other workers because they knew that the ones that were assigned would further the objective to hurt the decedent and further his demise

62

COMPLAINT

regarding his health.  The agency would provide last minute caregivers and change schedules frequently and there rarely one or two individuals that would work consistently.  It was almost a different person every week and the plaintiff had to train them over again.  They also didn't provide the full names of the individuals and sent caregivers that claimed they couldn't do the job and were "injured" (unable to lift).   The agency kept on sending incompetent caregivers.  There were only possibly a couple caregivers that were satisfactory but they only worked for possibly 5 shifts total out of 4 months.  Multiple caregivers abused the decedent by allowing the decedent to fall and hit his head on the wall rather than slowly helping him sit down or helping him move in the same direction as them (Miriam).  There were other caregivers who also left bruises on the decedent's arm and also would force him to sleep when the plaintiff stated for them not to do that (Jocelyn).  It is also believed that a caregiver injected him (medical battery) with substances like Ozempic which caused the decedent to lose a lot of weight from 145 pounds to 110 pounds.  Another thing that the plaintiff recalls is that (Jocelyn) killed the plaintiff's pet bird.  Another caregiver when told regarding the pet bird stated it was the person who was there that week (who was Jocelyn).  When questioned, Jocelyn didn't deny it but said "So you like birds?" (animal cruelty).  Prior to speaking to the caregiver, the plaintiff went to the Arcadia Police Department to report the incident because she believed it was a neighbor at first but then later discovered it was the caregiver.  Due to the incompetence of the various caregivers and observations of the negligence and intentional abuse of Tai M. Lai, the plaintiff put video cameras in the home where the decedent was being cared for.  Once the plaintiff put cameras in the premises, the caregivers started to wear masks to cover their faces when they didn't prior to working before.  It was clear and convincing evidence that they did not want to be identified as working for the plaintiff and doing various activities that were

63

COMPLAINT

intentionally reckless or negligent towards the decedent. Soon after the cameras were in the decedent's home, many of the caregivers were soon "unavailable" and either "sick" or "injured" from some other activity. The last caregiver 1Heartcaregivers provided was Maria. She was the laziest and most incompetent worker of them all. She refused to clean up after the decedent, she caused the decedent to fall due to her incompetence, she also was observed multiple times texting on her cellphone rather than supervising the decedent and wasting time writing "documentation" for notes rather than working which was only necessary for people on government assistance and the agency wasn't receiving government assistance from the plaintiff, they were getting paid for their services. She also abandoned and left the decedent home alone (elder abuse and neglect) during her work shift to go buy food outside of the home on at least two occasions. Maria told the plaintiff that her agency told her "not to work too much." The agency was told not to send her and provide another caregiver but they refused. They also paid her during the times she was not working when she abandoned the decedent during her "lunch break" which was at least 20-45 minutes. Finally, they had no other caregivers and the plaintiff had to find another agency in the middle of December 2023 right before Christmas.

FINANCIAL ELDER ABUSE FROM ENTERPRISE RICO: FIDELITY INVESTMENTS TO FURTHER THE GOAL OF MEDICARE FRAUD, PREMEDITATED WRONGFUL DEATH, AND TAKE OVER OF TAI M. LAI FINANCIAL FUNDS AND TRUST FUNDS THROUGH THE ELDER ABUSE OF MING MEI LAI (SAME GOAL AS ARCADIA POLICE DEPARTMENT: OFFICER JOSE ROBLES)

In October 2023, Ming Lai told the plaintiff that someone at Fidelity called her and she is unable to get into her husband's Fidelity account because of what the plaintiff "did"

64

COMPLAINT

(submitting the power of attorney as one of Tai Lai's agents). The Fidelity advisors were obstructing justice by preventing the plaintiff from helping him get access to his finances and used this to extort Ming Lai to petition for a conservatorship in order to get access to her financial accounts. Ming Lai said someone at Fidelity told her she has to go to court to get access to the account and put her husband in a nursing home. At this time, the plaintiff thought it was strange and realized that they must have been annoyed that the power of attorney was finally submitted. She thought that she should have a right to help her father since they obviously received it. The plaintiff didn't think that Ming would actually go through with sending her father to a nursing home at the time or do any legally since she knew that as a spouse she should be able to access the account of her husband as power of attorney. The plaintiff submitted the power attorney her father signed electronically and she was under the impression that it should be approved since it was a valid and someone in another office finally approved it and that someone at the local office was just trying to block the plaintiff's efforts. The plaintiff believed the other times when they were physically handed to an employee at Fidelity, they were not submitted and probably destroyed but later, the plaintiff believes that it was actually submitted but they refused to honor it and did not notify the decedent or plaintiff. In the end of December 2023, the plaintiff discovered a letter that was sent addressed to the plaintiff in Ming Lai's room. It appeared as if Ming Lai was hiding it from the plaintiff. The plaintiff believes she was told by Jim Lai to hide the information that was addressed to Kristen Lai. Ming Lai also stated that she didn't have to tell the plaintiff anything regarding the trust around this time and she didn't have to tell the plaintiff what the attorneys told her. She looked at the letter and it was from Eric Yamamoto, her attorney and it had to do with a conservatorship for her father. The plaintiff went to a random local attorney's office after

65

COMPLAINT

discovering the proposed conservatorship but didn't speak to any attorney because it was close to closing and was able to speak to what is believed a paralegal in the parking lot of an attorney's office. The plaintiff briefly told the paralegal about the situation and told the paralegal that she believes the plaintiff has dementia and she already had a police report regarding elder abuse made about her in 2021 because she wasn't properly caring for the decedent. The paralegal said that the plaintiff probably needs to have her doctor assess her for the dementia. The plaintiff called her primary care physician Dr. Andrew Liao. The plaintiff called Dr. Liao and the office worker set an appointment to speak to the doctor on the phone but when Jim Lai found that the plaintiff told his mother "Don't go!!! She's going to tell the doctor you have dementia!" The plaintiff had to speak to the doctor over the phone because her mother refused to speak to the doctor and left to the mall.

Then in the beginning of January 2024, the plaintiff took some time off to take her parents together on a trip to Las Vegas. During this time in Las Vegas, Ming Lai received a phone call from Jim Lai and the plaintiff heard her speaking to Jim Lai. He said "Don't let Kristy hear anything you're talking about, a probate investigator is going to call you." Then the probate investigator called and Ming Lai spoke to her. The plaintiff didn't hear what Ming was talking about because she told her daughter to stay with her father in the other room because of what her son "told her". After spending a few days in Las Vegas, the plaintiff and her parents returned to Los Angeles. A few days later, the plaintiff went out with her father and was either called or told last minute that a probation investigator was coming over to speak to her father. At this time, the plaintiff was already outside and worried because she recalls her mother signed a paper stating she had to place a conservatorship over her father and proposed to put him in a nursing home. The plaintiff looked into the home through video cameras in the home

66

COMPLAINT

and saw a Pilipino woman sitting with her mother and brother at the dining room table. She didn't hear anything because it was only video. Then approximately a few days later, the same thing occurred where the lady called and wanted to speak to Tai Lai but the plaintiff was already gone with him doing errands. Since she realized she probably needed two doctors to "incapacitate" her mother because she recalled that's what the trust said. So she went to her mother's oncologist Dr. Monty Polonsky around January 22, 2023 and spoke to him. She was very upset because she said told the doctor that she wanted to see if he could assess her for dementia but he said he didn't observe her or see her for a while. The plaintiff also told him that her mother had the police come to the house in 2021 to but she didn't have the report. The doctor just printed up an APS number to call and said "maybe you can get information there". The plaintiff called the number but nobody picked up and it kept ringing. Then the plaintiff went to the Arcadia Police Station around that same day and spoke to an officer Evelyn Calderon. The plaintiff told Officer Calderon that the police went to the home at 2531 Louise Avenue Arcadia in the spring of 2021 around April she believed or June regarding an elder abuse investigation regarding her father Tai M. Lai. Calderon said she would check and came back stating, there's no report or incident that shows anyone came. Then the plaintiff stated, "I know the officer who came and his name is Robles. He spoke to my mother and me." Then she went back and looked for a while and just wrote on a pink post it note, 6/21/2021 6:43 p.m. She said that's the date they came. The plaintiff asked isn't there a report? Officer Calderon said "No." The plaintiff later discovered that officer Calderon lied and was concealing evidence of a crime (obstruction of justice, misprison of felony, fraudulent misrepresentation), which was the fraudulent misrepresentation reported by Officer Robles (predicate act: obstruction of justice). The next day or a few days later, the plaintiff went to court for the

67

COMPLAINT

conservatorship hearing and brought her father. She went into the courtroom and told Judge Rosenbloom that she objected to the petition and was instructed to write an objection or competing petition by a certain date in March 2023. The plaintiff went to various places for help at the law library but she wasn't able to get anyone to help her and nobody at the Bet Tzedek center would help either. The plaintiff had to ask for a continuance and tried to write whatever she could in a competing petition. Then she was told that she had to have a bond and since she wasn't sure she could afford that she was given the option of just writing an objection. During this time, the plaintiff was finishing up her last two terms in her nurse practitioner program and while caring for the decedent. She was very stressed out, overwhelmed and she also had so many problems with caregivers that were not properly supervising the decedent and abusing him. It didn't matter which caregiver services she used, all of the services had caregivers who had the common goal of hurting the decedent and sending him to the hospital or physically abusing him.

ENTERPRISE RICO: COLLABORATIVE EFFORT FIDELITY BROKERAGE SERVICES ADVISORS, CAREGIVING AGENCIES & HOSPITALS (NURSES, PHYSICIANS, SOCIAL WORKERS, SECURITY GUARDS) GOAL TO END DECEDENT'S LIFE AND CONTINUE TO FINANCIALLY ABUSE DECEDENT, HIS WIFE AND EXTORT PLAINTIFF

CARENET LA

In January 2024, the plaintiff had to find more appropriate caregivers for the decedent so she searched and found Carenet LA. They sent a caregiver named Suzanne. At first, she was acceptable as a caregiver but soon, she appeared to have a very bitter attitude and made statements about her own life to the plaintiff regarding "making mistakes" which it seemed as

68

COMPLAINT

if she had financial problems. She appeared very angry and spiteful and started to intentionally harm the decedent like allowing him to walk into a chair purposely in the social security department so he would fall and didn't attempt to help him. She also squeezed the decedent in front of the plaintiff very hard in the rear to cause him to scream. She also did things intentionally like put a grease like substance on the floor where the decedent stays in his office so he would slip. After Suzanne abused the decedent, the plaintiff requested a different caregiver. The agency never provided the last names of the caregivers nor did the caregivers identify themselves with any employee badge. The next caregiver that was hired was Mary. Mary only worked for approximately a couple weeks and then she would have to cancel. She also behaved very strange and told the plaintiff that she wanted her "boyfriend" to pick her up at the decedent's house. The plaintiff thought it was strange because he didn't have a car and she acted suspicious about the arrangement. The plaintiff didn't want him to meet her at the house and told her to meet him at the end of the block. She also texted the plaintiff before asking to "sleep over" at the decedent's home because she was not getting along with her boyfriend. At this point, the plaintiff stated "No." because she felt it was a way for the caregiver to try to "establish residency" in the decedent's home. Mary also told the plaintiff that she used to live in Florida and was only paid $9 an hour to work. The plaintiff told her that it was illegal to do that and that employers have to pay minimum wage no matter whether you are legal or not. Mary was like Jocelyn, Christy and the other caregivers that Steve, the neighbor suggested who desired to be live-in caregivers. The plaintiff could tell she appeared to know Steve as well by the way she spoke. In fact, many of the caregivers would talk to the plaintiff and acted as if they knew each other and communicated amongst each other even though they were working at different agencies. They would mention things regarding the

69

COMPLAINT

same elements about "obscene matters" in a subtle way. They also appeared as if they knew what each other were doing regarding the goals of the enterprise and actions of other caregivers. Some of the caregivers (all female) would show the plaintiff pictures or videos where they appeared "sexualized" wearing revealing clothing and making sexually provocative gestures. The plaintiff also had a conversation with a neighbor who also is believed to be in the conspiracy and enterprise's goal of theft and extortion against the plaintiff and her parents. The neighbor, Steve told the plaintiff approximately a year ago that he knew a "friend" from his church that was from the Philippines and he was here illegally and living in his car. The plaintiff could tell he was trying to see if she would hire him as a caregiver for her father but because she knew that the neighbor was untrustworthy, he would argue with her and stay threatening things, she knew he was trying to find a way to "swindle" the plaintiff. He asked if the plaintiff knew anyone who would hire him and she said "no." She knew he was trying to get her to hire her friend and allow him to live in the house making it very difficult to "kick him out". Mary was not the only caregiver who was trying to live in the decedent's home and sleep over. Jocelyn from 1Heartcaregivers also asked multiple times to work overnight and the plaintiff didn't want her to. In fact, when she saw that the plaintiff had put bed sheet on the second bed in the decedent's room, she said "Who's sleeping here!?!?! Why is someone else sleeping here?" as if she had authority to choose who should sleep in the decedent's room. Also, Christy from Firstlight Caregivers also wanted to live in the decedent's house as well when she was working for the plaintiff.

After Mary claimed multiple times she needed a play to stay (trying to establish residency to extort the plaintiff and her family), the plaintiff was given a new caregiver named Tabitha. Tabitha appeared to work hard at first but like Susanne she also made a strange comment about

70

COMPLAINT

her own financial problems that she created for herself. She did the same caregiving activities as the other caregivers but she also started to sexually harass the plaintiff and make subtle hints at extortion efforts as her neighbor Steve regarding "work" in obscene matter. She told the plaintiff about strange "parties" that she would go to at her "grandfather's" place. She also stated she had a case where she beat up her ex-girlfriend's brother and had to go to "jail". The plaintiff wasn't sure whether her stories were true or not. It was much later that the plaintiff believes that Tabitha had possibly had large debts from financial problems that could be from a criminal nature. Tabitha also stated she was in the "military" the coast guard to be specific and she showed the plaintiff some videos of her "graduation" for a ceremony. When the plaintiff looked at the video it looked very weird like Artificial Intelligence because her face looked like it was melting off the head or bouncing off the surface like a bobble head figure. All of the pictures she showed the plaintiff from being in the "coast guard" appeared photoshopped. Tabitha also claimed to be a "lesbian" and she had a girlfriend. She stated she was not married but had one girlfriend she lived with. One time Tabitha stated to the plaintiff she was looking for a "sugar momma" and the plaintiff stated that's pretty hard to get one. After the plaintiff said this, Tabitha appeared as if she was going to cry and she started to get very frustrated. Then the plaintiff felt that Tabitha was referring to her to pay her bills. During the same month around April 17, 2024, the plaintiff received a call from the probate investigator "Sandra Tello". The probate investigator came to the residence of Tai M. Lai and spoke to the decedent and the plaintiff. The investigator did not look like the same person who came to speak to Ming Mei Lai and Jim Lai. This lady was a younger Hispanic female with brown hair approximately in her 30's. The female who came to speak to Ming and Jim Lai appeared to be an Asian woman who wore a mask and glasses in her 60's. The probate investigator who

71

COMPLAINT

identified herself as "Sandra Tello" asked some questions regarding the decedent and also the plaintiff. "Sandra Tello" also went into the room where Tai Lai was and asked him questions without the plaintiff around. She didn't hear her father respond to her. The probate investigator, "Sandra Tello" left after interviewing the plaintiff and her father. The plaintiff discovered that Sandra Tello and Maribel Torres did not mail any investigation letters to the plaintiff or her mother and it was not filed in the court until much later. The investigation contained fraudulent statements by the plaintiff and false accusations of financial elder abuse about the plaintiff by Sandra Tello. She recommended a "neutral party" be the conservator for Tai Lai (goal to extort and hire a paid conservator to further the objective of the RICO conspiracy, fraudulently gain money through any financial tactics). Later in the week the plaintiff had to deal with problems with her father getting sick. The plaintiff believes that Tabitha poisoned her father around April 18, 2023 before a court hearing on April 22, 2024 because he was having abdominal muscle pain. The plaintiff started to realized this much later that he was poisoned. The plaintiff believes that the drug was an overdose of statin drugs. These types of drugs do not show up on a drug test because they are not controlled substances. The plaintiff took the decedent to the emergency room at USC Arcadia Hospital and San Gabriel Hospital on April 19 and 20, 2024. The plaintiff didn't know what was wrong because the physicians at USC Arcadia Hospital and San Gabriel Hospital weren't properly diagnosing him and just discharging him. Tabitha came to one of the hospitals with the plaintiff but then was sent home because she was no longer needed. The plaintiff had tried to keep the decedent at home and was very worried because of how sick the decedent was. Sunday night, April 21, the night before court, she recalls Jim Lai took Tai Lai away when he was very sick and the plaintiff. The plaintiff went to court alone and when she returned, her father still was missing.

72

COMPLAINT

The plaintiff called the Arcadia Police and this is when officer Christopher Tsai and officer Dylan Morrill came to the residence of Tai Lai. The plaintiff already explained what happened and that Christopher Tsai was the first to arrive and then Dylan Morrill came. Officer Morrill told the plaintiff that her father was not a missing person, that the plaintiff can't request a restraining order against her mother for her father and brother even though he was told that her father was being abused and neglected. He just ignored the claims that the plaintiff stated and did not provide equal protection for victims of abuse under the 14th amendment of due process and equal protection. Later the plaintiff discovered the same evening that Tai Lai was in the hospital due to neglect and a fall. Tai Lai stayed in the hospital for approximately 5 days and then he was discharged again on St. Vincent Hospice by the recommendation of Dr. Jennifer Li at USC Arcadia Hospital. It is believed that Ming Lai signed the papers for the hospice discharge. The plaintiff was not present when the decedent was discharged but Dr. Jennifer Li claims she spoke to the plaintiff which is not true. It was discovered that Dr. Li spoke to the plaintiff's cousin. The plaintiff was very exhausted from handling all of the problems that the caregivers, her brother and mother caused the decedent. St. Vincent Hospice again did not have any reason to enroll Tai Lai on hospice care because they did not have an evaluation by an oncologist that stated the decedent qualified under his diagnosis. The only information the physicians at USC Arcadia Hospital was CT readings by radiologists who claimed he had "metastatic prostate" cancer. These physicians were obviously part of the RICO enterprise to further the premeditated wrongful death of Tai M. Lai.

Around this time, the plaintiff also tried to file a conservatorship for Ming Mei Lai (March 2024) because she saw that she was being taken advantage of and she had dementia. However, the plaintiff withdrew her petition for conservatorship of Ming Mei Lai at the hearing on April

73

COMPLAINT

22, 2024, because the other attorneys (Yamamoto, Finkelberg, Piro) bullied her into withdrawing it. She recalls some of them or all of them write that she was an "adult dependent" which is not true. It is Ming Mei Lai who is the adult dependent who never had a job and was not capable of handling financial matters for the family. The plaintiff also was overwhelmed with having to file two petitions for two people (as a self-represented litigant with no help from any of the clinics-like Bet Tzedek Clinic), finishing her master degree as a nurse practitioner, taking care of Tai and Ming Lai while having to fight her brother and find a way to get better caregivers or a better living situation for herself and her father. From January 2024-July 5, 2024, the plaintiff took her father multiple times to New York and Las Vegas because she was trying to avoid the caregivers, her mother who was neglecting her father and refused to listen, the neighbors who she believed were trying to trespass and harass her and she did not feel safe staying at 2531 Louise Avenue with her father.

Tabitha, the caregiver from CareNet LA momentarily seemed to stop sexually harassing the plaintiff for a few days and the plaintiff thought also that Tabitha appeared very "desperate" to work and needed money to pay for whatever financial problems she had. When the plaintiff suggested to Tabitha about trying to get a career and education in something to get help her earn more money, she appeared adverse to that suggestion. The plaintiff suggested to pay her some money for staying longer to help because she thought that Tabitha would possibly take the opportunity to provide better care for the decedent. The plaintiff realized later that Tabitha was part of the RICO enterprise and believes that Tabitha was under the same impression that she could extort the plaintiff into doing something of an "obscene matter" in order to get a job by the various statements she said to the plaintiff. Tabitha would also speak in subtle ways to show that she was trying to get the plaintiff to do foolish things of an "obscene matter" by

74

COMPLAINT

texting her stating if she would give CPR to her. She also made comments about her girlfriend "Jennifer" and that she would like to do some sexual videos with her with her wearing a diaper. The way Tabitha stated this information, the plaintiff could tell she was inferring that "Jennifer" was the plaintiff. Tabitha also stated that she was in the "military" and there were benefits if you were married and you get $1000 a month and she said she was in the military for 5 years. The plaintiff knew that there is no increment of 5 years in the military and she never heard of any benefit of getting $1000 for being married. This is what lead the plaintiff to believe that not only was First Light Caregiver services involved in this massive fraud but so were other caregiver services such as LA CareNet. Also in May 2024, Tabitha stated something strange to the plaintiff about an argument she had with her girlfriend "Jennifer". The plaintiff believes that Tabitha was using the name "Jennifer" to mean various people which included the plaintiff. Tabitha said she had a "fight with Jennifer" (meaning Christy) and the plaintiff believes that Christy and Tabitha were communicating with each other in doing something of an "obscene matter" for money. The plaintiff believes that after Tabitha had this agreement (to do an AI video of an "obscene matter") with Christy that she used this to blackmail Christy regarding her legal status. Christy told the plaintiff about doing some video about AI in an email around the same time (May 2024). Later, Christy stated in an email had some problem where she might not be able to "come back" (meaning having a legal status) to America. At the same time, Tabitha also stated she and "Jennifer" had a fight and they "broke" up and then they decided to "stay together". She was very happy at this time when this occurred because she said something about getting paid $50. Tabitha made it appear as if she got paid some money to black mail Christy into doing a video and use it against her regarding her legal status in an indirect manner. Around this time, Christy also posted a video

75

COMPLAINT

of a person graduating wearing a cap and gown with a statement that her father was dead and the graduate was mourning on her Instagram. The plaintiff never told Christy that she was in school for nurse practitioner. The video seemed to be a hint that Christy knew that someone was going to do something towards the plaintiff's father. All of these statements that all the caregivers were telling the plaintiff showed circumstantial evidence that they were all communicating together with the same goal and objective to hurt the decedent and were involved in doing things of an "obscene matter" for money.

CARE SPECIALIST AND SUNRISE HOSPITAL COMMON GOAL: FRAUDULENT MISREPRESENTATION FOR THE PURPOSE OF MEDICARE FRAUD: STROKE DIAGNOSIS

After April 2024, the plaintiff was referred to Care Specialist for caregiving services because she could tell that LA CareNet was also problematic regarding caregivers and elder abuse. She called the agency and they provided some caregivers to interview. The plaintiff spoke to one of the caregivers they provided and her name was Lamyia. She came to the house around end of April or beginning of May 2024 to introduce herself. The plaintiff met her but Lamyia kept on stating she would come but never came multiple times. The agency send other caregivers in her place and each of them just stayed for a couple days and they did not provide the full names of the caregivers. None of the caregivers also had name badges, this was the same for LA CareNet. LA CareNet did not provide last names of the caregivers. Lamyia stated she would come several times but never came. Ultimately, another caregiver replaced her and Care Specialists sent other caregivers. Lamyia finally came a total of 4 times at the end of May 2024 and the last time she came was on June 11, 2024. In this visit, she helped the plaintiff and in the early evening, the plaintiff allowed Lamyia to help the decedent out of the car and

76

COMPLAINT

opened the front door. Within the few minutes of leaving the decedent alone with Lamyia, the plaintiff noticed a red mark behind the ear of the decedent's left ear that was the size of a dime. She thought it was very suspicious but the decedent didn't behave or act differently at first. Later, the plaintiff noticed that the decedent had difficulty swallowing. The plaintiff noticed the problem with the swallowing which was more pronounced the next morning. The plaintiff used to be able to swallow pills but this time, he was unable to and he had difficulty swallowing his food. It wasn't until much later after his death that the plaintiff realized that Lamyia had used some type of paralytic to cause impaired swallowing on the decedent and the red mark near his mandible was probably the area she administered the paralytic. Lamyia also made some indirect comments as if she knew Christy and Tabitha were doing and also stated they were "up to a plan". She referred to these other "team members" that were on the basketball "team" were primarily "lesbians". But after watching Lamyia's actions and months later, the plaintiff realized that Lamyia was also "in on the same plan". The decedent continued to have issues with swallowing for the whole week and the plaintiff was so distraught because she did not feel safe around any of the caregivers and decided to leave to Las Vegas on June 16, 2024. The plaintiff at the time did not know or realize that his impaired swallowing was due to the actions of Lamyia whom the plaintiff believes injected a paralytic into the decedent's neck. Tai Lai was able to eat very slowly but he would also vomit at times due to his impaired swallowing ability. The plaintiff was able to help him eat but he had to eat small bites and very slowly. On June 16, 2024, the plaintiff took her father to Las Vegas and they ate at a sushi restaurant. At this time, Tai Lai also vomited multiple times and was unable to keep the food down. At this point, the plaintiff attempted to take some food for the decedent to try to eat in the hotel. The plaintiff was able to slowly get the her father to swallow food in

77

COMPLAINT

very small portions and very slowly. She called an urgent care line for a physician because she didn't want to go to a hospital because he was unable to swallow and also appeared congested. She requested if he could provide possibly a prescription for antibiotics. The plaintiff wasn't able to get a good reading on her pulse oximeter for her father's oxygen so she panicked. The reading was 93%. The physician instructed her to go to Sunrise Hospital ER. When she went to Sunrise ER, the plaintiff saw that Tai's oxygen saturation was 98-99% from an ear oximeter probe. At Sunrise ER, the plaintiff entered and told the physician and the scribe that Tai Lai **could not swallow and he vomited**. But the emergency room physician and the scribe documented "denies vomiting or difficulty swallowing". The reason the plaintiff believes that these two individuals falsely documented on a legal document what the plaintiff said was to cover up the actions of Lamyia (obstruction of justice, fraudulent misrepresentation part of the RICO plan to pretend that decedent died from metastatic prostate cancer rather than starvation), the caregiver because they were in on a common goal. Also when Care Specialists finalized the billing for the plaintiff, they did not even include Lamyia (a caregiver that worked for the plaintiff which was sent by Care Specialists) in the documentation of employees who came to care for Tai Lai. Care Specialists tried to cover up the elder abuse of the caregiver they employed (obstruction of justice, fraudulent concealment, fraudulent misrepresentation) and sent to purposely paralyze the decedent to send him to the hospital. They only "charged" the plaintiff for other caregivers but did not charge for the 4 times that Lamyia came. The last day Lamyia came (June 11, 2024) she claimed she didn't get paid by Care Specialists but the plaintiff believes she was just working with Care Specialists for the further goal of the RICO enterprise which was to cause the premeditated wrongful death (murder) of Tai Lai through fraudulent means by medically assaulting the plaintiff by caregiver, Lamyia. She also was

78

COMPLAINT

friends with another caregiver that Care Specialists who worked one day for the decedent named Vanessa and Lamyia showed the plaintiff some videos of the two together in sexualized videos. Lamyia told the plaintiff that Vanessa was a "lesbian" but she was "straight". When the plaintiff went to the ER, she did not sign any admission papers but Sunrise Hospital but in medical records there are forgeries of the plaintiff's signature on June 21, 2024, a date when the plaintiff was unable to enter the hospital because they prohibited the plaintiff to enter due to a fraudulent cause. After the plaintiff brought her father on June 16, 2024 to the ER, Tai Lai was admitted and the plaintiff received a phone message from the ER doctor early in the morning of June 17, 2024. The next day the plaintiff went to the hospital in the morning to speak to some physicians and she was told that the decedent had a hemorrhagic stroke. The plaintiff was very confused as to how he could have had a hemorrhagic stroke since he didn't have any precipitating factors that would cause such a thing and he did not fall recently. The plaintiff also asked the nurse who was assigned to him (June 17, 2026) about his lab results and she would not provide them to her. She said regarding the PT/INR, they are "a little high". The plaintiff didn't understand how the decedent could have a high PT/INR since he didn't take blood thinners. She also asked the nurse to nasal suction him and provide some warming packs but she didn't do it. The plaintiff also spoke to another physician who asked her if she had power of attorney for Tai Lai and the plaintiff confirmed to the physician, "yes". After two days, Tai Lai was transferred from the Neuro ICU to a regular floor. The plaintiff went around June 18, 2024 to the new unit in the afternoon and accompanied her father to the new room. In this room, she met a nurse named Sasha. She told the nurse Sasha that her father needs physical restraints so he doesn't get out of bed and falls down. Sasha said "We don't use physical restraints on this floor." She also said, "Even if the doctor ordered it, I wouldn't obey

79

COMPLAINT

listen to his orders because I don't feel that it's right so I would do what I think is necessary." Nurse Sasha also said something about ordering a chemical restraint from the doctor. The plaintiff stated she didn't want a chemical restraint because that would cause sedation and the decedent wouldn't be able to eat if he was sedated. She said she didn't care. Nurse Sasha was also asked if she could nasal suction the patient and nurse Sasha said, that's not in her job description and duties. As a registered nurse, this is within the scope of practice of registered nurses. Nurse Sasha blatently refused to do the nursing task. She said only a respiratory therapist can do it. Nurse Sasha said that patient Tai had to stay on bed rest, he is not allowed to get up and he is not allowed to eat anything. At this time she spoke to the nurses at the nursing station and said she wanted physical restraints and the nurses said "Don't worry, we're here to watch him, he's close to the station." The plaintiff then left to buy something to eat and when she returned, her father already pulled out his IV. The plaintiff went to the nursing station and told them that her father pulled out his IV and they didn't do anything for a couple of hours. She continued to tell them that he needed physical restraints to prevent falls and pulling out his IV. It was believed that the charge nurse stated, we don't do that on this floor. The plaintiff asked to have the patient transferred to another floor and they said no. He is going to get a chemical restraints. The charge nurse stated they only use chemical restraints on that floor. The plaintiff stated she didn't want her father to get chemical restraints. The charge nurse nor did Sasha respect the patient's choice of refusing chemical restraint, being free from abuse and being in a safe and non-abusive environment. The plaintiff spoke to both nurses on both shifts for day and night including the charge nurse and they all refused to put Tai Lai on physical restraints and forced chemical restraints on Tai. Also there was a chair in Tai Lai's room when she left to get something to eat and it is believed that Sasha R.N. removed the chair

80

COMPLAINT

so the plaintiff couldn't stay there. The plaintiff asked again for another chair. It took a while for the nurses to get another chair but the plaintiff saw that he was ordered to be on bed rest and not get up. The plaintiff disregarded the orders and had her father get up and walk around in the hospital and took a video because she knew they were not helping her father get better and putting him in a dangerous situation (refusing to feed him and also refusing him to allow him to move with assistance, they were keeping him bed bound which is not appropriate care). She wanted to document that he is capable of doing many things and he was not as "sick" as they wanted to make it appear. The radiologists tried to state he had a "hemorrhagic stroke" and the new attending physician wanted him to "get worse" (Dr. Batieha). After the plaintiff tried to stay with the decedent as long as she could, the nurses said that she had to leave. The plaintiff believes she spoke to two nurse practitioners that day. The plaintiff left and returned the next morning and saw that there were many things wrong (June 19, 2024). She noticed that the bed alarm was off. She also asked again for the decedent to be placed on physical restraints in which the response again was no. They continued to administer chemical restraints despite the objection of the plaintiff. She told all the nurses on both shifts day and night for June 19-20, 2024. One of the charge nurses Belinda stated that she doesn't have to do anything that the patient requests if she didn't feel it was "right" (basically denying patient rights). The nurses refused to nasal suction the patient and called a respiratory therapist to do the task when it is within the scope of duties of nursing which was only one time. On June 20, 2024, the plaintiff spoke to Dr. Batiaha. When she first met Dr. Batiaha started to act flirtatious towards the plaintiff and sexually harassed her by his body gestures and stuck his back and rear close to her face (believes this was an extortion tactic to try to get the plaintiff to do something of an "obscene matter" with the physician in order to stay with her father). The plaintiff spoke told

81

COMPLAINT

him that she didn't want her father to receive chemical restraints but Dr. Batiaha refused to change the order and put physical restraints. Dr. Batiaha also wanted to do a bone scan and the plaintiff didn't find it necessary. She could tell that Dr. Batiaha wanted to make it appear as if her father had cancer (Medicare Fraud) and she didn't want to waste time or medical resources on that. She recalled that the plaintiff had abdominal pain and was told that he had some gallstones in a CT (this was at San Gabriel). At this time, she was under the impression that this was the cause of his pain (later she believes it was due to the overdose of statin drugs that a caregiver gave the decedent). Dr. Batiaha said no and started to get angry. He also started to aggressively question the plaintiff what her mother's phone number was and she refused to provide it. The plaintiff thought that he would leave her father alone if she just told him that he was on hospice and not to do any further testing but he questioned what hospice and she said St. Vincent Hospice. Then he started to yell and say "Get out of here, you can't be in here! I'm going to call your mother. Call security!!" He left and the plaintiff stayed with her father for a while and then later left to get something to eat. When she returned, she was told by the charge nurse Belinda that she couldn't be here and also she told Belinda she wanted her father to be on physical restraints and Belinda also refused. She said she didn't have to do anything the patient wanted if she didn't feel it was necessary. Later, the plaintiff went to the same floor to see her father but the staff had kidnapped him and moved him to another location. The plaintiff spoke to the nurse manager, Holly and told her that she wanted to change the doctor because he was not respecting patient rights, did not provide a safe environment for the patient. She also asked to have her father transferred to another hospital. Manager Holly said that the doctor stated the plaintiff couldn't see her father and she was prohibited from getting any information about him. Manager Holly said this was the reason why she was being "kicked-

82

COMPLAINT

out". Holly also refused to provide the information as to who the director of nursing was or any grievance process. After that, the plaintiff went into the lobby and waited. She decided to try to speak to the nurse manager again and spoke to Belinda who said "She can't confirm or deny it and after you speak to the manager, you have to leave the premises" Then manager Holly came out again and just called security to kick out the plaintiff wasn't without a justified reason.

The next day the plaintiff attempted to enter the hospital in the morning but was met with a female in pink scrubs and she stated that the plaintiff wasn't allowed to go inside the hospital. Later the plaintiff discovered that in medical records a social worker named Brandi Hall claimed she spoke with the plaintiff. The plaintiff never spoke to any social worker named Brandi Hall and only spoke to a social worker named Christian. The plaintiff spoke to Christian because she told one of the physicians she believed that the decedent was being abused by various caregivers. Brandi Hall documented fraudulent encounters regarding speaking to the plaintiff and also it was discovered that someone had forged the signature of the plaintiff signing consent for services on June 21, 2026. The plaintiff wasn't able to get into the hospital to sign anything on that date. The date she spoke with social worker Christian was around June 17, 2024. She told the social worker that she was worried because she felt that the caregivers were abusing the decedent and no matter how many different agencies she went to all of the caregivers were the same. She also told social worker Christian some of the things the caregivers were doing like what Susanne was doing and intentionally hurting the decedent by grabbing him to make him scream. The plaintiff attempted to call her mother and she was able to only speak to her on June 22, 2024. Allegedly her mother told her that she was going to see Tai that day but later she discovered that her mother lied and didn't go to see her father.

83

COMPLAINT

The plaintiff was under the impression that her father was with her mother on Saturday and Sunday June 22-23, 2024. Later she found out that she went on June 25, 2024 to pick him up. The plaintiff was so worried that she went to the police department in Las Vegas to ask what she could do because her father was falsely imprisoned and kidnapped (moved to another location in the hospital) without consent. The plaintiff filed a temporary restraining order to request the protection of Tai Lai because of the abuse he was experiencing in the hospital and detailed the isolation and abandonment of decedent along with the financial abuse and neglect committed by her mother and brother. LA Superior Court Commissioner Laura Cohen at Stanley Mosk Court, despite being given information of the **isolation and confinement of the Tai Lai as well as the financial abuse and neglect denied the temporary order of protection allowing for the abuse of the elder dependent to continue because she is believed to be part of the RICO enterprise**. She refused to protect the decedent because she had financial gain and wanted Tai Lai to prematurely die. She tried to justify her decision stating that the plaintiff has no standing and she needed "more information". The plaintiff had standing because she was one of the power of attorneys and she had enough information which was the isolation and abandonment of the decedent in a hospital along with financial abuse and neglect. Even the assistant presiding judge Ricardo Ocampo admitted that even though her decision was "wrong" it doesn't mean she "violated the code of judicial ethics". The plaintiff learned that the decedent was back in his home around June 24, 2024. Ming Lai refused to answer calls regarding her father and continued to ignore the plaintiff's calls during this time. She never called to let the plaintiff know that she had picked him up. When the plaintiff arrived home the evening of June 25, 2024, she saw that her father was emaciated and excessively lethargic. The plaintiff the next day attempted to feed the patient but he was

84

COMPLAINT

unable to eat due to being so lethargic (due to the excessive chemical restraints). Since the plaintiff was unable to eat and he was emaciated, the plaintiff was extremely worried and realized he needed to get a nasogastric tube to help feed him. The plaintiff was so scared because she thought he was going to die of starvation because he did not eat for more than a week due to his inability to swallow. There was a caregiver that was hired and she helped take the decedent to USC Arcadia Hospital. When the plaintiff arrived, she signed some papers and she signed the no arbitration box but later when she received the medical documentation, the signature of the plaintiff was "whited out". It appeared as if the person, Kristy Alilain had concealed the signature and "erased" it and also added Ming Lai's signature somehow since she was the one who signed as a witness. Kristy Alilain also wrote the time as in the evening when the document was signed when it was in the day (predicate act: obstruction of justice, falsifying/tampering with evidence used in a legal proceeding). When the plaintiff was in the ER of USC Arcadia Hospital, the plaintiff asked to have her father nasal suctioned by the day nurse and the night nurse. Both of them did not do it. The plaintiff also asked the night nurse for food for her father multiple times but he did not bring any. In fact, he wrote in his notes that he spoke to "Yelena" the hospice nurse and said that the daughter didn't want any food for her father in their documentation. It is believed that it was a nurse named Johnathan who intentionally refused to provide food and suctioning for the patient because he was also part of the RICO enterprise and the goal was to deprive Tai Lai of his life and refuse him the basic necessities to live which include nutrition. The plaintiff asked the nurse to bring food and he ignored her requests, she had to leave and purchase food from outside to attempt to feed her father. He was unable to swallow because the nurse refused to nasal suction him. Also it was clear and convincing evidence that Jose Tandoc was purposely writing false documentation

85

COMPLAINT

regarding the decedent's medical condition. He stated in a reading of Tai Lai's CT that his nasal passages were clear and well aerated when they were not. Everyone could audibly hear the decedent's coughing and congestion. The two admitting physicians stated that he should be on hospice, this was Dr. Jennifer Li again (she kept on placing the decedent multiple times on hospice 3 to be exact without any justification). Dr. Li actually came down to physically talk to the plaintiff for the first time. The plaintiff stated she never met her before and she said that she didn't want her father to be on hospice and that he needed to get help to eat since he couldn't swallow. She requested to change doctors and eventually Dr. Fardad Sarabchi was assigned. The plaintiff's "cousin" Jeffrey came also to see the decedent and eventually her mother. The plaintiff asked Dr. Sarabchi to see if her father could get an NG tube since he was having trouble swallowing. The plaintiff stayed overnight sleeping in a chair next to her father. The next day, the plaintiff requested the nurses on each shift to nasal suction her father but she noticed that none of them would comply with her requests. She also noticed that one of the nurses potentially shoved a yanker in her father's mouth to cause him to vomit because he had some residual blood on the side of his mouth (Minnie Wong night shift), this was believed to be a nurse who wrote her name as "Winnie" on the board but it was her name was Minnie Wong. Also the plaintiff asked Minnie as well to suction the patient but she didn't do it. According to medical records the dietician Emily Rhodes stated that the family wanted to restrict the diet but no one told this to her and it is believed that she just wanted was part of the RICO enterprise to fulfill the goal of starving the decedent to help pursue the goal of premeditated death of Tai Lai. At the end of the discharge of Tai Lai, there was an attempt to try to get the decedent the proper care for him by the plaintiff but a female Indian physician came on the date of discharged and started to speak to the plaintiff by getting involved in the

86

COMPLAINT

decedent's care when she was not his physician. She started to talk in front of Dr. Fardad Sarabchi outside of the decedent's hospital room to the plaintiff stating that the hospital does not provide "suctioning" of the patient (when this is a basic nursing activity that should be performed if necessary to promote the health of the patient) and then she also proceeded to falsely accuse the plaintiff of wanting to get a g-tube for her father. She kept on stating that the decedent cannot stay in the hospital and that he needs to go on hospice. After this conversation, the plaintiff left and returned an hour or two later. At this time, Dr. Sarabchi and it is believed it was the nurse manager were discussing the plan for the decedent with the plaintiff and then a group of hospital employees who were not involved in the direct care of the decedent started to yell and scream which included a nurse named Miriam. The plaintiff also saw one of the case managers Dana who also was screaming and they basically were shouting for the plaintiff to "mind her own business" and that this is not her decision. It is believed the nurse manager attempted to speak to the plaintiff and said "Are you close to him?" but at this point two security guards escorted the plaintiff out without any due process. The plaintiff learned later that Dr. Sarabchi's medical notes stated that the risk management and case management decided that Ming Lai was the decision maker. The problem with that is that the plaintiff did not see any risk management or case manager introduce themselves nor did they have a conversation with the plaintiff or her mother together. In fact, there were no case management notes in the medical record and it only had Tara Davies, a social worker who wasn't even on the floor, didn't speak to the plaintiff and even in her documentation writes in third person and appears to be writing only in "heresay" and not actual firsthand observations. The plaintiff didn't even know why the social worker was involved. Tara Davies stated she received the "power of attorney for healthcare" via email allegedly and then she also states that

COMPLAINT

Eric Yamamoto and Ellen Finkelberg are the lawyers for her parents. She also continues to say that Ming is the power of attorney and that Jim is next but fails to mention the plaintiff. The problem with Tara Davies documentation, according to the medical records, there is no power of attorney on file, this is why Dr. Sarabchi had to write that the case manager and risk management decided it was the wife who was the decision maker. Tara Davies documentation is just evidence that she is involving herself in the RICO enterprise by just stalking the plaintiff's family, aiding in the goal of the premeditated death of the decedent by intentionally interfering with patient rights, due process and informed consent. The plaintiff also told Dr. Sarabchi that she believes her mother has dementia but the female Indian doctor just continued to interrupt to further her agenda as part of the RICO enterprise and send the decedent on hospice because she didn't want him to live.

When the plaintiff went home, she was very distraught because she felt that her father would die soon from starvation. When Tai Lai returned home, a nurse from St. Vincent's hospice came to stay with him for 24 hours to induce his death when he wasn't even diagnosed by an oncologist with metastatic cancer. The radiologists wrote the fraudulent CT readings for the purposes of theft of Medicare funds and to purposely financial profit. St. Vincent's hospice services had Tai Lai on hospice services for more than a year when hospice services are meant for patients who have a life expectancy of less than 6 months. When Yelena from St. Vincent's hospice came with another nurse with prescribed drugs like morphine. The plaintiff knew that she was going to murder her father using an overdose of morphine. When the plaintiff attempted to nasal suction her father, Yelena became very irate and angry because that would help the decedent breathe and eventually eat. Yelena started to yell at the plaintiff to prevent her from clearing his nasal passages. Yelena purposely wanted to inflict pain and

COMPLAINT

suffering on the decedent by not providing basic care and trying to induce the death of the decedent with controlled substances for profit. Yelena screamed at the plaintiff stating "You're abusing him, I'm going to call the police." The plaintiff said "Go ahead and call them!" Then Yelena said she didn't feel "safe" and said she was going to leave. The plaintiff stated that Yelena was not providing the basic care that the decedent needed. There was another female nurse there who appeared to be Nigerian. Soon after the argument, Yelena and the second nurse left. Soon after, the Arcadia Police arrived and interviewed the plaintiff regarding an Adult protective services call. The two officers that came were Officer Meraz and Cibrian. The two officers separated the plaintiff and her mother and questioned them individually. Later the officers stated that the plaintiff was cleared of any abuse allegations by her mother. The plaintiff stated to the officers that she felt that the care that Yelena was providing wasn't the proper medical care and that her father needed to get adequate medical help for his needs. She didn't explain everything in detail regarding the fraudulent diagnosis. Later, she asked the officers prior to leaving regarding how to get her father to another hospital without calling 911 because she didn't want him to go back to USC Arcadia Hospital. They stated to call a private ambulance. At this point, she called Guardian ambulance and she had her father sent to Huntington Hospital.

24. On June 28, 2024, Tai M. Lai was taken to Huntington Hospital due to difficulty breathing (eustachian tube dysfunction) and impaired swallowing. The plaintiff called a private ambulance to transport Tai M. Lai to Huntington Hospital because the decedent was already at University of Southern California Arcadia Hospital and calling 911 would automatically take the decedent to the same location. Ming Mei Lai also stated in front of several witnesses that she permitted the plaintiff to take Tai Lai to the hospital. Plaintiff took a separate car while the

89

COMPLAINT

ambulance drove with Tai M. Lai to Huntington Hospital's Emergency Room approximately on June 28, 2024, 11:30 p.m .-June 29. 2024 12:30 a.m.  When the ambulance arrived, the emergency medical technicians escorted Tai Lai and daughter into the emergency room to be admitted.  At this time, Tai Lai and daughter/plaintiff were taken into a room within the ER.  The plaintiff spoke to a nurse and told her that Tai Lai had difficulty swallowing and breathing. Huntington Hospital staff were also told by plaintiff that patient had various "diagnosis" from pneumonia to brain hemorrhages at other hospitals immediately prior to this visit.  The Emergency room physician, Dr. Buggs ordered a CT scan for patient, Tai Lai.  Plaintiff accompanied patient Tai for the CT scan.  A second nurse by the name of Denise came into Tai Lai's room and started to administer an intravenous antibiotic.  Plaintiff stated she didn't want the patient to receive the antibiotic, nurse Denise got very upset and angry.  Nurse Denise said plaintiff had to leave and get an ID badge outside and proceeded to administer the intravenous medication.

25. Denise, RN, called three male security guards to escort plaintiff out of emergency room and forced plaintiff to leave patient Tai.  Plaintiff was in the hospital room for approximately 45 minutes to 1 hour with patient Tai Lai until forced to leave at the demand of nurse, Denise. After plaintiff got a badge made by the security guard, plaintiff attempted to return to decedent's hospital room to be with the patient.  At this time the two front desk employees stated that the nurse said "no visitors are allowed" and refused to allow plaintiff inside the room where patient was (false imprisonment/kidnapping).  Two front desk employees said simultaneously that the nurse refused to allow visitors and did not say why but gave daughter a paper to call a number for patient relations for reason.  The plaintiff called the number and there was no answer.  During this time, plaintiff continued to *wait while in the lobby of the*

90

COMPLAINT

*emergency room for several hours while patient, Tai Lai was kidnapped (predicate act) and no family was allowed into the emergency room with him without any justified reason.* It is believed he was moved to another location because according to his Medicare charges, it stated that he had a surgical procedure on June 29, 2026 which meant he had to be moved to another location to have it done since the room he was in was not a sterile field (second predicate act: kidnapping, same thing occurred in Sunrise Hospital). This is believed that Huntington Hospital was trying to bill as many fraudulent procedures as they could for Tai Lai and without his consent. The plaintiff did not approve or sign anything when he was admitted. Plaintiff, Kristen Lai repeatedly asked emergency room front desk employees when she could see patient Tai Lai but employees continued to prohibited all visitors from seeing patient. They stated to call the phone number again and said that the plaintiff could get the answer at the patient relations number. They continued to falsely imprison Tai Lai in the hospital without any written authorization to perform any medical procedures. Plaintiff, Kristen Lai waited several hours and called Ming Mei Lai, Tai Lai's spouse/mother of plaintiff, to let her know that he was at Huntington hospital. Plaintiff spoke to her mother on the phone. Ming Lai said someone told her that the doctor at the hospital said to pick up Tai Lai to go home. Ming Lai was at home and she came later around 4:44 am on June 29, 2024. This time the front desk employees stated it was the doctor that stated "no visitors allowed" when Ming Mei Lai appeared to inquired about Tai M. Lai. After approximately 5-10 minutes later, Ming Mei Lai was allowed into the hospital room where Tai Lai was falsely imprisoned. However, the front desk employees stated plaintiff was prohibited to go with into the emergency room as Ming Lai entered to see the decedent. The two female front desk employees said only Ming Lai can go in. After a couple minutes of Ming Lai entering the hospital room to see Tai Lai, a male

91

COMPLAINT

clinical care partner came out and stated that the plaintiff is not allowed to go in "per the power of attorney". The plaintiff left the hospital and Ming Mei Lai stayed in the hospital room with Tai Lai.

26. Later in the morning of June 29, 2024 probably before 12 p.m., plaintiff was able to enter the hospital room of Tai M. Lai and spoke to the admitting doctor for a few minutes. The physician appeared to be a middle eastern/Arab looking man with wavy black hair and brown eyes. He was thin to medium build and possibly 6 feet tall or taller. He said that our family should try to collaborate together to agree on a plan for my father.

27. On June 29, 2024 in patient's room, after speaking to the physician, plaintiff attempted to feed Tai Lai but was unable to due to issues with congestion and swallowing. Plaintiff asked the nurse for patient to be nasal suctioned. The nurse was an Asian female nurse who was assigned to decedent, Tai Lai. The nurse did not suction patient. Plaintiff went to request again after 30 minutes. Plaintiff continued to request that the nurse suction patient multiple times and also asked for charge nurse. Plaintiff told the nurse since due to waiting a long time to provide the equipment for the plaintiff to do the suctioning since she was neglecting the decedent. The nurse refused and said she is the only one who can do it.

28. After spending some time with father, Tai Lai, plaintiff left to get her mother to return together. Plaintiff returned to Huntington Hospital in the afternoon with Ming Mei Lai around 5 p.m. Ming Mei Lai was told that an employee would meet her to escort her to see Tai Lai. A female employee with dark brown hair met with Ming Mei Lai outside the hospital area and refused to allow plaintiff to go inside stating only Ming Lai was allowed. Ming Lai stated prior to going to the hospital that it was not she who was preventing the plaintiff from going into the hospital to see decedent but the employees of Huntington Hospital were prohibiting the plaintiff to

92

COMPLAINT

enter. In the video, the plaintiff states she will call her mother to allow her to go inside. The plaintiff made many attempts to call Ming Lai while she was in the room with Tai Lai. She didn't pick up for most of the calls but when she picked up one time. The plaintiff asked if she could see the patient, but instead of hearing her mother speak, plaintiff could hear the same female whispering "Say no! Say No!", after the plaintiff heard the other individual whispering, Ming Lai said "we'll see". Ming Lai told plaintiff that the defendants were prohibiting plaintiff to enter while telling the plaintiff it was Ming Lai who was prohibiting the plaintiff to see the decedent. The defendants told Ming Lai that plaintiff can't be allowed in because she is "interfering with the patient's medical care".

29. On June 30, 2024, it is believed that plaintiff was able to enter the hospital room in the morning again to attempt to feed, Tai Lai. Another request to the nurse was made for patient him to be nasal suctioned again. There was an Asian female nurse as his primary nurse again and this nurse did not suction him as well. The plaintiff also asked again for the decedent to be suctioned but nobody came to perform the procedure when the plaintiff asked at the nursing station. At this time, a person name Mary Ann, a black female nurse with a shower cap on her head stated to plaintiff "You are not supposed to be here" Nurse Mary Ann kicked plaintiff out and said "You have to leave". Nurse Mary Ann was not involved in the direct care of the patient nor was she the charge nurse per the nursing station yet she was meddling in the medical affairs of Tai M. Lai which is a HIPAA violation.

30. On approximately July 1, 2024, plaintiff tried to enter the hospital room of Tai Lai and was not permitted to go in. Plaintiff was referred to a security guard regarding restriction by front desk employee. The male Huntington Hospital Security guard stated that sometimes they do not know why the person is restricted and to call patient relations. The security guard also stated

93

COMPLAINT

that it could be that the person is interfering with the medical care of the patient and that is why they are not allowed to enter. The security guard stated to call the patient relations number and said the plaintiff could get the answer there. The plaintiff called again and left a message. A person from the patient relations office and stated that they did not know why that the plaintiff was not authorized to go into the hospital.

31. Tai Lai was not fed at Huntington Hospital, he was not nasal suctioned from what was observed by the plaintiff which caused him difficulty to breath and swallow.

32. Finally, plaintiff discovered that Ming Mei Lai signed a contract to place Tai Lai on hospice with General Care Group Inc. She was convinced by certain individuals to place him on hospice with a fraudulent diagnosis of metastatic prostate cancer. However, Tai M. Lai was not a candidate for hospice. Tai M. Lai was neglected to receive appropriate care to properly feed him and provide nutrition due to the impaired swallowing and eustachian tube dysfunction.

33. Tai Lai returned home on July 1, 2024 approximately 7 p.m. via ambulance. When Tai Lai returned, he was lethargic, congested, unable to swallow and emaciated.

34. It was believed that General Care Group Inc. came to the house either July 2 or 3rd, 2024 to tend to patient. The physician came to see Tai M. Lai with two other female employees whom are believed to be nurses. At least one of the female employees attempted to put in an IV into his arm a couple of times and failed. The physician looked at the patient and said "Oh, I see you can understand what's going on?" She did not examine him or do any assessment. I attempted to ensure that Tai Lai would get intravenous fluids because he was heavily sedated at Sunrise Hospital in Las Vegas. The plaintiff was hoping to flush out the toxins from the sedative medications. After the failed attempt at putting in an IV into patient's arm, the

94

COMPLAINT

physician left with the two employees. The physician did nothing to investigate or inquire about Tai M. Lai's medical history but continued to treat patient as if he was a qualified candidate for hospice.

35. On July 4, 2024, Tabitha from LA CareNet came to help with decedent Tai M. Lai in the morning. On July 5, 2024, Tabitha came again and helped the decedent. She appeared to be very interested in looking at his condition and would go to him closely to observe him. She would not leave his side and appeared to have a special interest. Later she believes that Tabitha had obviously a special interest in ensuring that he passed away because when the plaintiff saw the decedent was not responding well and appeared to be very lethargic again, she wanted to take him to the hospital. After she took him to El Monte Hospital with Tabitha's help, Tabitha left quickly as if she had done something and later the plaintiff texted her that the decedent passed away. Tabitha made a suspicious comment regarding how he passed in a text saying "did he die by himself or did someone give him something to ease the pain", then because of her suspicious behavior, it was believed that Tabitha gave the decedent some type of poison to induced his death. The decedent passed away on July 5, 2024 at El Monte Hospital.

36. Since the passing of Tai M. Lai, the plaintiff requested medical records of decedent on August 23, 2024 from Huntington Hospital. It is believed that the written form was submitted on August 30, 2024. Huntington Hospital medical records employees refused to comply with the written request despite several attempts to meet and confer. Most of the attempts were ignored by medical records employees. A motion to compel medical records of Tai M. Lai was made at Stanley Mosk Courthouse for case number 24STPB11789 Removal of trustee in which plaintiff acquired documentation regarding the denial of medical records.

95

COMPLAINT

37. Sandra Banuelos, Michelle Gomez, Angela Ortiz denied medical records to the plaintiff. It is also believed that Debbie or Deborah Jackson (Director of patient relations) stated in writing that they were not going to provide medical records to the plaintiff. In addition, Angela Ortiz sent an email with a link to hack into the plaintiff's email (Computer Abuse Act).

38. In a separate event, the plaintiff was a patient at Huntington Hospital on December 10, 2020. The plaintiff went to the Huntington Hospital Emergency Room due to an incident of battery from her brother, Jim Lai, beneficiary of the Tai M. Lai and Ming Mei Lai Revocable Trust 4/2/2008. A previous incident on October 14, 2017 was recorded where another battery occurred where Jim Lai was the assailant, however, the plaintiff did not go to the ER.

39. The plaintiff went into the emergency room on December 10, 2020 after being dropped off by a relative. Plaintiff met with a physician first and discussed injuries which included primarily pain to the ribs from being punched by Jim Lai multiple times. The plaintiff stated she wanted to get xrays of the area to see whether there were any substantial injuries due to the severe pain. The purpose for the xrays was to obtain evidence of injuries for a restraining order.

40. After the physician exited the room, another individual entered the room without introducing himself. This was possibly an hour later. The plaintiff believed he was a phlebotomist since he did not introduce himself with his name and title. The plaintiff didn't notice any identification badge. He appeared to be an Asian male with black hair and brown eyes. He stated that the physician wanted to draw blood for laboratory tests and take xrays. The plaintiff told the Asian male that she did not want to do lab draws and just wanted to take xrays due to the injury to the ribs.

41. The plaintiff went into the xray room where the xray technician took two xrays. One xray of the whole chest area and the second was a close up xray near the source of the pain in the ribs.

96

COMPLAINT

After going back to the room, the Asian male came back and stated that there was nothing wrong with the xrays and that the plaintiff can be discharged. The Asian male is now believed to be a physician assistant, Richard Ramos and stated that the xrays were normal.

42. Plaintiff requested medical records regarding the incident around February 2025 but saw that the records were not complete since employee Sandra Banuelos only provided one xray image when the patient took 2 xray images. After receiving the medical records in 2025 from Huntington Hospital, the plaintiff discovered that the physician assistant, Richard Ramos fraudulently wrote in a legal medical document that the plaintiff refused the right rib xray for the injury. The purpose of the ER visit was to get the xray for the injury. Richard Ramos also fraudulently documented that the plaintiff spoke to a social worker and stated patient feels safe to go home. The plaintiff never stated, "feels safe to go home" nor was she asked this question.

After the death of the decedent on July 5, 2024, the plaintiff was very depressed but she also knew she had to worry about her mother. At this point, she knew she had to get a conservatorship over her mother because of her failing mental state. Plaintiff also requested Tai M. Lai's conservatorship file and discovered many issues regarding the file which include a fraudulent assessment for Tai Lai stating he was assessed by Dr James Lin when he wasn't even Dr. Lin's patient for the past 3-4 years and only saw him one time on July 27, 2023. He didn't assess Tai Lai for any cognitive disorder because it takes several visits to do the testing and the decedent go to the physician's office. Also when she went to the last visit at the end of July 2024, Dr. Lin said he wasn't able to be his primary care doctor.

97

COMPLAINT

PETITION FOR CONSERVATORSHIP OF MING MEI LAI AND REMOVAL OF TRUSTEE, MING MEI LAI, TAI M. LAI AND MING MEI LAI REVOCABLE TRUST 4/2/2008

After the passing of Tai M. Lai, the plaintiff was very distraught, depressed and started to feel very guilty because she was unable to protect her father from so many elder abusers and scammers. She realized she had to petition for the conservatorship for her mother and realized that there were people who intentionally wanted Tai M. Lai to die because they were planning to continue the elder abuse of Ming Mei Lai.

While the plaintiff also filed for the conservatorship of Ming Mei Lai, she also gathered documents from the conservatorship of Tai M. Lai and discovered many discrepancies. She saw that her mother was signing papers that stated that Tai Lai was almost bed bound, basically appeared as if he was unable to communicate and unable to do anything, could barely eat on his own and didn't walk. These things were all inaccurate and the plaintiff believes that Jim Lai was the person who wrote those things for her to sign. They also included that Tai Lai was to be sent to a nursing home and he had paranoia and dementia. That form that was completed by Dr. James Lin shows that he is part of the conspiracy and RICO enterprise since Dr. Lin only saw Tai Lai one time on July 27, 2023 and he did not see him before that for several years. Dr. Lin also didn't really do anything or speak to the decedent because the plaintiff just wanted to ask about having a renewal for the handicap placard. They included an assessment by Dr. James Lin who filled out the GC 335 form declaring him incapacitated. The plaintiff refiled the petition for conservatorship in the end of July 2024 and filed removal of trustee petition in October 2024. Kristen Lai experienced the same kind of issues with the probate investigator Sandra Tello and received a call from her. The plaintiff discovered that there were

98

COMPLAINT

actually two women who visited her in the fall of 2024 regarding the conservatorship and she described the two different women the plaintiff described regarding the conservatorship of Tai M. Lai (a Philipino woman ages 50-60s and a Hispanic woman). The plaintiff asked her mother questions and her mother stated that these two women asked her cognitive assessment questions as if they were healthcare providers (unauthorized practice of medicine and tampering with a witness). She said they were asking her what the date, year, who the president was and other types of questions in attempts to assess her cognitive state. She said they told her after, "You're fine you don't have dementia." These two individuals were in a conspiracy together because they came together with the same objective as the plaintiff stated regarding the RICO enterprise (financial elder abuse and fraud) and one is involved in impersonation and the other is complicit to conspire regarding the impersonation. Kristen Lai received a couple calls from "Sandra Tello" again but she doesn't recall speaking to her directly. Ming Lai was angry because all of these individuals (probate investigators, financial advisors, healthcare employees) were telling her that she was capable of doing her own affairs (tampering with a witness through coercion: predicate act). Ming Lai continued to claim she was paying all her bills when people at Citibank, specifically Anna Li and Connie Kwok were very aware that Ming Lai was forgetful and they would at times tell her that she has to pay certain bills while telling her that her Certificate of Deposit gets automatically renewed (so they can get a payment and Ming Lai can't withdraw her funds because she forgets). After researching about the trust and reading more portions of the Tai M. Lai Revocable Trust 4/2/2008, the plaintiff learned she had to remove her mother as trustee. She also learned she had to get a physician to assess her for dementia which could take care of both issues, the conservatorship and the removal of trustee. At a conservatorship hearing for Ming Mei Lai,

99

COMPLAINT

she requested that her primary care doctor, Dr. Andrew Liao to assess her mother (September 2024).

TAMPERING WITH WITNESSES: PATTERN OF RICO PREDICATE ACTS

At a hearing in October 2024, a capacity declaration was submitted for Ming Lai by her attorney Frank Piro from Dr. Liaos' office and it stated she was competent, however when the plaintiff questioned her after the conservatorship hearing, she said she saw Dr. Liao **after the hearing and not before**.  She also told the plaintiff later that there was a "girl" who asked her questions at his office and said you're "normal".  To assess a patient for dementia, the patient has to be seen by the physician for several visits and has to undergo several cognitive tests that are to be administered by a physician, physician assistant or nurse practitioner, **not a medical assistant**.  Additionally, Ming Mei Lai wasn't seen by her primary care physician in approximately 2 years according to a message the plaintiff received regarding an appointment the plaintiff wanted to make regarding lab tests for medication.  This was not the only time that there was suspicious activity occurring with Dr. Liao's office.  The plaintiff made another appointment for her mother in November 2024 and continued to make appointments with him for each month to have a further assessment for her mother.  During this appointment times when the plaintiff took her mother, two medical assistants kept on interfering with the medical care (tampering with a witness) of the patient (Ming Lai), one was a Hispanic female approximately in her 30-40's and a Chinese female in her 20-30's.  It is believed that the Chinese female would speak to Ming and assess her because the plaintiff's mother only describes an Chinese woman when it comes to her interactions with the employees, however, the plaintiff noticed that this Chinese woman is the only Asian women she has seen in the office of Dr. Liao besides the manager.  The Hispanic employee also interfered with the

100

COMPLAINT

patient's care by convincing the patient that she should go into her appointments by herself and then she shut the door and locked it to keep the plaintiff out despite being power of attorney for healthcare. The Hispanic employee said in November 2024 (appointment for Ming), you can't go in her appointment. The plaintiff called her mother in Dr. Liao's office and spoke to her mother and then spoke to Dr. Liao, then she said to Dr. Liao she wanted to talk to him. Dr. Liao asked her mother if she could come in and she agreed. This was not the only time this Hispanic female did this. She also told the plaintiff her name was Denise but then later she said it was Cecelia. The Chinese medical assistant would do similar things regarding involving herself in the plaintiff's mother's affairs by asking what are the documents that are being given to the doctor and also forcing the plaintiff to only get phone visits with the doctor. The plaintiff believes that they are conspiring together in the RICO conspiracy to prevent the incapacitation of Ming Lai because they want to manipulate her for financial gain, help the financial advisors to steal funds from the Lai trust and force the plaintiff to work for the RICO enterprise because they are directly or indirectly profiting from financial gain from Ming Mei Lai. Also the manager of Dr. Andrew Liao's office (claimed that she gave all the documents to him yet she refused to allow the plaintiff to speak to him and also stated, "You have to have the documents served personally, a person has to come and give him the documents." Dr. Liao served subpoeanas by mail. Manager Liyu stated she didn't open the envelopes allegedly, so how does she know that there were subpoenas in the mail? It was clear that not only was the manager, the two office workers were conspiring together but they were also obstructing justice and tampering with a witness (Dr. Liao and Ming Lai).

In August 2025, during one of the appointments for Ming Lai, Dr. Andrew Liao finally confirmed that her mother had dementia but he was still assessing her. In February 2026, Dr.

COMPLAINT

Liao gave the plaintiff the GC 335 confirming that her mother has a neurocognitive disorder. In March 2026, the plaintiff also went to Dr. Jessie Liu to see if he would be able to assess her mother but the employees Joy Zhou said the only appointment she had available was in August 2026. Also when the plaintiff had Dr. Jessie Liu subpoenaed for witness testimony and attempted to contact him regarding payment, his manager Melody Tsui was interfering (tampering with a witness) and wrote letters to the plaintiff on his behalf and also spoke to the plaintiff asking "why is it necessary? You have all the medical records?" She was trying to prevent the testimony of Dr. Jessie Liu who was a neurologist for the decedent (tampering with a witness). The plaintiff also received emails and letters allegedly from Dr. Liu, a neurologist, stating **he does not perform "neurocognitive exams" and it is outside of his practice yet he is a neurologist.** Dr. Liu also did several cognitive tests on her father in medical records that were sent to Stanley Mosk Courthouse.

Since Dr. Jesse Liu's office had employees who appeared to be preventing the medical care of her mother and also preventing the testimony of Dr. June Chih Jesse Liu, she found board certified neurologist, Dr. Arthur An located at 1015 N. 1st St. Arcadia, CA. After seeing the physician a few times, her brother called to interfere as stated in the earlier portion of the complaint. The plaintiff left forms for Dr. Arthur An to sign around the second week of May 2026 for the court hearing and also attempted to speak to Dr. An but two employees interfered with the plaintiff's attempts. In an appointment, Dr. An already confirmed with her mother that she had dementia with the plaintiff present. The plaintiff tried to speak to Dr. An but the manager Debbie Martinez just said for the plaintiff to wait in the waiting room. The plaintiff also discovered that the manager Debbie Martinez was given the documents that were meant for Dr. An to fill out. When the plaintiff asked if he received the documents, Ms. Martinez

102

COMPLAINT

stated "yes". Then she also said "if he's going to fill them out." as if she had a decision in the matter. It was clear that Debbie Martinez was also obstructing justice and tampering with a witness. The plaintiff also attempted to contact Dr. An via email to the office and a person from a different office in Pasadena not the Arcadia office replied and apparently told Debbie Martinez who called the plaintiff. The email only stated that the plaintiff wanted to speak to Dr. An and instead of sending the message to Dr. An to have him call the plaintiff, it was apparent that Leigh Jacobson, the individual who responded to the email notified Debbie Martinez. Debbie Martinez (interfering with a witness) called the plaintiff and stated that she can have an appointment for her mother on June 22, 2026 but the plaintiff stated, "I am not calling about an appointment." The plaintiff allowed Ms. Martinez to "reschedule" an appointment for Ming Lai but she also emailed back Leigh Jacobson who allegedly emailed Dr. An to call the plaintiff before May 29, 2026 regarding paperwork but the plaintiff never received any call from Dr. An. It is believed that these two employees are obstructing justice and tampering with a witness (two predicate acts to further the RICO enterprise goal).

REMOVAL OF TRUSTEE CASE #24STPB11789 & CONSERVATORSHIP OF MING MEI LAI #24STPB03536 SUBPOENAED DOCUMENTS (PREDICATE ACTS: OBSTRUCTION OF JUSTICE, FRAUDULENT CONCEALMENT, FRAUDULENT MISREPRESENTATION)

43. The plaintiff had various subpoenas served on various entities. The entities include: First Bank, Citibank, Fidelity Investments, Arcadia Police Department, Aging and Disabilities Adult Protective Services, Los Angeles County Sheriff Department, Fed Ex Corp, Med West Realty, Dr. Andrew Liao's office, office of Dr. June Chih Jesse Liu, Dr. Andrew Hung's office, Dr. Monty Polonsky's office, Transwestern Realty, CT Corp, CSC Lawyers Incorporating Service

COMPLAINT

and Harmon Wong and Im, CPA offices & Verizon Wireless, Getem Process Servers. Each of these entities were either intentionally withholding or concealing information, including fraudulent information in documents or trying to prevent a witness from testifying and/or appearing. The entities Transwestern Realty, Getem Process Servers, Huntington Hospital, Arcadia Police Department, Fed Ex Corp, Fidelity Investments also sent emails with malicious links to hack into the plaintiff's email to get unauthorized access to her computer and email accounts and/or delete information regarding the related court cases. Also Jose Alvarez of Getem Process servers who was the deposition officer for the plaintiff regarding various subpoenas was conspiring with Transwestern Realty (Spencer Wilson and attorney, Nabeela Anwar) and Fed Ex employees (Rosa Miller, attorney for Fed Ex and Letiticia Jackson, custodian of records) to coerce the plaintiff to click on the links insisting that the records are sent in this manner. (Computer Abuse and Fraud Act).

FIRST BANK

44. First Bank were produced incomplete which included forgeries of Tai M. Lai's signature from attorney Barbara Dite counsel for First Bank in Missouri. There were two notaries of an employee named Tina Peto yet the notary book did not contain identifying information of the individual with proper state identification.

CITIBANK

45. Citibank records were incomplete and did not produce all of the records for the Tai M. Lai trust. The attorney who was served, John Preston Turner did not respond regarding any meet and confer emails regarding subpoenas for Citibank. In prior communications John Preston Turner admitted in an email that he was an attorney for Citibank in January 2026 and emailed information regarding notaries that Johanes Hermanto documented for Tai M. Lai.

104

COMPLAINT

## 46. FIDELITY INVESTMENTS

Fidelity Investments was subpoenaed in a motion to compel hearing in which branch manager Walter Conley was served to produce documents and he did not produce them for a hearing at Stanley Mosk Courthouse.  The plaintiff also tried to give him the power of attorney document to file in the Pasadena, California branch where he works but he refused to accept it and told a security guard to escort the plaintiff out denying to log a legal document.  A legal analyst named Alexis Fasano emailed the plaintiff and also sent emails which contained a malicious code to hack into the email account of the plaintiff claiming that there was a link in her email that has the records to the Tai M. Lai and Ming Mei Lai Revocable Trust 4/2/2008.  She sent the email on multiple occasions to hack into the email address of Kristen Lai.  She also refused to comply with subpoena requests and refer the plaintiff to an actual attorney after claiming to be a "legal specialist".  It is believed that she is also receiving advisory fees from the Tai M. Lai and Ming Mei Lai Revocable Trust 4/2/2008.  The plaintiff also went to drop off a power of attorney document at another Fidelity Investments Branch and was told that an individual named Sam Ruddick denied the power of attorney and would not honor it.  All of these employees that are mentioned are involved in the RICO enterprise and committing at least two of the predicate acts of racketeering and are making a pattern of this.

ARCADIA POLICE DEPARTMENT

It was already mentioned regarding the Arcadia Police Department employees who were obstructing justice by concealing legal documents that indicate elder abuse and fraud.

AGING AND DISABILITIES ADULT PROTECTIVE SERVICES

Ralph Pascual, custodian of records at Adult Protective Services received a subpoena to produce records and he refused to produce them in a court hearing.  The records that the

105

COMPLAINT

plaintiff are aware of that actually contain an investigation on Ming Mei Lai is by social worker, Jose Luis Flores. Jose Luis Flores came to USC Arcadia Hospital and the residence of Ming and Tai Lai to conduct an "investigation". Mr. Flores called the plaintiff and stated he was going to investigate elder abuse allegations regarding Ming Lai. He first stopped by USC Arcadia Hospital and did not talk to the plaintiff around June 27 or 28, 2024. He just called the plaintiff but did not really ask any questions when he arrived because the plaintiff was busy talking to the medical staff regarding the discharge of Tai Lai. The next time he came was around July 3, 2024 when the hospice nurse and doctor was present. All Jose Flores did was ask Ming Lai, "Your daughter says that you don't feed your husband and you don't pay for his bills." Ming Lai stated, "Do you believe that?" then Jose Flores stated, "No." and after that he stated to the plaintiff, "He's going to die of his 'disease'." The social worker didn't ask for any proof or spend more than 5-10 minutes in the house and then he left. There was another report that was mentioned by probate investigator Sandra Tello regarding the elder abuse incident in June 2021 by Yvette Gallegos which stated according to Sandra Tello the allegations and an attempt to speak to someone but they were unable to get hold of any family member, however, according to Ralph Pascual all of the elder abuse allegations he stated in an email was regarding the plaintiff Kristen Lai. During a motion to compel, Ralph Pascual along with attorney Airionna Whitaker stated that he refused to comply with the deposition subpoena. He also refused to meet and confer. He would refuse to communicate with the plaintiff, purposely delayed communications regarding the subpoena (obstruction of justice) and stated he wouldn't provide any records after months of delays and no communication.

47. FOOD SERVICES: The following defendants served the plaintiff food or drinks that caused the plaintiff personal injury. The dates range from March 2026 to June 28, 2026. The

106

COMPLAINT

defendants were served subpoenas for various evidence including video and employee names of individuals who prepared food or beverages for the plaintiff. The defendants had a duty to ensure that the consumer was not served intentionally adulterated foods. The plaintiff sustained health injuries which included vomiting, severe dizziness, drowsiness, heart racing, and severe dry eyes, and headaches. The acts from all of the defendants were done by various employees and managers that were intentional and believed to be connected with the RICO enterprise due in attempts to retaliate (obstruction of justice) against the witness (plaintiff) for bringing forth complaints and attempting to remove Ming Mei Lai as trustee. In fact, two of the managers, Paris Baguette and Sharetea were aware of the intentional act of adulterating drinks at their businesses. On March 1, 2026 and also on March 9, 2026, three employees placed unauthorized substances in the drink if the plaintiff which caused the plaintiff to become sick from dizziness and drowsiness. The plaintiff went to speak to the manager, Annie Lee around 3 p.m. around March 9, 2026 regarding the incidents and asked if she could provide the video footage. The plaintiff stated that she believed that the employees put something in the drink of the plaintiff. Instead of questioning the plaintiff, Annie Lee, the manager already knew who it was and said she knew that they were doing it. Annie Lee said to the plaintiff, "It was the fat Mexican girl?" The plaintiff was surprised that she knew who it was. Then the plaintiff said there was also a white female with two braids in her hair that made a drink also today." Annie Lee also laughed. She said "Sometimes they do they put a little something in the drink." She said "sorry" and then offered a free drink or food. The plaintiff stated she wanted the videos of the employees and she said what were the dates and times so she could see. The plaintiff showed the pictures of the drinks with the date stamped and Annie Lee stated she would check. Approximately a week later, the plaintiff came in and offered a

107

COMPLAINT

free drink to the plaintiff. She was also working with the Hispanic female who adulterated the drink the same day and had the same worker make a drink for the plaintiff. Approximately a few days after the plaintiff received the free drink, Annie Lee was served a subpoena for the video footage and for the three employees who made drinks for her. When the plaintiff returned to order a drink, an employee named Aaron said, "The manager said she can't serve you anymore drinks.". The plaintiff realized that the manager was lying about providing the video for the plaintiff. When the plaintiff returned to meet and confer regarding the video, she was very defensive and said "Have your lawyer call me and I will have them talk to my lawyer." The plaintiff stated, "Who is your lawyer?" Annie Lee refused to tell the plaintiff and said "I want you to leave." Annie Lee refused to meet and confer nor would she provide the name of her attorney.

48. SHARETEA

The plaintiff was a customer of Sharetea and one day after discussing the poisoning of the plaintiff's drinks at another location, the manager/owner, Jason stated that "If they are doing that, they are probably doing much worse things." He also said previously that all of his cameras can hear audio and video. He continued to state that if he knew an employee was doing something like poisoning an individual, he wouldn't provide the video because it's "his video and he owns it". He also said, how can you prove someone put something in your drink? The plaintiff said, "Because the person can feel if it is drugged from the side effects."Then after Jason, the owner of Sharetea gave the plaintiff her drink he asked "How do you feel?" The plaintiff believes he purposely adulterated the drink because the plaintiff started to feel the effects of the drink soon after. Sharetea was also served a subpoena for video footage and employee records. The defendant has not complied or communicated with the plaintiff. The

108

COMPLAINT

plaintiff also recalls around 2020 when the defendant took an unauthorized video of her in his business wearing a maroon shirt that had a logo that changed print when moved in a certain direction. It is believed that the manager is also in the RICO enterprise of attempting to extort the plaintiff to do "obscene matters" for money.

AIRLINES: DELTA AIR LINES, JET BLUE, AMERICAN AIRLIENS

The plaintiff also experienced the same issues regarding adulterated foods and also premise liability. The plaintiff was injured from various adulterated foods consumed on the planes served by flight attendants in the same manner that the food services entities provided. Also on Delta Airlines it is believed that a flight attendant stole legal documents regarding probate cases because a flight attendant suspiciously asked if the plaintiff was going to go to sleep and the next day after waking up the next morning, she found that her documents were stolen out of her bag which was above her. The plaintiff already had the airlines served subpoenas for video footage but the entities have not produced any. The plaintiff also believes that the entities CT Corp and CSC Lawyers incorporating service are altering the documents by destroying notice to consumer papers served upon them in order to delay or obstruct a legal process (obstruction of justice, fraudulent concealment, tampering with a witness).

ARCADIA POLICE DEPARTMENT: NEGLIGENCE, VIOLATION OF PLAINTIFF'S 14TH AMENDMENT RIGHT TO DUE PROCESS, FRAUDULENT MISREPRESENTATION POLICE REPORTS, FRAUDULENT CONCEALMENT, ADULT ELDER ABUSE

49. On October 14, 2017, the plaintiff's brother came to the residence of Ming Mei Lai and Tai M. Lai in the afternoon. The plaintiff had an argument with her brother because he did not help regarding their mother's poor driving. Ming knocked down a brick wall at 22 W. Magna Vista Avenue Arcadia, CA 91007 and Kristen Lai wanted Jim Lai to tell her to the stop driving late

COMPLAINT

at night. Instead of speaking to his mother about the incident, he started to batter the plaintiff. After he battered the plaintiff, she called the Arcadia Police Department. Three officers that arrived to the scene were John Bonomo, Adam Hernandez and Mario Castro. By the time the officers arrived, Jim already left. After the plaintiff told the officers that her brother hit her multiple times. She also said that she wanted to press charges and she wanted a restraining order against Jim Lai. Officer Bonomo did not examine the plaintiff or take pictures of injuries, he just asked if the suspect, Jim Lai was still there and the plaintiff said no. Then he said well he's gone, there's nothing we can do about it. The other two officers Hernandez and Castro stated that since Jim Lai lived in another city, he is no longer at the scene, that was out of their jurisdiction and they can't do anything about that. None of the police officers took any pictures of the plaintiff's injuries or write a report about the incident. The three police officers failed to write a report about the incident as required when a victim is battered and didn't follow up with the respective law enforcement agency in Jim Lai's jurisdiction to be interviewed. Officer Bonomo, Castro and Hernandez violated the plaintiff's constitutional rights by depriving the plaintiff of the right to due process, equal protection under the law and right to be free from discriminatory action. Officer Bonomo, Hernandez and Castro discriminated against the plaintiff by not providing equal protection under the law by refusing to write a report regarding the battery, taking pictures and denying the plaintiff a restraining order after a battery occurred and failed to provide due process under the 14th amendment. Officer Hernandez and Castro were both smiling snickering as if they found the incident funny. There was only an incident report regarding the battery because she called 911. A few days later, the plaintiff went to the police station and spoke with officer John Bonomo in an interview room and asked for the "police report". He stated he didn't write one and it wasn't

110

COMPLAINT

necessary to write any documentation since there was no injury. She told the plaintiff she needed a police report to sue her brother and she wanted a restraining order. Officer Bonomo said there has to be "proof" of an injury in order to get a restraining order. He also said that since the plaintiff stays with her parents, it would infringe on the rights of her brother since he wouldn't be able to see his parents and that was the reason why the plaintiff can't get a restraining order. The plaintiff said, "What about my rights to be protected?" The plaintiff said she wanted to press charges against her brother because of the battery but officer John Bonomo said there was no evidence of any injury and you need to have evidence of an injury to press charges.

50. A few years later on December 10, 2020, Jim Lai went to the residence of Ming Mei Lai and Tai M. Lai and battered the plaintiff again. The battery was so severe that the plaintiff went to the ER to get examined due to the immense pain in her ribs. Jim Lai punched the plaintiff multiple times in the ribs with excessive force. The officer Miguel Marquez came to the scene and took pictures and wrote a report. The plaintiff went to Huntington Hospital to get Xrays of the ribs due to the immense pain. There is evidence in which another defendant (Huntington Hospital) is concealing one of the Xrays of the plaintiff's ribs which shows a detailed picture of the injured location. This is addressed later. The plaintiff went to the ER for documentation because she remembered that officer Bonomo said that she had to have "evidence" of an injury to get a restraining order. The plaintiff went to get the evidence at Huntington Hospital, however the defendant, Huntington Hospital is concealing the plaintiff's medical records to prove that an injury was sustained. The provider, Richard Ramos, P.A., also falsified a document by claiming that the plaintiff didn't want an xray of the ribs when the plaintiff went to the ER for the purpose of getting an Xray of the ribs. It is believed that the three officers,

111

COMPLAINT

Adam Hernandez, Mario Castro and John Bonomo refused to document the incident to allow the abuse of the plaintiff because the goal of the enterprise was to harm the plaintiff and her parents to further the agenda of the premeditated wrongful death of the decedent. Issuing a restraining order against her brother would hinder those efforts since these three officers condoned the violence of Jim Lai against plaintiff Kristen Lai.

This was not the only incident that the Arcadia Police Department which furthered the agenda of the enterprise (RICO). On June 21, 2021, an elder abuse report was made and the Arcadia Police Department was called. Two officers arrived but the plaintiff recalls that the individual who wrote the report was Jose Robles. It is believed the other officer was officer Munguia. Officer Robles interviewed the plaintiff and her mother and told both of the individuals he was there to investigate an elder abuse allegation. He spoke to the plaintiff and she told him that her mother abandons and leaves her father. She doesn't care for him and refuses to pay for a caregiver to provide help for her father. The plaintiff's mother started to say nonsensical things which had nothing to do with the subject regarding the plaintiff's purchases of "expensive purses". The plaintiff discovered in a motion to compel elder abuse records that officer Jose Robles filed a false police report regarding the incidents. He wrote many fraudulent events regarding statements the plaintiff and her mother said. He claimed that the plaintiff stated that she wanted her father to go to a nursing home and that her mother stated her father eats sushi. He also included false facts about where the plaintiff works. This is just more evidence that the Arcadia Police Department are collaborating with Fidelity Investments regarding the same objective of sending the decedent to a nursing home. It is believed that the individuals in the enterprise wanted to send him to a nursing home to be further abused and die

112

COMPLAINT

there so they can continue to further the grand theft of Tai Lai's accounts with Ming Lai as the trustee since she is unable to withstand undue influence and fraud.

Another incident that occurred in January 2024 involved another officer named Evelyn Calderon. The plaintiff went to the Arcadia Police Department around January 22, 2024 in the afternoon to inquire about the Adult Protective Services Report that was made on June 21, 2021 involving officer Robles. When questioned, Officer Calderon stated there was no report was made on that date at the house of 2531 Louise Avenue for Tai Lai and she failed to provide an incident number. Officer Calderon was told again that someone indeed came to the house and that officer Robles came to the house at 2531 Louise Avenue, Arcadia, CA 91006 and did an investigation in approximately June 2021. The only thing officer Calderon did was to provide a pink post it note that stated the date and time of the incident instead of providing the full incident number with call for service with the names of the officers that did the investigation. It was only when the plaintiff subpoenaed the APS records from the Arcadia Police Department that she found that there was a report written by Officer Robles that false information was included in the report. Officer Calderon was purposely concealing the record because she didn't want any evidence of an incident that would hinder the conservatorship of Tai M. Lai by Ming Mei Lai to put him into a nursing home and she didn't want the plaintiff to dispute the allegations that Officer Robles made.

Other accounts of elder abuse and violation of the decedent's 14th amendment rights for due process by Arcadia Police Department involved another officer Dylan Morrill. On April 22, 2024, a call was made because the plaintiff couldn't find her father and she called in for a missing person's report. She remembers that her brother took her father the evening before to prevent her father from going to court. Tai Lai was taken to the emergency room twice

113

COMPLAINT

because he was not feeling well and very sick. She believes now that he was poisoned by one of the caregivers that worked for the family. At first, officer Christopher Tsai arrived and briefly spoke to the plaintiff but then officer Dylan arrived approximately 3-5 minutes later. Officer Dylan started to ask questions and the plaintiff said that she couldn't find her father and that he was very sick. He needed medical treatment and needed to rest at home. The plaintiff said she wanted to get a restraining order against her mother for her father because her father was being neglected by her mother. Officer Morrill said, "You can't do that. You can't get a restraining order against a spouse." The plaintiff said, "Are you joking? You're telling me that if a wife is being beaten by her husband, you can't get a restraining order against him?" It was apparent that officer Morrill was part of the enterprise in perpetuating the elder abuse of Tai Lai and asserting misinformation for the purpose of leaving the decedent open to further abuse and lack of protection. He said, "Well he's (Tai Lai) with your brother and mother, that's not a missing persons report." Officer Tsai said for the plaintiff to call both her brother and mother and she did but nobody answered. Then officer Tsai said try calling 211. The plaintiff did and left a report to APS leaving an elder abuse claim about Ming Lai and Jim Lai regarding the decedent's lack of care and being missing. She received an email regarding the call. Officer Dylan Morrill state false information to the plaintiff regarding restraining orders, denied a restraining order that was requested and refused to properly investigate the elder abuse of Tai Lai because his goal was to ensure that the decedent be further abused and sent to a nursing home to die. Approximately 2 hours later, the plaintiff discovered that Tai Lai was sent to University of Southern California Arcadia hospital because he wasn't properly cared for by Ming Lai and Jim Lai.

114

COMPLAINT

Despite calling 211 on April 22, 2024 and leaving a message reporting an elder abuse case, no one from Adult Protective Services or the Arcadia Police Department called the plaintiff regarding the incident until sometimes in June 2024. The plaintiff believes that this was due to Other occasions of corruption and common goals of the enterprise with the Arcadia Police Department include the Records Department in the Arcadia Police Department and other officers. A complaint was made regarding officers John Bonomo, Adam Hernandez, Mario Castro, Jose Robles and Dylan Morrill, Evelyn Calderon, Faviola Chaidez, Danielle Rounds and Michelle Salazar for the previous reasons stated. The complaint regarding Faviola Chaidez, Danielle Rounds and Michelle Salazar were incidents of concealing true records for incident numbers. Rather than providing the corresponding incidents and reports to the requests for subpoenaed records, Danielle Rounds and Faviola Chaidez did not provide the accurate and true records despite claiming to do so under oath. The records they produced were elder abuse allegations against the plaintiff rather than the Arcadia Police Officers that the complaints were made. Officer Kollin Ciealdo took over a year to investigate these complaints and did not get back to the plaintiff until recently when the plaintiff made another complaint in which he did not respond to either. Officer Kollin Ciealdo is another officer who is part of the enterprise to conceal and condone the elder abuse and premeditated wrongful death of Tai Lai by the officers in the Arcadia Police Station. Another complaint that was made was regarding an employee named Michelle Salazar who was asked about an incident report that involved Ming Mei Lai on February 8, 2023. Michelle Salazar was asked regarding this incident which involved Ming Mei Lai and a car accident on that day with an individual named Roxanna Felix Ruiz. Michelle Salazar stated there was no record of this accident. Officer Kollin Ciealdo was given these complaints regarding all of the employees of the

115

COMPLAINT

Arcadia Police Department and he stated in writing (email) that there was no "wrongdoing". The plaintiff is unsure how Officer Ciealdo did his investigation because he never contacted the plaintiff to question her or her mother regarding the accusations for any investigation. In order to do a complete investigation, all parties need to be interviewed. There is clear and convincing evidence that there is blatant discrimination and bias regarding the investigations by Captain Kollin Ciealdo. It is just believed that Captain Ciealdo is only protecting the corrupt officers and their conduct. He was also given a written complaint regarding business that were intentionally food poisoning the plaintiff in the city of Arcadia but in an email he just repeated that the plaintiff should file another written complaint. The plaintiff didn't find that filing another complaint would do any good if the detectives who are supervising the police department are corrupt and part of the enterprise themselves, it is believed that Mario Castro is the head of the detectives and since this officer failed to investigate a battery, it is unlikely that he will serve the interests to protect the safety of the plaintiff. It is also believed that the food service businesses are involved in the goals to poison the plaintiff and her parents. Officer Ciealdo is aware of a group of individuals who are related to other police officer in an insurance fraud scam against the plaintiff's mother. The plaintiff emailed officer Ciealdo regarding a redacted police report provided by Jennifer Brown Gomez about an incident report that involved Ming Mei Lai on February 8, 2023 for a car accident at the intersection of Baldwin and Huntington Drive. The person who was involved, Roxanna Felix Ruiz, claimed that Ming Mei Lai hit her but Ming Mei Lai reported that Roxanna Ruiz hit her car. According to officer Ciealdo, he stated that the report that the plaintiff received in an email was redacted for the "safety" of the individual reporting the incident. In Officer Ciealdo's email, he made it appear as if it was the other party, Roxanna Felix Ruiz was the one who reported the incident.

116

COMPLAINT

It was the plaintiff's mother who called the police since Ruiz is the one who hit her. This is because officer Ciealdo is aware of the insurance fraud scam against my Ming Lai and is trying to cover it up. The plaintiff's mother stated that Ruiz begged her not to call the police but Ming Lai called them. The plaintiff's mother didn't understand why Ms. Ruiz filed a lawsuit after 2 years and why she didn't bring it to her immediate attention. The plaintiff tried to explain to her that Roxanna Ruiz wanted to wait almost 2 years to increase her "profit" from the scam to claim she had many injuries when in fact, she didn't have any as the police incident report states. The plaintiff's mother kept on forgetting that Ms. Ruiz even filed a complaint against her. Officer Ciealdo also stated in the email that there were **no injuries according to the incident number**. It is also stated in the incident report at the top right. However, Roxanna Felix Ruiz filed a unlimited complaint against the plaintiff's mother for over $80,000 in May 2025. In the end, the Ms. Ruiz settled with the Ming Lai's insurance company, State Farm, for $17,000. It is assumed that she settled since the plaintiff filed an answer to her complaint under the power of attorney for Ming Mei Lai and requested interrogatories regarding the incident and her injuries. State Farm failed to properly investigate the claim and paid Ruiz (this incident is also mentioned later).

The plaintiff also filed a complaint in writing with the Arcadia Police Department regarding poisoning incidents at various food service establishments and Captain Ciealdo asked for the plaintiff to file a "complaint". The plaintiff at this point believes that Captain Ciealdo is refusing to provide equal protection under the 14th amendment of the U.S. Constitution and violating the plaintiff's constitutional rights by failing to follow through with equal protection under the law regarding all of her complaints (obstruction of justice, fraudulent concealment of the illegal acts that other individuals in the RICO enterprise are

117

COMPLAINT

committing, concealment to further the objectives of the enterprise). Since Captain Ciealdo claims that the officers in the Arcadia Police Department have committed no "wrong-doing", it is easy to assume that he would not investigate and other claims that the plaintiff is requesting failing to provide equal protection under the 14th amendment. Despite filing a complaint in writing regarding these poisoning events from various food services businesses, he did not follow through and stated that the plaintiff should write a "formal" complaint. This shall be the formal complaint.

STATE FARM (Mail & Wire Fraud 18 U.S.C. §§ 1341, 1343 Interstate Commerce Fraud 18 U.S.C. § 1033)

Not only were the Arcadia Police Department trying to conceal the evidence of the "no injury report" and who was the person who called into the Arcadia Police Department on February 8, 2023 but employees at State Farm also collaborated with the scheme. They did not want to produce subpoenaed records regarding any car accident "investigations" for claims regarding Ming Mei Lai's insurance policy. Roxanna Felix Ruiz already admitted that there was no bodily injury in the police incident report but later went to a chiropractor and pain specialist doctor to get "treated" for her injuries and waited almost 2 years to file a lawsuit against Ming Lai. Ms. Ruiz maliciously prosecuted Ming Mei Lai which caused her emotional distress due to a false claim. The defendant Roxanna Felix Ruiz purposely hit Ming Mei Lai's vehicle to make a fraudulent insurance claim against Ming Mei Lai's insurance with the cooperation of employees at Ming Mei Lai's insurance, State Farm. The plaintiff discovered during the litigation against Ming Lai by Roxanna Ruiz that the car Ms. Ruiz was driving did not have any active insurance policy during the accident she caused and she did not even own the car she was driving. It is believed that Roxana Felix Ruiz hit Ming Mei Lai's vehicle on the back

118

COMPLAINT

bumper making a left turn onto Baldwin Avenue. The police arrived to the scene because Ming Mei Lai called 911 and Arcadia PD saw that there was no bodily injury which was included in the incident report. This was plan was premeditated and Ms. Ruiz waited almost 2 years to file a claim even though it was already decided that each of the drivers were responsible for their own car damage when the incident occurred according to State Farm. With the legal counsel of Jeffrey Carson, employees at State Farm, Janny Huang and Kristen Yee decided they would pay Ms. Ruiz for her fraudulent claim without any investigation. The plaintiff filed an answer regarding Ms. Ruiz's complaint at the Glendale Courthouse at 600 E. Broadway, Glendale, CA but Ms. Ruiz withdrew her complaint with prejudice and accepted a settlement. It is believed she did that because the plaintiff filed an answer and asked Ruiz to answer interrogatories which included incidents of the accident and her medical records for her injuries. Kristen Yee claimed that they just wanted to pay her rather than go through a trial. The plaintiff also received a letter from attorney, Jeffrey Carson who was supposed to be the "attorney" for the insured. He claimed he was the "attorney" for State Farm but not Ming Mei Lai and State Farm can settle without the consent of the insured. State Farm did not use good faith and due process in regards to the claims that were made against Ming Lai. When Mr. Carson was asked whether he received the police report regarding the accident via email, he did not respond. They received a subpoena from the plaintiff regarding records from the investigation for the accident on February 8, 2023 but since they settled and paid Ms. Ruiz $17,000, they didn't have to provide the records, **until now (because the plaintiff is filing a complaint against State Farm, Roxanna Felix Ruiz and attorney Jeffrey Carson)**. Kristen Yee, manager handling the claim for Ruiz stated that Ming Lai's insurance would not go up. All of the claims adjusters appear to reside in Arizona.

119

COMPLAINT

The plaintiff believes a related incident which occurred on April 7, 2025 in which Ming Lai had another car accident, provided the "excuse" to increase Ming Lai's premiums through a second insurance fraud to off set the costs of the fraudulent pay out to Roxanna Felix Ruiz. On April 7, 2025, Ming Lai had a car accident on Duarte and Highland in the city of Duarte. In this incident, her car flipped over from a parking lot area onto the sidewalk. Someone apparently called 911 and reported an incident of a female (Ming Lai) allegedly "running" from the scene. Ming Mei Lai was stuck in her car because her seat belt was fastened and she could not get out. The Los Angeles County Sheriff Department responded and helped Ming Lai out of her vehicle. The person who called 911 was involved in the fraudulent "hit and run". The plaintiff believes that this was also an attempt on her life and to send her to the hospital to be medically assaulted as her father to die from lack of proper care which occurred with Tai Lai. Two deputies helped get her out of the car and told her she had to go to the hospital. She stated that she didn't want to go to the hospital because she felt fine and she wanted to go home. The plaintiff's mother told her that a deputy took her in a green vehicle and accompanied her to the hospital. The plaintiff called her mother on her cell phone and spoke to the deputy who met her at Foothill Presbyterian in Glendora, California. The deputy at the hospital told her that allegedly her mother hit a parked car and reversed and her car flipped over. The incident report states that she and another party exchanged insurance information. The plaintiff also discovered that the Los Angeles Fire Department was at the scene as well and one of the captains named Smith documented in a report that Ming Mei Lai accidently "hit the gas" and hit a car in the parking lot and reversed and flipped her car over. When the plaintiff asked what happened she denied hitting any parked car or any car at all nor seeing anyone at the scene. She denies hitting the gas petal and denies telling anyone that she

120

COMPLAINT

hit anything. She also denies seeing anyone at the scene. This was also a collaborative effort on the LA Sheriff and Fire Department in the goal to defraud Ming Mei Lai through an insurance scam as well. It is believed these individuals were hoping Ming dies in the hospital as her husband did. She did not want to go to the hospital but the LA Sheriff Deputies insisted and forced her to go. They even took her into a sheriff vehicle instead of an ambulance. I asked my mother whether she went into an ambulance and she said no. She went inside a green "truck" with the "police". Ming Lai stated that if she hit someone they would have stayed and spoke to her but they didn't since she was already escorted quickly with the deputy to the hospital. The plaintiff also had other records from the 911 calls requested and a deputy is heard requesting for the scene to be "staged". So that is clear and convincing evidence that the LA County law enforcement, fire department and State Farm Insurance with the advice of legal counsel, Jeffrey Carson that they were in a conspiracy together due to the fraudulent documentation that was documented. It is beyond a reasonable doubt that the accident was planned and premeditated for fraudulent purposes. It is also beyond a reasonable doubt that they were in a common goal to cover up the truth that Ming Lai did not hit any other cars because the evidence from the damage on the car does not show the claims that the Deputies and Captain of the fire department state. Ming Lai told the plaintiff that she went into a parking lot and then her car slowly stopped and then her car just spontaneously flipped over and nobody was around. Ming Lai denies hitting anyone and she also claims nobody hit her, she believes the car flipped over by itself. The plaintiff went to investigate with her mother at the storage lot where the car was being held and took videos and pictures of the car. There was no front end damage, the air bags in the front did not deploy on either side of the car, and there was substantial rear end damage. State Farm emailed the plaintiff to her email address

121

COMPLAINT

regarding the accident and the plaintiff was unsure how they knew the plaintiff's email and why they were not mailing the information regarding the accident directly to Ming Lai since it is a violation of her privacy. Ming Lai also was very angry because she stated, "Why am I not being mailed any of the insurance information for the accident?" The plaintiff only received a few letters in the mail regarding the accident but the majority of letters and correspondence was through email to the plaintiff. (mail fraud and wire fraud, multiple correspondence, pattern of rackateering).The plaintiff also found it suspicious that almost immediately after, State Farm emailed her regarding medical claims when nobody informed State Farm of any injuries. State Farm employee, Jeanie Wu called Ming Lai along with claims specialist Benjamin Rodriguez. Ming Lai told the plaintiff Jennie Wu stated that someone "saw" Ming Lai hit another car. Ming Lai said "Tell me who?!?" Ming Lai stated that after she demanded that Jennie Wu tell her who was the witness, Jennie Wu said "Never mind.". The plaintiff also spoke to Jennie Wu, Benjamin Rodriguez, Rose Situ and Justin Turley regarding the accident. State Farm agent Joseph Tseng also left a message regarding Ming Lai's accident on the plaintiff's phone requesting that the plaintiff "help her mother", regarding the accident. The plaintiff was already angry that at Lynn Wen State Farm Lynn agency, insurance agent, Joseph Tseng refused to change the vehicle insurance for herself (Kristen Lai) despite being called and emailed multiple times. She also recalls Rose Situ refusing to pay out another claim for the plaintiff regarding an accident concerning parking (insurance fraud). Plaintiff realized later that Joseph Tseng was hoping that the plaintiff would get into a car accident and not be insured causing financial trouble for the plaintiff. All of the agents, Joesph Tseng, Jennie Wu, Benjamin Rodriguez, Rose Situ and Justin Turley and other claims specialists already violated the privacy of Ming Mei Lai by emailing and calling the plaintiff without the insured's

122

COMPLAINT

consent. Jennie Wu and Justin Turley called the plaintiff regarding a subpoena that was served upon State Farm. Jeannie Wu left messages in Chinese and the plaintiff couldn't understand what she was saying since the plaintiff doesn't speak Chinese. The plaintiff called back Jeannie Wu and spoke in English. Jeanie Wu didn't seem to understand still despite the plaintiff speaking in English and the plaintiff told Jeannie Wu that the subpoena that was served was requesting information regarding the investigation of the accident. Justin Turley stated he would not comply with the subpoena that was served to State Farm and that the subpoena had to be sent to a P.O. Box in Arizona. The plaintiff also was told by Justin Turley in or around April 2025 and he stated that a claim was made against Ming Lai's insurance by a person named Syed Tirmizi an alleged employee of 7-Eleven and his parked car was hit by Ming Lai on April 7, 2025. The plaintiff also asked information regarding the so-called "investigation" of Ming Lai's accident and that she had hit a car. The plaintiff asked how did they arrive to the conclusion that Ming Lai hit this individual's car? They could not explain why and couldn't provide any factual proof such as video footage or other independent eye witnesses besides the so called "claimant". The plaintiff asked why did the claims specialist, Dariel Rodriguez, Rose Situ, Jeanie Wu, Justin Turley just take the "word" of the other party (Syed Tirmizi) rather than the insured. The plaintiff spoke to Jeannie Wu, Justin Turley and Rose Situ regarding the accident and all of them just stated that they took "the word" of the other claimant as the "truth" but had no factual evidence of the incident. This is just heresay the plaintiff stated. Also Dariel Rodriguez, the claims specialist when attempting to speak to Ming Lai and the plaintiff regarding the payment for the totaled car belonging to the insured (Ming Lai), he tried to "low ball" the cost of the car to pay a lower amount than fair. The adjustors/claims specialists above claimed they have an investigation file with pictures and

123

COMPLAINT

documentation but they refused to provide that to the plaintiff and her mother. Based upon the interaction that Jeannie Wu and Rose Situ had with the plaintiff and her mother, she believes that Jeannie Wu or Rose Situ decided to change the investigation claim of the alleged person named "Syed Tirmizi" to a different cause. One of the claims specialist (believed Rose Situ or Jeanie Wu) wrote in an email stating that Ming Lai didn't "control the car" and that she is more than 50% at fault. This way they were able to fraudulently increase the insurance of Ming Lai in order to off set the fraudulent claim by Roxanna Felix Ruiz (common goal to defraud Ming Lai through collection of "unlawful" debt). The evidence shows from the damage of Ming Lai's vehicle shows only a rear end collision due to the dent in the rear bumper and no evidence of front end collision since there front had no dents and the drivers side air bag nor did the front passenger side air bag deploy. Basically one could come to a logical conclusion that Ming Lai was rear ended.

### FIRST CAUSE OF ACTION

**51. PREMEDITATED WRONGFUL DEATH CCP § 337.60**

Defendants: Huntington Hospital, Sunrise Hospital, University of Southern California Hospital Arcadia, St. Vincent Hospice & General Care Group Inc., Arcadia Police Department & Aging and Disabilities Adult Protective Services.

Once the decedent was admitted into the hospital and hospice services, the defendant had a duty of care for the decedent. They had a duty to provide standard of care and treat the decedent with appropriate guidelines using appropriate screening methods, ensuring patient rights, due process, duty to prevent harm or injury to the decedent once the patient was admitted under their care. They fell below that standard and breached their duty. Each of the defendants knew the perils posed to DECEDENT for their failures to comply with their duties of care which a reasonably

124

COMPLAINT

prudent hospital operator, physician, social worker, nurse, ethicist, risk management, bioethics director, or other healthcare administrator would use. During the period of their care of decedent, each of the DEFENDANTS knew or should have known that the perils posed by their failure to comply with their standards of care to provide care which a reasonably prudent hospital operator, physician, social worker, ethicist, nurse, bioethics director, risk management or other health care provider or administrator would use, exposed DECEDENT to the high probability of his injuries and death. The defendants intentionally discarded the standards of care because they had malicious, oppressive and reckless intent to purposefully misdiagnose Tai M. Lai with metastatic cancer (RICO predicate acts: premeditated murder/wrongful death with a common goal), refuse food and purposefully prohibited his caregiver/daughter from making healthcare decisions for the decedent with the goal to end his life. Due to the breach of duty and lack of standard of care, the defendant caused the wrongful death of Tai M. Lai by not properly diagnosing him with eustachian tube dysfunction and failure to thrive due to impaired swallowing ability and over sedation. The defendants should have performed nasal suctioning and a feeding tube for the decedent but instead they intentionally and fraudulently diagnosed decedent with metastatic prostate cancer and placed him on hospice rather than providing appropriate standard of care. General Care Group Inc. had a duty to consult a specialist or refer patient rather than just accept the patient on hospice because they did not have enough information to constitute a diagnosis of less than 6 months to live by an oncologist. Failure to do so constitutes malpractice unless the doctor conformed to the standard of a specialist. Sinz v Owens (1949) 33 C2d 749, 758. General Care Group also had a duty to continue hospitalization. It is professional negligence for a doctor to fail to hospitalize a patient under circumstances in which standard practice dictates hospitalization. Armstrong v Svoboda (1966) 240 CA 2nd 472.Because the defendant breached their duty of care, the decedent lost his life

125

COMPLAINT

due to lack of appropriate medical care. The damages for wrongful death are loss of society, comfort, care, companionship and consortium of the decedent. The damages also include funeral and burial expenses. In the survival action, pre-death pain and suffering from of the decedent are damages being sought as well as medical bills incurred before the passing of the decedent.

52. **SECOND CAUSE OF ACTION: CIVIL & CRIMINAL 18 U.S.C. §§1961-1968**

**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)**

Plaintiff asserts a claim against all of the defendants: Arcadia Police Department, Adult Protective Services, Fidelity Investments, JP Morgan Chase Bank, Citibank, First Bank, First Light Caregiver Services, LA CareNet, 1Heart Caregiver Services, Care Specialist Inc., St. Vincent's Hospice Services, General Care Group Inc., Huntington Hospital, New York Presbyterian Hospital, University of Southern California, Garfield Hospital, Sunrise Hospital and all of the food service defendants, all Offices of Dr. Liao, Dr. An, Dr. Liu, Dr. Yip, Dr. Hung, accountant, Norman Wong CPA, Fed Ex Corp., CT Corp, CSC Lawyers Incorporating Service, Transwestern Property Co. West LLC, Nabeela Anwar & Spencer Wilson, Med West Realty, Bryan McKenney, Jose Alvarez: Getem Process Servers, Remax, Cloudflare, Verizon Wireless, Getem Process Servers, Jose Alvarez, Statefarm, Roxanna Felix Ruiz and all food service businesses and airlines for allegedly violating the Racketeering Influenced and Corrupt Organizations Act, commonly known as RICO. Kristen Lai specifically claims that all of the defendants violated section 1962(a) of RICO. These defendants derived income either directly or indirectly, from a pattern of racketeering activity. These defendants participated as a principal in the pattern of racketeering activity. Part of that income, or proceeds of that income, was used to acquire or maintain an interest in, or to operate an enterprise. The enterprise engaged in, or had some effect on, interstate or foreign commerce. As stated already in the statement of facts, the defendants received or obtained money, either

126

COMPLAINT

indirectly or directly from a pattern of racketeering activity. The activity was already described as derived from insurance fraud (Medicare and car insurance more than one time, causing a pattern of conduct, financial elder abuse, money making schemes to believed to be connect with trust property for production of videos of an "obscene matter" and eventual extortion of plaintiff to work for the enterprise in that field or in order to get employment). It is also believed that there is a connection to the real property of the Tai M. Lai and Ming Mei Lai trust through illegal surveillance, the enterprise also obtained profits from the sale and fraudulent sale of property belonging to the Tai M. Lai and Ming Mei Lai trust. It is believed that the property is used for profit from "obscene matters" using blackmail of various "victims". The acts in the statement of facts include multiple predicate acts by the enterprise of individuals which includes: extortion, kidnapping, murder, mail fraud, wire fraud, interstate transportation of stolen property (grand theft),

PREDICATE ACT RICO ACT A. KIDNAPPING: SUNRISE HOSPITAL & HUNTINGTON HOSPITAL

The tort of false imprisonment is "the unlawful violation of the personal liberty of another". Asgari v City of Los Angeles (1997) 15 C4th 744, 757. The hospital had a duty to allow the patient the right to freely move in and out of the facility according to patient rights. Kidnapping is the unlawful seizure and movement of the victim. Huntington Hospital breached their duty by confining the decedent and even performed surgical intervention on him during that time and moved him to another location to perform the procedure which constitutes kidnapping. The decedent was last seen in an ER patient room and in order to perform a surgical procedure, the patient had to be moved to a sterile room to satisfy the sterile requirement. The movement and confinement of the patient falls under the definition of kidnapping. Tai Lai was moved at

127

COMPLAINT

Sunrise Hospital in attempts to prevent the plaintiff from participating in his care as a power of attorney. This constitutes kidnapping, movement from one place to another, unlawful seizure and movement of the victim.

**THIRD CAUSE OF ACTION: FEDERAL CONSPIRACY**

All the defendants for the second cause of action are included in the Third cause of action since each of the parties made an agreement to commit illegal acts with a common goal for the enterprise.

**FOURTH CAUSE OF ACTION: VIOLATION 42 CFR § 482.13 PATIENT RIGHTS, CONFIDENTIALITY, DUE PROCESS, INFORMED CONSENT, FAILURE TO COMPLY WITH LEGITAMATE DISCOVERY REQUESTS**

**FOURTH CAUSE OF ACTION: DENIAL OF PATIENT RIGHTS CODE OF FEDERAL REGULATIONS TITLE 42 CHAPTER IV §482.13** Condition of participation: Patient rights.

Defendants: Huntington Hospital, USC Arcadia Hospital, Sunrise Hospital, Garfield Hospital, Office of Monty Polonsky, Office of Arthur An, Office of June Chih Jesse Liu, Office of Monty Polonsky

The defendants had a duty to protect and promote each patient's rights. The defendants breached that duty by:

1. Not informing the patient of the patient's rights or patient representative (the plaintiff or decedent's spouse), in advance of furnishing or discontinuing patient care. New York Presbyterian Hospital, USC Arcadia Hospital, Sunrise Hospital, Huntington Hospital, St. Vincent Hospice Services, General Care Group Inc.

128

COMPLAINT

2. The defendant did not establish a process for prompt resolution of patient grievances and did not inform each patient whom to contact to file a grievance. New York Presbyterian Hospital, USC Arcadia Hospital, Huntington Hospital, Sunrise Hospital, Garfield Hospital.

3. The defendant did not allow the patient the right to participate in the development and implementation of his or her plan of care: Huntington Hospital, USC Arcadia Hospital, Sunrise Hospital, New York Presbyterian Hospital, Garfield Hospital.

4. The defendant did not allow the patient representative (as allowed under State law) the right to make informed decisions regarding his or her care. The patient right's include being informed of his or her health status, being involved in care planning and treatment, and being able to request or refuse treatment. The right must be not construed as a mechanism to demand the provision of treatment or services deemed medically unnecessary or inappropriate. New York Presbyterian Hospital, Garfield Hospital, Sunrise Hospital, USC Arcadia Hospital, Huntington Hospital, St. Vincent's Hospice Services, General Care Group Inc.

5. The defendant breached their duty to the patient's right to personal privacy: Huntington Hospital, Arcadia USC Hospital, Garfield Hospital.

6. The defendant breached their duty to provide the patient the right to receive care in a safe setting: Huntington Hospital, USC Arcadia Hospital, New York Presbyterian Hospital, Sunrise Hospital.

7. The defendant breached their duty to provide the right to be free from all forms of abuse or harassment. New York Presbyterian Hospital, Sunrise Hospital, USC Arcadia Hospital, Huntington Hospital.

129

COMPLAINT

8. The defendant breach their duty to provide the right to confidentiality of his or her clinical records.

9. The defendant breached their duty to provide the patient's right to access their medical records, including current medical records, upon an oral or written request, in the form and format requested by the individual, if it is readily producible in such form and format (including an electronic form or format when such medical records are maintained electronically); or, if not, in a readable hard copy form or such other form and format as agreed to by the facility and the individual, and within a reasonable time frame. The hospital must not frustrate legitimate efforts of individuals to gain access to their own medical records and must actively seek to meet these requests as quickly as its record keeping system permits.: Huntington Hospital & University of Southern California

FAILURE TO COMPLY WITH LEGITIMATE DISCOVERY REQUESTS 45 Code of Federal Regulations § 164.510 (5)

The defendant had a duty to provide medical records to the plaintiff but failed to do so. The defendant breached their duty by refusing to provide the medical records and plaintiff believes the defendants who are denying the medical records are guilty of willful misconduct. The defendants who are denying the medical records are aware of medical documentation showing that the plaintiff was involved in the decedent's care at Huntington Hospital.

10. The defendant breached their duty to the patient's right to be free from physical or mental abuse, and corporal punishment. All patients have the right to be free from restraing and seclusion, of any form, imposed as a means of coercion, discipline, convenience, or retaliation by staff. Defendants: Huntington Hospital & Sunrise Hospital.

130

COMPLAINT

**FIFTH CAUSE OF ACTION: 18 U.S.C. §1030(g) COMPUTER FRAUD AND ABUSE ACT (CFAA)**

Defendant: Fidelity Wealth Management: Alexis Fasano, Fed Ex: Rosa Miller, Letiticia Jackson, Huntington Hospital: Angela Ortiz, Transwestern Property Co. West LLC, manager Spencer Wilson and Nabeela Anwar, Getem Process Servers (conspirator, Jose Alvarez)

The defendant had a duty to comply with Electronic Communications Privacy Act of 1986 which applies to a variety of technology and is an amendment to the Federal Wiretap Act of 1968.  Title 1 (The Wiretap Act) prohibits intentional, actual, or attempted interception, use, disclosure, or "procure[ment] [of] any other person to intercept or endeavor to intercept any wire, oral, or electronic communication."  Title 1 also prohibits illegally obtained communications to be used as evidence.

The defendants sent malicious email with links misleading the plaintiff to believe that email had contained documents for records from the defendants.  The plaintiff opened up the email and found that the links were malicious codes to lock the plaintiff out of her computer (damage).  Later the plaintiff noticed that contents of emails deleted.  The defendant breached her duty by providing fraudulent emails despite with the intent to hack into the plaintiff's computer and destroy evidence (fraudulent concealment and obstruction of justice).  The defendant breached their duty of care causing damages.  Damages were the invasion of privacy, loss of valuable information and damage to her computer.

12. **SIXTH CAUSE OF ACTION: 18 U.S.C. § 371 GENERAL CONSPIRACY TO DEFRAUD THE GOVERNMENT (MEDICARE)18 U.S.C. § 286 & 287 (C ONSPIRACY FOR CLAIMS AND FALSE CLAIMS)**

Defendants: Huntington Hospital, USC Arcadia Hospital/Pasadena, Sunrise Hospital, Garfield Hospital, New York Presbyterian Hospital, General Care Group Inc., St. Vincent Hospice Services

131

COMPLAINT

The defendants had a duty to provide standard of care. The defendants fell below the standard by fraudulently billing the the U.S. Government unnecessary services. The evidence is shown in Tai M. Lai's medical record that he did not have metastatic prostate cancer, physicians were improperly diagnosing him with this for payment or unnecessary medications which patient refused.

1. **SEVENTH CAUSE OF ACTION: VIOLATION OF ELDER ABUSE § 15610.17 CARE AND CUSTODIAN, PHYSICAL, EMOTIONAL & FINACIAL § 15657(B)**

Defendant: First Light Caregivers, 1Heart Caregiver Services, LA CareNet, Care Specialist Inc., St. Vincent Hospice Services, General Care Group Inc., Aging and Adult Protective Services & Arcadia Police Department

Under the "Elder Abuse Act" [EADACPA Welfare & Institutions Code § 15600(h)], a plaintiff is entitled to recovery attorneys' fees and certain predeath pain and suffering damages, in addition to other remedies provided by the law. A defendant must have responsibility for attending to one or more of the elder's basic needs that an able-bodied and fully competent adult would ordinarily be capable of managing without assistance. Namely these enumerated basic needs are (1) assistance with securing personal hygiene, food, clothing, or shelter. (2) assistance with securing access to healthcare (3) protection from health and safety hazards, and (4) prevention of malnutrition or dehydration. The decedent, Tai Min Lai was 65 years or older and was a "dependent" within the meaning of Welf. & Inst. Code, § 15610.23. The defendant had care or custody over the decedent. Defendant neglected decedent (abandonment). Decedent was harmed (mostly intentional harm). The defendant's conduct was a substantial factor in causing decedent's harm. Decedent injured himself and lost weight due to the acts of caregivers when decedent was in their custody (all caregiving agencies). In regards to the Arcadia Police Department and Aging and Disabilities Adult Protective Services, the two government agencies

132

COMPLAINT

had a duty to provide equal protection under the 14th amendment and due process in which the two agencies failed and intentionally neglected the decedent by failing to properly.  They also violated EADACPA Welfare & Institutions Code § 15600(h), (3) protection from health and safety hazards, and (4) prevention of malnutrition or dehydration.  By failing to provide equal protection under the 14th amendment, decedent was deprived of safety (Robles & Morrill ignored the statements the plaintiff said regarding neglect and   The Arcadia Police Department treated decedent unfairly, discriminated against him, intentionally wrote fraudulent information regarding the plaintiff and decedent for purposes of the RICO goal (premeditated murder, further the financial extortion of Tai and Ming Lai).

**FINANCIAL ELDER ABUSE WELF. & INST. CODE § 15610.30**

Defendant: Emily DeSimone, Michael Mitchell, Alexis Fasano, Benjamin Ashkinos, Anna Li, Johanes Hermanto, John Preston Turner, Lea Calara, Lynette Menjivar.

These defendants purposely defrauded the decedent by refusing to provide him his funds, and did not have authorization to take funds from his account.  These defendants also are guilty of financial abuse of Ming Mei Lai since they knew that the elder had memory issues and was unable to care for herself, took advantage of her, prevented the plaintiff from helping trustee manage her financial accounts and profited directly or indirectly from the financial elder abuse.  Defendants refused to acknowledge the power of attorney that the plaintiff provided for the purpose of furthering the goal of financial elder abuse of Ming Mei Lai.

**EIGHTH CAUSE OF ACTION: MEDICAL BATTERY**

Defendant: Huntington Hospital, Sunrise Hospital, New York Presbyterian Hospital

When the decedent was confined to the emergency room on June 28-29, 2024, he was medically battered.  He did not consent to any medications, the plaintiff as the patient representative told

133

COMPLAINT

nurse Denise not to administer the IV antibiotic and the plaintiff was harmed by the action of nurse Denise. Mount Vernon Fire Ins. Co. v Busby (2013) 219 CA 4th 876, 881. The plaintiff also believes that the decedent was also medically battered in a surgery that he did not consent to. It was observed approximately in his Medicare billing at Huntington Hospital. The case defines battery as physical contact, not necessarily body to body contact. The defendant had a duty which was to honor patient rights and the choices of the patient, they did not do that and forced the patient to comply with "their medical treatment". The treatment was unnecessary, not a life saving measure and the decedent already received multiple IV antibiotics at the previous hospital. The nurse refused to comply with the requests for the patient and in the end was harmed by unnecessary medications which affected the decedent's kidneys. The defendant made her decision with malice and harmful intent and was reckless with disregard to patient rights. A bodily contact is deemed offensive "if it offends a reasonable sense of personal dignity." Sunrise Hospital also had a duty to prevent battery by respecting patient rights. Sunrise Hospital did not even have any signed consent and decedent was medically battered with chemical restraints. Patient was harmed by chemical restraints which contributed to his death due to lack of nutrition from sedation and impaired swallowing. New York Presbyterian had a duty not to infringe on patient rights and respect wishes of patients to reject unnecessary medications such as IV antibiotics. The defendant did not respect those wishes and administered IV antibiotics and also administered them surreptitiously which damaged the patient's kidneys and also made it hard for him to recover back to baseline.

## NINETH CAUSE OF ACTION: LIBEL, SLANDER, & DEFAMATION OF CHARACTER

Defendant: Jim Lai

Defendant Jim Lai published false facts about the plaintiff which caused injury to the plaintiff

134

COMPLAINT

regarding elder abuse allegation in probate court in an objection to a petition for removal of trustee. The plaintiff suffered emotional distress from this publication and was told by various people that she would not get employment due to his allegations.

TENTH CAUSE OF ACTION: GROSS NEGLIGENCE

Defendant: Ming Mei Lai

Ming Mei Lai as trustee had a duty to be impartial to beneficiaries, she also had a duty to provide standard care when executing and signing documents. She breached that duty which caused harm to the plaintiff. She was negligent in signing papers given by beneficiary Jim Lai and cause the beneficiary to suffer emotionally and financially. Due to signing the papers which she later cancelled, she caused the plaintiff to suffer emotional suffering, lost wages and has not reimbursed plaintiff from the claim set forth more than two years for hiring a negligent and fraudulent attorney Cloyd Havens.

ELEVENTH CAUSE OF ACTION: PERSONAL INJURY

Defendants: Food service defendants, the food service businesses had a duty to provide a standard of care which included unadulterated foods. The food service businesses breached that duty which caused harm to the plaintiff. The plaintiff sustained injuries due to the food/beverages which were tainted. The plaintiff suffered pain, emotional distress, and lost wages.

WHEREFORE, PLAINTIFF prays for judgement against DEFENDANTS as follows:

1. For costs related to the litigation regarding medical records request according to proof.

2. For survival damages to heir, personal injury.

135

COMPLAINT

3.  For general, and special damages according to proof.

4.  For punitive damages according to proof.

5.  For funeral, burial costs, medical costs, pain and suffering of DECEDENT.

6.  For the loss of the care, comfort, and society of DECEDENT.

7.  For the pain and suffering of the DECEDENT.

8.  For the attorneys fees, unilaterally to PLAINTIFF.

9.  For any costs associated with the litigation.

10. For lost wages of decedent and plaintiff.

11. For costs of suit, including expert costs and prejudgment interest CC §3288.

12. For such other and further relief as the court deems just and proper which does

    not exclude further criminal charges to be prosecuted depending on the evidence

    set forth.

Plaintiffs hereby requests a bench trial on all issues raised in this complaint.

DATED: July 1,  2026

Sign: _____

Name: Kristen Lai

136

COMPLAINT